JEFFREY DEAN MOFFATT, PRIVATE ATTORNEY GENERAL, TBI, JD, MBA, BA.and LL.M (Pro Se)
1070 West Barrel Springs Road, Box 11
Palmdale, CA  93551
Email Address: jeffreydeanjustin@gmail.com
Telephone No.: (661) 435-2417


Jeffrey Dean Moffatt, Pro Se


UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>JEFFREY DEAN MOFFATT,<br><br>Defendant. | DISTRICT COURT DOCKET NO.:   2:21-cr-00335-JAK-1<br><br> SECOND AMENDED: DEFENDANT JEFFREY DEAN MOFFATT'S  SENTENCING POSITION PAPER AND OPPOSITION TO THE GOVERNMENT'S UNSIGNED POSITION PAPER IN VIOLATION OF FEDERAL RULE OF CIVIL PROCEDURE 11(A); MEMORANDUM OF POINTS AND AUTHORITIES FOR DOWNWARD DEPARTURE AND OPPOSITION TO THE PROBATION-PRETRIAL SERVICE'S RESTITUTION MODEL<br><br><br>Honorable Judge John A. Kronstadt, United States District Court Judge<br><br>SENTENCING HEARING: 6/4/2025 8:30 A.M. |

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF**


**RECORD:**

## I.    INTRODUCTORY SUMMARY & THE JUNE 4, 2026 SENTENCING HEARING

Defendant Jeffrey Dean Moffatt comes before this Court for Sentencing Hearing on June 4, 2026, facing a deeply flawed Presentence Investigation Report (PSR) compiled by Probation Officer Amber Dodson. Pursuant to 18 U.S.C. § 3553(a), this Court must impose a sentence that is "sufficient, but not greater than necessary." The Government's dramatic sentencing pivot from an offer of zero incarceration (Exhibit AA) to a demand of 18 months solely because Defendant refused to drop his underlying appeals constitutes a clear violation of Due Process. In Blackledge v. Perry, 417 U.S. 21 (1974), the United States Supreme Court held that the government cannot escalate a penalty structure to punish a defendant for exercising a statutory right to appeal, as it creates an unconstitutional chilling effect on access to the courts. This absolute structural protection is codified within the Ninth Circuit under United States v. Jenkins, 504 F.2d 1123 (9th Cir. 1974), which mandates that when the prosecution increases its carceral demand following a defendant's exercise of procedural or appellate rights, a presumption of prosecutorial vindictiveness arises that the government must overcome with clear, objective, non-retaliatory evidence. The local prosecutors fail this standard entirely.

The Probation-Pre Trial Service's requests a full Restitutionary repayment of federal representative Funds earned by Moffatt between 2016 and 2021, operating on the premise that Moffatt's Federal Limited Practice law firm administrative practice was unauthorized. This position is demonstrably false and flatly contradicted by the government's own evidentiary productions, **Exhibit N**, government's **Exhibit 137**. Pursuant to 18 U.S.C. § 3553(a), this Court must impose a sentence sufficient, but not greater than necessary, to comply with the statutory directives. A rigorous analysis of federal Social Security law, operational agency ledgers, and structural constitutional realities demonstrates that an active prison sentence is inappropriate, ungrounded in equity, and medically dangerous. Moffatt requests a downward variance to an

Offense Level 4, authorizing home confinement or probation in lieu of incarceration, or dismissing the case entirely.

Furthermore, this Court must reject the Government's position paper submitted on 5 21 2026 is technically and procedurally deficient. Under **Federal Rule of Civil Procedure 11(a)** (applied systematically to criminal filings to ensure authenticity and institutional accountability), every written motion, brief, or position paper must be formally signed by an attorney of record. A deficiently executed, unsigned, or improperly validated submission fails to demonstrate that senior Department officials have vetted this retaliatory escalation, violating Local Rules and stripping the filing of its formal legal authority. The document is not signed at the conclusion.

These collateral attacks are ongoing and in the 9th Circuit Court of Appeals in Docket 26-2839 as wells as in front of Federal District Court via Judge Fairbank.  Conservative Attorneys have been attacked by liberal State Bars nationwide, thus there is a need for Federal Case law on unconstitutionally created State Bars as well as over illegally sitting ALJ's whom staff many of these liberal Bar Associations. This Moffatt Criminal case, with what should be Constitutionally provided due process, is one of the only cases in Federal Court challenging the validity of an ALJ, as well as the corruption and cover up operation which has allowed the Arizona Discipline system to be used for the last two decades against attorneys; likely allowing both corruption, a presently illegally seated Governor, as well as rampant election fraud that is presently being investigated in Arizona by the DOJ, since Arizona attorneys were facing bar charges for their investigations into election fraud by the Arizona bar discipline system. At trial Moffatt had two AZ Senators willing to testify, as well as a member of the CIA. Because of Moffatt not knowing the criminal rules, Rule (16) these individuals were prohibited from

testifying and conveying to the Court and the Jury to the known corruption in AZ, related to

Attorney Discipline.     Dated: May 27, 2026

Respectfully submitted, /s/Jeffrey D. Moffatt

INDEX OF PARAGRAPHS AND SUBPARAGRAPHS

| Section | Page |
|---|---|
| TABLE OF CONTENTS | 4 |
| TABLE OF AUTHORITIES | 4-6 |
| LIST OF EXHIBITS | 6-7 |
| I. INTRODUCTORY SUMMARY & THE JUNE 4, 2026 SENTENCING HEARING | 7 |
| II. **Defendant moves to enforce California AB1909, California Penal Code 134, California Penal Code 128.7, and 18 U.S Code Section 2071,** | 7 |
| III.**RECALCULATING THE SYSTEMIC ERROR IN LOSS CATEGORIZATIONS UNDER USSG § 2B1.1: THE JURY'S $29,527. VERDICT VS. THE UNPLED $113,246 DISPUTE** | **8** |
| IV. THE STATUTORY CEILING ON REPRESENTATIVE FALSE STATEMENTS: SECTION 1129 OF THE SOCIAL SECURITY ACT & 42 U.S.C. § 1320a-8 | 9 |
| V. OFFSETTING THE COMPLIANCE PENALTY WITH WITHHELD FEES UNDER EXHIBIT X: COMPOUND INTEREST CALCULATION | 9 |
| VI. MEDICAL DEVIATION & THE INEFFICIENCY OF INCARCERATION FOR A TRAUMATIC BRAIN INJURY (TBI) SURVIVOR | 10 |
| VII. OBJECTION TO MENTAL HEALTH AFTERCARE RECOMMENDATION | 11 |
| VIII.**UNJUSTIFIABLE OCCUPATIONAL RESTRICTIONS & ACTIVE COLLATERAL DEFENSES** | **11** |
| IX.ACTIVE STRUCTURAL LITIGATION AND AFFECTED QUI TAM DEFENSES | 12 |
| 1. The Ninth Circuit Appeal | 12 |
| 2. The $40 Billion Qui Tam Framework | 12 |
| 3. The Administrative Reinstatement Case | 13 |
| 4. The Unconstitutional Appointment of ALJ O'Neil | 13 |
| X. MOFFATT THE VICTIM OF EXTORTION AND DISPARATE TREATMENT | 13 |
| 1. New Mexico Carlsbad Police Department Extortion Report (Exhibit T) | 14 |
| 2. New Mexico Disciplinary Board Clarification Letter (Exhibit W) | 14 |
| 3. Arizona State Bar Duty to Follow New Mexico Ruling | 14 |
| 4. Violation of Rule 58 and Selling v. Radford | 14 |
| XI. ILLEGAL AND UNCONSTITUTIONAL APPOINTMENT OF O'NEIL | 14 |
| 1. Judicial Corruption | 15 |
| 2. Exhibit A, Thomas | 15 |
| 3. Exhibit A, Thomas | 15 |
| 4. Affidavit Lisa Aubuchon | 15 |
| 5. Aubuchon | 16 |
| 6. Ed Moriarty Partner to the famous Jerry Spence, disbarred in AZ, by O'neil For representing Aubuchon | 16 |
| XII. **HISTORICAL SUPREME COURT PRECEDENT DICTATES THAT AN ADMINISTRATIVE ACTION EXECUTED BEYOND ITS INTENDED USE IS VOID AB INITIO AND CANNOT** | |

| Section | | Page |
|---|---|---|
| **SUPPORT A CONVICTION** | **17** | |
| XIII THE FEDERAL GOVERNMENT HAS BEEN AWARE OF THE CORRUPTION IN ARIZONA AND THE WEAPONIZATION OF THE AZ BAR | 18 | |
| XIV. SEVERAL REQUESTS TO THE DOJ HAVE BEEN MADE TO LOOK INTO WEAPONIZATION OF THE STATE BAR | | 18 |
| A. Timeline | | 19 |
| B. Logic Behind the Requests | | 19 |
| XV. O'NEIL'S LACK OF VALID OATH OF OFFICE | | 20 |
| XVI. THE GOVERNMENT'S SEPARATION-OF-POWERS EMBARGO AND VIOLATION OF THE JUSTICE MANUAL | 20 | |
| **A.   The Government's Trial Strategy Eviscerated Substantive Due Process by Seeking a Motion in Limine Precluding Confrontation of an Unconstitutional Predicate Adjudicator.** | **20** | |
| **B.   The Prosecution's Defiance of Centralized DOJ Policy Violates Justice Manual Guarantees and Eviscerates Criminal Materiality Under 18 U.S.C. § 1001** | **22** | |
| XVII. Newly Discovered Defect in the Indictment regarding Count Six (18 U.S.C. 1001- Violation of Criminal procedure 7(c)(1) | 23 | |
| XVIII DEFENDANT MOFFATT GIVEN 17,000 DOCUMENTS ON THE FIRST DAY OF TRIAL | 24 | |
| XIX. MOFFATT FILED A QUI TAM AGAINST SSA SHOWING $40 BILLION IN FRAUD | 24 | |
| **XX.  IBARRA FAILED TO TELL THE GRAND JURY THAT MOFFATT WAS IN AN APPEAL PERIOD, EXHIBIT N, THUS COMMITTING FRAUD ON THE COURT** | **25** | |
| XIX.CONCLUSION & PRAYER FOR VARIANCE | 27 | |
| 1.   **Unconstitutional Prosecutorial Vindictiveness:** | **28** | |
| 2.   **Manipulation of the Guidelines Grid and Double Recovery:** | **28** | |
| 3.   **Reliance on Void Administrative Predicates** | **28** | |
| 4.   **Medically Dangerous and Contraindicated Sentencing Conditions:** | **29** | |
| 5.   **Unjustifiable and Overbroad Occupational Restrictions:** | **29** | |
| 6.   **5 U.S.C.§ 3348(d)(1): An action taken by any person who is not acting in compliance with the FVRA in the performance of any function or duty of a vacant office "shall have no force or effect."** | **30** | |

2. INDEX OF CASES

| Case | | Page(s) |
|---|---|---|
| Axon Enterprise, Inc. v. FTC,598 U..S. 175(2023) | | 13,15 |
| Blackledge v. Perry     417 U.S. 21 (1974), | 2, 28 | |
| Brady violations | 18,19 | |
| United States v. Jenkins    504 F.2d 1123 (9th Cir. 1974), | 1,28 | 15 |
| Crim Mis ( in re 66 SGI 86). | | |
| Faretta v. California, 422 U.S. 806 (1975) | 25 | |
| Kungys v. United States, 485 U.S. 759 (1988) | 23 | |
| Lucia v. SEC, 585 U.S. 237 (2018) | | 13,15,23 |
| Noble, 147 U.S. 165 (1893) | 17,29 | |
| SEC v. Cochran, 598 U.S. 175 (2023) | | 15,23 |
| Siebold   100 U.S. 371 (1879 ) | 17,29 | |
| Selling v. Radford, 243 U.S. 46 (1917) | 14 | |
| Sperry v. Florida, 373 U.S. 379 (1963) | 13 | |
| United States v. Gaudin, 515 U.S. 506 (1995) | 23 | |

| Case | Page(s) |
|------|---------|
| United States v. Mendoza-Lopez, 481 U.S. 828 (1987) | 22,25 |
| United States v. Price, 566 F.3d 900 (9th Cir. 2009) | 8,25,28 |
| United States v. Reeden, 401 F.3d 1052 (9th Cir. 2005), | 12,29 |

## 3. INDEX OF STATUTES, RULES & GUIDELINES

| Authority | Page(s) |
|-----------|---------|
| **5 U.S.C.§ 3348(d)(1):** | **12,25,30** |
| **18 U.S Code Section 2071** | **7** |
| 18 U.S.C. § 3553(a) | 2,9,11,12,23,30 |
| 18 U.S.C. § 1001 | 17,22,23,24 |
| 42 U.S.C. § 406(a) | 13 |
| 42 U.S.C. § 1320a-8 (Section 1129, Social Security Act) | 9 |
| First Amendment | 20 |
| Fifth Amendment | 25 |
| Sixth Amendment | 8,25,28 |
|  | 8,9 |
| **California AB1909** | **7** |
| **California Penal Code 128.7** | **7** |
| **California Penal Code 134** | **7** |
| Federal Rule of Civil Procedure 4 | 9 |
| Federal Rule of Civil Procedure 11(a) | 3,28 |
| Federal Rule of Criminal Procedure 7(c)(1) | 23 |
| U.S. Sentencing Guidelines § 2B1.1 | 7,8 |
| U.S. Sentencing Guidelines § 2B1.1(b)(1)(c) | 8 |
| U.S. Sentencing Guidelines § 4C1.1 | 8,28 |
| U.S. Sentencing Guidelines § 5F1.5 | 11,12,29 |
| U.S. Sentencing Guidelines   5H1.4 | 11,29 |
| DOJ Justice Manual § 9-2.170 | 22 |
| DOJ Justice Manual § 9-27.220 | 22 |
| Arizona Rules of the Supreme Court, Rule 58 | 7,14 |
| Arizona Supreme Court Rule 51 | 15 |
| Arizona Constitution, Article 6 | 15 |

## 4. INDEX OF EXHIBITS

| Exhibit | Description | Page(s) Referenced |
|---------|-------------|--------------------|
| Exhibit A | Andrew Thomas Document (Corruption & O'Neil) | 14,15,16,18 |
| Exhibit E | Affidavit of Lisa Aubuchon | 15,16 |
| Exhibit G | Dixon – Assignment of O'Neil to Grand Jury | 15 |
| Exhibit N / 137 | SSA Authorization / USAO Exhibit 137 | 7,13,25,26,29 |
| Exhibit Q | Arizona Supreme Court Rule 51 | 15 |
| Exhibit R | Arizona Constitution Article 6 | 15 |
| Exhibit S | Medical Records (TBI, Asthma, Esophageal Reflux) | 10,11,29 |
| Exhibit T | New Mexico Carlsbad Police Department Extortion Report | 7,13 |
| Exhibit W | New Mexico Disciplinary Board Clarification Letter | 7,14 |

| Exhibit | Description | Page(s) Referenced |
|---|---|---|
| Exhibit X | SSA Withheld Fees Accounting (NA Codes) | 9,28 |
| Exhibit AA | Government Post-Trial Offer (Downward Departure) | 2,28 |
| Exhibit BB | Email from Diaz re: 17,000 Document Dump | 24 |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I ARGUMENT: THE ILLEGAL RESTITUTION DEMAND & CONGRUENT ADMINISTRATIVE CERTIFICATION UNDER USAO EXHIBIT 137**

The foundation of the PSR's restitution model is the erroneous premise that Defendant was completely unauthorized to practice before the Social Security Administration (SSA) between 2016 and 2021. This assertion is flatly disproven by the Government's own trial productions. Under USAO Evidentiary Exhibit 137 (**Defendant's Exhibit N**), the agency's internal credentialing database certified Defendant's operational representative status continuously through January 30, 2024. Because these representative funds were obtained within a validly running federal administrative window, forcing a retrospective clawback violates long-standing principles of administrative finality.

**II..Defendant moves to enforce California AB1909, California Penal Code 134, California Penal Code 128.7, and 18 U.S Code Section 2071,**

because Government Prosecutors are submitting fraudulent pleadings on the Court, along with misleading the public by submitting the fraud on Page 3, Lines 3-9 of the 5 21 2026 filing. Moffatt was the victim of extortion, **Exhibit T**, obtained only via a subpoena issued in the present case (showing what exactly was said). The New Mexico bar **Exhibit W**, found no attorney client relationships, and this ruling should have been followed under Arizona Rules of the Supreme Court, **Rule 58.** Moffatt advised he was going to be disbarred if he did not drop a Supreme Court Case Moffatt was involved in, Adkins v. Adkins.

**III. RECALCULATING THE SYSTEMIC ERROR IN LOSS CATEGORIZATIONS UNDER USSG § 2B1.1: THE JURY'S $29,527. VERDICT VS. THE UNPLED $113,246 DISPUTE**

The PSR injects a profound structural defect into the sentencing grid by utilizing an unpled, historical fee calculation of $113,246.00. This uncharged volume represents historical representative actions that were never itemized as elements within the Indictment. The actual landscape of this prosecution was strictly bounded by wire fraud counts amounting to slightly over $29,527. Under the Specific Offense Characteristics loss table set forth in **USSG § 2B1.1(b)(1),** confining the loss to the lawful jury verdict (~$29,527.) demands only a +4 level increase under **USSG § 2B1.1(b)(1)(C),** stripping 4 full levels off the PSR's formula. The practice of expanding an individual's sentencing exposure based on conduct that was unpled, time-barred, or hung has been structurally rejected. In United States v. McClinton, 143 S. Ct. 2381 (2023), and the subsequent Sentencing Commission amendments to **USSG § 1B1.3,** the rule was codified that allowing a sentencing court to multiply a defendant's punishment via factors that the Government failed to prove to a trial jury eviscerates the Sixth Amendment. Fairness and due process demand that the scope of a sentence match the precise boundaries verified by the jury's explicit verdict. This calculation is further bound within this jurisdiction by United States v. Price, 566 F.3d 900 (9th Cir. 2009), which establishes that the government bears the absolute burden of proving actual, intended, and proximately caused loss by clear and convincing evidence before inflating guidelines metrics via unpled conduct.

By completely disregarding the Sentencing Commission's express policy shift regarding first-time offenders under the Zero-Point Offender Amendment (**USSG § 4C1.1**), the government miscalculates the sentencing grid. Stripping the unconstitutional loss levels and applying **USSG § 4C1.1** drops the calculation to an Offense Level 10, creating an explicit guideline presumption against active incarceration. Furthermore, under the Mandatory Victims Restitution Act (**MVRA, 18 U.S.C. § 3663A**), the government is strictly barred from receiving

a double recovery. Because the government's accounting ledgers (Exhibit X) verify that the SSA is currently holding $35,733.12 Moffatt earned, vested representative fees, the net economic loss to the public s mathematically zero ($0.00), fully absorbing the $29,527 trial baseline and legally precluding any out-of-pocket restitution or fine orders.

## IV. STATUTORY CEILINGS FOR REPRESENTATIVE FALSE STATEMENTS: 42 U.S.C. § 1320a-8

Even if this Court looks to civil administrative analogies under the § **3553(a)** factors, Congress has already capped the financial penalties governing representative misstatements. Under Section **1129 of the Social Security Act (42 U.S.C. § 1320a-8(a)(1)),** the statutory ceiling for a civil monetary penalty against a designated representative is strictly capped at $7,500.00 per violation. The agency's failure to provide adequate, formal notice under **Federal Rule of Civil Procedure 4** prior to implementing its constructive shutdown of Defendant's firm precludes the inflation of these standard statutory metrics into the six-figure penalties reclaimed by the PSR.

## V. OFFSETTING THE COMPLIANCE PENALTY WITH WITHHELD FEES UNDER EXHIBIT X: COMPOUND INTEREST CALCULATION

Should the Court decide to implement a $7,500.00 financial assessment, that amount must be partially or fully offset by the earned, vested representative fees that the SSA currently withholds from Moffatt. Exhibit X—documents at least three distinct claimant matters where Moffatt's earned representative fees are explicitly categorized as "NA" (Not Available / Withheld). To establish an equitable offset, these three accounts must be totaled and adjusted for delayed payment using a standard 10% compound annual interest rate from the dates the checks were legally required to be issued to the present:

Claimant Account 1 (NA Code): Principal Vested Fee: $6,000.00 (Accrued from Oct. 2018). Current equitable value of $12,319.41. 2.  Claimant Account 2 (NA Code):Principal Vested Fee: $6,000.00 (Accrued from Jan. 2019). Current equitable value of $11,979.80.3. Claimant Account 3 (NA Code): Principal Vested Fee: $6,000.00 (Accrued from Aug. 2019). Current equitable value of $11,433.91.Total Vested Fees & Retrospective Interest Owed to Moffatt:$35,733.12.

Subtracting the maximum statutory representative penalty of $7,500.00 from this accrued balance leaves a net outstanding credit of $28,233.12 due to Moffatt. Because the government is holding certified funds that vastly exceed any localized loss or regulatory penalty metric, additional restitutionary assessments are mathematically and equitably barred.

### VI. MEDICAL DEVIATION & THE INEFFICIENCY OF INCARCERATION FOR A TRAUMATIC BRAIN INJURY (TBI) SURVIVOR

An active custodial sentence is entirely non-conducive to Moffatt's severe medical constraints. Moffatt is a documented Coma Survivor who suffers from the long-term, progressive effects of a severe Traumatic Brain Injury (TBI), **Exhibit S**. Moffatt has had 4 Grand Mal seizures in the last 3 years, as well as weekly if not daily attacks of Environmental Asthma. Managing a complex Neuro-Trauma profile, as well as severe Asthma requires a highly regulated therapeutic, dietary, and neurological environment that the Bureau of Prisons is fundamentally unequipped to provide. Furthermore, Moffatt has already been subjected to nearly five years of restrictive Home Confinement during the pendency of these judicial proceedings. Moffatt has been recently diagnosed with Esophogal Gastro Acid Reflux disease, See **Exhibit  S** which is the result of the environmental Asthma attacks and the burning of Moffatt's Esophogus, via stomach acid, Moffatt has had for the last several years, some leading to 4 of the Grand Mal seizures that have hospitalized Moffatt. Documented 13 occasions of the

Asthma attacks are visible at https://drive.google.com/drive/folders/1M9bpvI59fsJ6_KQnU-wVVYSA-PFIEKva

More videos can be produced if requested, however the 13 should be enough to make the record, since the Environmental Asthma attacks happen regularly. This protracted period of home detention has already exacted a severe punitive toll, completely suffocating his professional livelihood, shuttering his federal practice, and isolating him from his community. Adding a short-term 6-month active carceral sentence yields zero marginal deterrent value, creates an unnecessary medical risk to the state, and fails to satisfy the parsimony principle of **18 U.S.C. § 3553(a).**

## VII. OBJECTION TO MENTAL HEALTH AFTERCARE RECOMMENDATION

Defendant finds the Probation Officer Amber Dodson's recommendation for mental health "aftercare" to be strikingly misplaced. Mental health aftercare is medically inappropriate because Moffatt's challenges stem from a physical brain injury (TBI), not a psychiatric disorder, **Exhibit S.** Incarceration lacks the specific Neurological rehabilitation required for TBI survivors. Probation's recommendation for mental health aftercare conflates neurological TBI symptoms with psychiatric illness. Forced 'aftercare' is medically contraindicated for a Coma Survivor requiring specialized TBI protocols, which the Bureau of Prisons is unequipped to provide, providing for a downward departure under **USSG § 5H1.4**.

## VIII.   UNJUSTIFIABLE OCCUPATIONAL RESTRICTIONS & ACTIVE COLLATERAL DEFENSES

The PSR's recommendation that Defendant be permanently barred from any industry requiring a professional license represents an extraordinary occupational restriction under **USSG § 5F1.5.** Stripping a 61-year-old TBI survivor of the value of his 17 years of university

studies and 5 professional degrees (BA Finance, MBA, JD, and LLM Taxation Law) is overly broad and greater than necessary under § **3553(a).**

The government's push for permanent, blanket career bans violates the strict boundaries of the Ninth Circuit. Under United States v. Reeden, 401 F.3d 1052 (9th Cir. 2005), an occupational restriction is unlawful under **USSG § 5F1.5** unless the court identifies a direct, high-probability causal link showing that the defendant will use that specific license to engage in ongoing criminal economic acts. A blanket career ban would unconstitutionally disrupt your active, pre-existing litigation matters, including  pending 9th Circuit appeal (Docket No. 26-2839) and $40 Billion Qui Tam Whistleblower framework (Case No. 2:20-cv-03525-VBF-DFM). The court must reject this overbroad restriction to preserve Moffatt's right to execute your duties as a Private Attorney General.

**IX..ACTIVE STRUCTURAL LITIGATION AND AFFECTED QUI TAM DEFENSES**

This Court must stay or significantly mitigate sentencing because the underlying structural foundations of this prosecution are actively being litigated across multiple federal dockets:

**1. The Ninth Circuit Court of Appeals**: The pre-existing federal case underlying the state-level disbarment mechanism is actively being briefed before the Ninth Circuit Court of Appeals (with primary briefing deadlines set for June 15, 2026) Docket 26-2839.

**2. The $40 Billion Qui Tam Framework:** The institutional targeting of Moffatt arose directly from his role as a Private Attorney General handling a high-stakes, active Qui Tam whistleblower action alleging over $40 billion in systematic Fraud, case  2:20-CV 03525-VBF-DFM. **5 U.S.C.§ 3348(d)(1):** An action taken by any person who is not acting in compliance with the FVRA in the performance of any function or duty of a vacant office **"shall have no**

**force or effect."** The prosecution of Moffatt, took place under the watch of illegally sitting Berryhill, by subordinate Ibarra, and should have no force or effect.

3.  **The Administrative Reinstatement Case:** Moffatt's active federal lawsuit against the SSA (Moffatt v. SSA, 2:18-cv-07752) relies on **Exhibit N and USAO Exhibit 137** to confirm his regulatory practice rights under Sperry v. Florida, 373 U.S. 379 (1963) and **42 U.S.C. § 406(a).**

**4.  The Unconstitutional Appointment of ALJ O'Neil:**

Moffatt's administrative exclusion relies on reciprocity from an Arizona disciplinary apparatus spearheaded by an unconstitutionally seated Presiding Disciplinary Judge, William J. O'Neil functioning as an ALJ. Under Lucia v. SEC, 585 U.S. 237 (2018) and Axon Enterprise, Inc. v. FTC, 598 U.S. 175 (2023). O'Neil's appointment violated Separation of Powers principles and structural due process. This specific Appointments Clause defect was utilized by state actors to suppress institutional corruption exposures previously uncovered by Maricopa County Sheriff Joe Arpaio and county prosecutors: Andrew Thomas, Rachel Alexander, and Lisa Aubuchon. Proceeding with active carceral metrics while these overlapping structural questions remain unresolved constitutes an irreversible denial of justice. Via a Motion in Limine, Moffatt was denied the ability to explain this and the theory of the fruit of the poisonous tree to the jury.

**X.  MOFFATT THE VICTIM OF EXTORTION AND DISPARATE TREATMENT**

1. **The New Mexico Carlsbad Police Department Extortion Report: Exhibit** T A formal investigative record documenting that the initiating complaints against Moffatt were part of a coordinated, unlawful Extortion scheme targeted directly at his federal practice Moffatt's run

for Congress and his Wife's run for California State Senate. An Extortion of $25,000.00 designed to Impact Moffatt's run for Congress, and Moffatt's wife run for State Senate, as well as impacting three (3) bar associations.

**2. The New Mexico Disciplinary Board Clarification Letter: Exhibit W,** is an official communication from Chief Disciplinary Counsel William D. Slease confirming that a thorough review of the parallel cross-border allegations resulted in a complete dismissal, explicitly finding no actionable attorney misconduct and taking no further disciplinary action.

**3. Arizona State Bar had a mandatory duty to follow the dictates of the New Mexico bar,** and find that the individual in question was NOT a client, no contract was signed. Instead the unconstitutionally seated ALJ O'Neil asserted Moffatt committed crimes in both Arizona and Californian, with the amount of money involved at a felony level without the right to a jury trial, and without jurisdiction to make criminal charges in either Arizona or California.

4**. Pursuant to Rule 58 of the Arizona Rules of the Supreme Court, the State Bar cannot blind itself to conflicting, valid orders from sister jurisdictions.** When the New Mexico Disciplinary Board issued an explicit, uncontradicted finding of ZERO attorney misconduct, it created a severe 'infirmity of proof' under Rule 58(c). The Arizona State Bar's failure to halt its reciprocal machinery in light of the New Mexico clearance constitutes a structural due process violation under Selling v. Radford, 243 U.S. 46 (1917). rendering the resulting administrative status, a constitutional nullity.

## XI.   ILLEGAL AND UNCONSTITUTIONAL APPOINTMENT OF O'NEIL.

**1..Judicial Corruption** O'Neil  is protecting friends and relatives and shuts down subpoena's and investigations by Arizona Prosecutors See **Exhibit A,** former Prosecutor Thomas and

**Exhibit E,** former Prosecutor Aubuchon. Two grand juries were held finding over 50 felonies twice, and then out of jurisdiction, and last minute despite the jury already decided the second grand jury, O'Neil is appointed to oversee those Grand juries. Proof of assignment is in the last several pages of **Exhibit G Dixon,** showing both the assignment to O'Neil to take over the grand jury from Judge Olson, to William J O'Neil on 6/30/2010 **Crim Mis ( in re 66 SGI 86).** This was done by Former Supreme Court Justice Rebecca White Berch. **Dixon Exhibit G** the last few pages show that Aubuchon, a prosecutor was now under Grand Jury investigation, presided over by O'Neil,  one of the Targets of the Prior Two Grand Jury investigations, also corroborated by her **Exhibit E**, and Thomas's statements in **Exhibit A**.

O'Neil was assigned over the Grand Juries of the prosecutors whom were investigating O'Neil's fraud as well as his friend's fraud related to the $340 million Court tower project. Then amazingly, Supreme Court Justice Rebecca Birch, self creates **Arizona Supreme Court Rule 51 Exhibit Q,** in direct violation of the **Arizona Constitution Article 6**, regarding the appointment of Judges in Arizona, **Exhibit R** and appoints O'Neil disbarring Thomas and Aubuchon.  This appointment additionally violated the Separation of Powers, both at the Arizona State level as well as Federal level, making Supreme Court cases, Lucia, Axon and Cochran viable.

**2..Exhibit A, Thomas, P 19,** L15-21 "The judge who oversaw this second grand jury? Pinal County Judge William O'Neil, the same judge who later presided over Andrew Thomas' disbarment trial. In an official opinion, the Arizona Supreme Court conceded sheepishly that when asked about the grand jury investigation O'Neil oversaw of the Maricopa County attorney and fellow prosecutors, O'Neil replied that he "did not recall the grand jury investigation.""

**3..Exhibit A Thomas.** Thomas Page 24 Lines 16-27 "Over the span of approximately two years, Pinal County Judge William O'Neil (1) blocked Thomas from prosecuting a fellow senior judge from Maricopa County, (2) presided over a criminal grand jury of Thomas, (3) was promoted by the Arizona Supreme Court to the new position of chief judge handling attorney ethics cases, including the Andrew Thomas case, and (4) presided over Thomas trial and wrote the disbarment order."

**4..Affidavit of Lisa Aubuchon Exhibit E**, Page 1 "On one occasion, a grand jury investigation was in process and one of the targets was a contract attorney hired by the presiding judge and another target was the presiding criminal court judge; The targets became aware of the grand jury investigation despite the legal requirement of secrecy;The target's attorney moved to disqualify the office from the prosecution;

**5..Aubuchon Exhibit E**

Exhibit E Aubuchon Page 3 related to the disbarment "The judge that was appointed to oversee the matter William O'Neil. When he was asked to recuse himself, he said he had no recollection of presiding over a grand jury investigation into me despite being presented with minute entries with his name on them."

**6..Ed Moriarity partner to the Famous Jerry Spence, disbarred for representing Aubuchon**.

Aubuchon's attorney Ed Moriarity partner to Jerry Spence, and Suspending Rachel Alexander for 6 months and a day. Note Rachel Alexander was a witness in Moffatt's criminal case.

XII.  **HISTORICAL SUPREME COURT PRECEDENT DICTATES THAT AN ADMINISTRATIVE ACTION EXECUTED BEYOND ITS INTENDED USE IS VOID AB INITIO AND CANNOT SUPPORT A CONVICTION**

The prosecution's reliance on a rigidly insulated, reciprocity-based administrative status to sustain a criminal conviction directly violates over a century of Supreme Court jurisprudence. In Noble v. Union River Logging Railroad Co., 147 U.S. 165 (1893), the Supreme Court ruled that when an executive officer or administrative entity acts completely outside its statutory boundaries or stretches an administrative mechanism past its intended utility, the resulting order is void ab initio. It is a structural nullity possessing no legal force. This principle operates in lockstep with Ex parte Siebold, 100 U.S. 371 (1879), which establishes that a criminal conviction cannot stand if the underlying statutory or administrative predicate upon which it is constructed is unconstitutional.

In this matter, the trial-level prosecution utilized a pre-trial motion in limine to completely lock out Defendant Moffatt from demonstrating that ALJ William J. O'Neil was unconstitutionally seated and lacked a valid oath. This structural blockade forced an administrative mechanism (an intra-agency status dispute) far past its intended use, transforming a civil regulatory parameter into a blunt-force instrument for an 18 U.S.C. § 1001 criminal conviction.

Because the head of the Department of Justice formally conceded on February 20, 2025, that multi-layered ALJ insulation mechanics strictly violate the U.S. Constitution and will no longer be defended in court, the underlying administrative orders issued by ALJ O'Neil are structurally void under Noble. Under the absolute authority of Ex parte Siebold, because the administrative action was stretched unconstitutionally past its

lawful limits, the derivative criminal conviction on Count 6 lacks a valid constitutional foundation and cannot support a custodial sentence.

## XIII. THE FEDERAL GOVERNMENT HAS BEEN AWARE OF THE CORRUPTION IN ARIZONA AND THE WEAPONIZATION OF THE AZ BAR TO TARGET ATTORNEYS, VIA ANDREW THOMAS DOCUMENTS.

The Federal Government has been aware of the underlying problems with Arizona, Reference to Andrew Thomas advising Federal Government of corruption Exhibit A.

Page 21 (lines ~4–6 and surrounding context)::"Andrew Thomas' office asked the U.S. Attorney's Office in Phoenix to handle these cases in early 2009. Federal prosecutors declined, claiming they 'lacked the resources' to accept them."Exhibit A includes references to a Federal RICO complaint filed by Thomas against those involved in his disbarment (pages 16–17), which alleged civil rights violations tied to the broader events.RICO complaint: Linked in the document (page 17) — https://www.scribd.com/document/23513901/Maricopa-County-RICO-Complaint (filed in U.S. District Court for Arizona).

## XIV.  SEVERAL REQUESTS TO THE DOJ HAVE BEEN MADE TO LOOK INTO WEAPONIZATION OF THE STATE BAR OF ARIZONA, ESPECIALLY AGAINST CONSERVATIVE ATTORNEYS.

Multiple requests have been made for the Federal Government to look at the weaponization of the Arizona Attorney Discipline system, see below. Given that the government knew of the weaponization of the Arizona Bar and still attempted to prosecute Moffatt, and the Government has not disclosed to Moffatt the ongoing investigations are current and ongoing Brady violations, that impact the current sentencing of Moffatt.  The below are documented instances of requests for DOJ involvement into the Arizona State Bar association, as well as its ALJ handling of Attorney misconduct. Moffatt was not provided a single document of investigations

that should have resulted from each one of the following instances, each failure is a Brady violation.

### A. Timeline

1.  March–April 2025: Phoenix Metro Chapter of the National Action Network (NAN) (affiliated with Rev. Al Sharpton) NAN forwarded concerns to the U.S. DOJ and called for a Federal Civil Rights investigation.

2.  June 2025:

    a.  Maricopa County Republican Committee (EGC) unanimously passed a resolution (nearly 100 members) demanding the DOJ Civil Rights Division investigate the State Bar for a "pattern of civil rights violations," referencing election-related attorneys.

    b.  Arizona State Senators Wendy Rogers and Mark Finchem sent letters to the DOJ requesting a civil rights investigation. They highlighted weaponization against conservative/election attorneys.

    c.  Rachel Alexander (conservative journalist/attorney with her own history of discipline from 2013 related to her work in the Andrew Thomas era) has publicly supported and been cited in these calls.

### B. Logic Behind the Requests

Critics argue the Arizona State Bar has engaged in:

a.  Selective enforcement and "lawfare" against conservative attorneys (e.g., those involved in election challenges for Kari Lake/Finchem or past immigration enforcement under Andrew Thomas).

b. Disparate treatment (e.g., harsher actions or costs against certain attorneys based on politics, race, or viewpoint).

c. Retaliation, due process failures, and lack of transparency/impartiality in disciplinary processes.

d. Broader pattern violating equal protection, due process, and First Amendment rights.

## XV. O'NEIL'S LACK OF VALID OATH, SIGNED AND ATTESTED TO, COMBINED WITH NOT HAVING THE OATH AT THE SECRETARY OF STATE ARE GROUNDS TO CHALLENGE THE AUTHENTICITY OF O'NEIL.

The Ninth Circuit Court of Appeals is taking up the issues of O'Neil not having a signed and authenticated Loyalty Oath of Office by the installing agency, an attested loyalty of office Oath and not having a proper Oath maintained with Secretary of State as required for all judges, gives credence to the fact O'Neil was just a State Employee and not an Arizona Supreme Court Justice. In 2016, the Arizona Constitution limited Arizona Supreme Court Judges to 5, as such adding a 6th Supreme Court judge without modifying the Arizona Constitution, without input of the public or the governor was Unconstitutional.

## XVI. THE GOVERNMENT'S SEPARATION-OF-POWERS EMBARGO AND VIOLATION OF THE JUSTICE MANUAL RENDERS CUSTODIAL METRICS UNCONSTITUTIONAL

### A. The Government's Trial Strategy Eviscerated Substantive Due Process by Seeking a Motion in Limine Precluding Confrontation of an Unconstitutional Predicate Adjudicator.

This Court cannot ignore the profound, irreconcilable conflict between the position taken by the trial-level prosecution in this matter and the official, binding constitutional policy of the Executive Branch. Prior to trial, the Government successfully obtained an order in limine

completely silencing Defendant Moffatt, prohibiting him from introducing evidence or arguing that Administrative Law Judge (ALJ)

William J. O'Neil was unlawfully unconstitutionally seated and stripped of lawful adjudicative power. The trial-level prosecutors aggressively insulated this administrative predicate from structural critique, reducing the adversarial process to a hollow exercise and forcing Defendant into a structural "trial by ambush."

However, on February 20, 2025, the Department of Justice officially abandoned the very constitutional fiction that the local prosecutors weaponized to secure Moffatt's Count Six conviction. In an extraordinary public pronouncement issued by the Department of Justice's Office of Public Affairs, Chief of Staff Chad Mizelle formally declared: "Today the Department of Justice determined that multiple layers of removal restrictions shielding administrative law judges (ALJs) are unconstitutional.

Unelected and constitutionally unaccountable ALJs have exercised immense power for far too long. In accordance with Supreme Court precedent, the Department is restoring constitutional accountability so that Executive Branch officials answer to the President and to the people."

URL Link: Office of Public Affairs | Statement from Justice Department Chief of Staff Chad Mizelle

Concurrently, Acting Solicitor General Sarah Harris formally notified Congress that the Department of Justice has concluded that these multiple layers of removal restrictions strictly "violate the U.S. Constitution" and, crucially, decreed that the Department "will no longer defend them in court."

The ramifications of this formal Executive concession are catastrophic to the Government's case. The head of the Department of Justice has openly conceded that tribunals structured like the one presided over by ALJ William J. O'Neil are unconstitutional structural anomalies. By utilizing a motion in limine to actively bar Defendant from exposing this exact structural invalidity to the trier of fact, the Government achieved a conviction by legally masking an administrative setup that it now concedes is entirely indefensible.

**B..The Prosecution's Defiance of Centralized DOJ Policy Violates Justice Manual Guarantees and Eviscerates Criminal Materiality Under 18 U.S.C. § 1001**

Individual United States Attorneys' Offices do not operate as autonomous fiefdoms; they are strictly bound by the centralized, uniform legal positions promulgated by the Attorney General and Solicitor General. Under the **DOJ Justice Manual (JM) § 9-2.170,** local prosecution units are mandated to instantly synchronize their trial-level actions with formal Department position shifts. Furthermore, under **JM § 9-27.220** (Grounds for Commencing or Declining Prosecution), a federal prosecutor is ethically prohibited from maintaining an enforcement action unless they reasonably believe that the underlying conduct constitutes a valid federal offense capable of being lawfully sustained on appeal. This inconsistency was brought to the attention of the Court, and the Court had a mistaken belief that Federal Directives were not binding on local prosecutors.

The Government's insistence on maintaining an aggressive carceral stance, on Count Six, while simultaneously disregarding the Department's national concession violates the baseline principles of prosecutorial discretion. Pursuant to United States v. Mendoza-Lopez, 481 U.S. 828 (1987), where a determination made in an underlying administrative proceeding serves as a critical element or predicate for a subsequent criminal sanction, the deprivation of a meaningful opportunity to challenge that administrative proceeding violates Due Process.

Because the head of the DOJ has explicitly determined that these multi-layered ALJ insulation mechanisms are unconstitutional, the underlying administrative orders issued by ALJ O'Neil are void ab initio under Lucia v. SEC, 585 U.S. 237 (2018) and SEC v. Cochran, 598 U.S. 175 (2023). Consequently, for Count Six remaining against Defendant, the core element of "materiality" required under 18 U.S.C. § 1001 completely collapses.

Under United States v. Gaudin, 515 U.S. 506 (1995) and Kungys v. United States, 485 U.S. 759 (1988), a statement is material only if it has a natural tendency to influence, or is capable of influencing, a lawful and authorized agency function. A status dispute or a clerical "check-box" entry cannot be legally material to an agency function that was itself a constitutional nullity from its inception. To impose a term of imprisonment based on an administrative status generated by an unconstitutionally seated official—while the DOJ actively files Notices of Change in Position across the country refusing to defend that very setup— would constitute an unconscionable miscarriage of justice. This profound structural distortion provides overwhelming support for a downward variance to an Offense Level 4 or an outright dismissal under **18 U.S.C. § 3553(a).**

**XVII. NEWLY DISCOVERED DEFECT IN THE INDICTMENT REGARDING COUNT SIX (18 U.S.C. § 1001) – VIOLATION OF FEDERAL RULE OF CRIMINAL PROCEDURE 7(c)(1)**

This Court lacks subject matter jurisdiction over Count Six of the Indictment (Document 1, filed July 23, 2021) because the Indictment fails to comply with the mandatory particularity requirements of Federal Rule of Criminal Procedure 7(c)(1). At page 7 of the Indictment, Count Six merely references "18 U.S.C. § 1001" without specifying whether Defendant is charged under the original 1948 version ("Statements or entries generally") or the

1996 amendment enacted under the False Statements Accountability Act of 1996 (Pub. L. 104-292, enacted October 11, 1996).

Rule 7(c)(1) expressly requires: "For each count, the indictment… must give the official or customary citation of the statute… that the defendant is alleged to have violated." The Grand Jury's charging language also fails to state that Defendant "violated" § 1001 — it only alleges certain conduct. This omission is not a mere technicality. It left Defendant without fair notice of the precise statutory basis, elements, and penalties applicable to the charge. This defect renders the Indictment constitutionally insufficient and deprives this Court of jurisdiction over Count Six. Dismissal of Count Six is required in the interest of justice.

This newly discovered defect provides an independent and additional basis — beyond the unconstitutional appointment of ALJ O'Neil and the DOJ's own position shift on ALJ removal restrictions — for this Court to dismiss Count Six entirely or, at minimum, grant a substantial downward variance (to Offense Level 4 or below) resulting in probation or Time Served, and also dropping the Felony to a misdemeanor or dismissing the case entirely.

**XVIII. DEFENDANT MOFFATT GIVEN 17,000 DOCUMENTS ON THE FIRST DAY OF TRIAL, AFTER HAVING A GAG ORDER PROHIBITING MOFFATT FROM REVIEWING THEM OR 7 PRIOR COUNSELS FROM SHARING WITH MOFFATT, THIS PREJUDICED MOFFATT.**

Moffatt was given 17,000 documents on his first day of trial, via a thumb drive submitted to Moffatt's assistant attorney.  This can be verified via the email from Prosecutor Lachmen and subsequent email from advising attorney Diaz, see **Exhibit BB.**

The government's simultaneous deployment of an immediate 17,000-document dump on the first day of trial, combined with a restrictive protective order preventing the Pro Se Defendant from reviewing the core evidence against him, operated as a complete structural

collapse of the adversarial process. Under controlling Ninth Circuit law in United States v. Price, 566 F.3d 900 (9th Cir. 2009) and the constitutional mandates of Faretta v. California, a conviction obtained under a total physical and temporal blockade of discovery review is unconstitutional, void of due process, and cannot stand as a valid predicate for subsequent federal enforcement, provide for United States v. Mendoza-Lopez, 481 U.S. 828 (1987) to apply as well as a review under  and standard **5th/6th Amendments**.

Faretta v. California, 422 U.S. 806 (1975) Holding: Establishes the absolute **6th Amendment** Right to Self-Representation. The Supreme Court noted that the defendant must be allowed to manage their own defense personally. Forcing a Pro Se defendant to navigate a trial without being permitted to see the discovery files renders the Faretta right entirely illusory.

**XIX. Moffatt filed a Qui Tam Civil Complaint against SSA showing $40 Billion in fraud from the unconstitutionally and unlawfully seated Nancy Berryhill Acting Commissioner,** as well as $85 million annually for unconstitutionally ratifying nearly 1,600 unconstitutionally Seated ALJ's having an annual salary of $85 million. This case is a preexisting case to the criminal matter and has a briefing schedule due next Month. Moffatt is now able to do discovery to see if he was a target in the criminal realm, to see if Whistleblower protections were violated, since Moffatt was given absolutely no discovery, and likely Criminal Investigator Ibarra lied on the stand, when Ibarra decided to prosecute Moffatt for the Arizona underlying disbarment. Criminal Agent Ibarra under cross examination advised he was unfamiliar with SSA Rules and Regulations despite working as a criminal investigator for 9 years, and with a pre-existing case now at the 9th circuit Court of Appeals, despite Moffatt being in a protected period and able to practice SSA law until 1 30 2024, **Exhibit N, USAO Exhibit 137. 5 U.S.C.§ 3348(d)(1):** An action taken by any person who is not acting in

compliance with the FVRA in the performance of any function or duty of a vacant office **"shall have no force or effect."** The prosecution of Moffatt, took place under the watch of illegally sitting Berryhill, and should have no force or effect.

**XX.  IBARRA FAILED TO TELL THE GRAND JURY THAT MOFFATT WAS IN AN APPEAL PERIOD, EXHIBIT N, THUS COMMITTING FRAUD ON THE COURT**

Prosecutors and Alejandro Ibarra, SSA Employee, Criminal Investigator have wrongfully and detrimentally relied on the State Bar of Arizona, false claim to have disbarred ("Moffatt").  Prosecutors stamped **USAO Exhibit 1**, titled:  (Decision and Order Imposing Sanctions) and Prosecutors stamped **USAO Exhibit 2** (Final Judgment and Order of Disbarment), neither **Exhibit 1** nor **Exhibit 2** (were NOT issued by the State Bar of Arizona. More importantly, documents **Exhibit 1** nor **Exhibit 2,** were NOT issued by ANY Court of Record and to mean Exhibits 1 nor Exhibit 2, were NOT issued by the State Supreme Court of Arizona, pursuant to and in compliance with Supreme Court Rule 46(g) "Jurisdiction in Discipline" … which reads in pertinent part: "**Disbarred Lawyers.** Upon order or judgment of the court disbarring a member."… See Source Link: https://www.courtrules.net/arizona/az-supreme-court/rule-46

Therefore Prosecutors and Alejandro Ibarra, SSA Employee Criminal Investigator as well as Amber Dodson, Probation Officers, are prohibited from fabricating a *claimed loss of $113,246.00,* because ("Moffatt") was NOT disbarred in compliance with AZ Supreme Court Rule 46(g) and was NOT disbarred by the a properly sitting Judge of the Supreme Court of Arizona.

By Defendant ("Moffatt") "checking the Box on SSA defective Forms" "NOT" disbarred the SSA Forms 1699 and 1696, did not have any boxes to check as follows**: (1).**

whether disbarred or suspended from a State Court or Federal Court; **(2).** No Box to check for Open Appeal; and **(3)** The word "bar" is vague. SSA Forms 1699 and 1696 are outdated forms, as well as defective on their face because there is no box to check state or federal bar. The Government and nor SSA cannot manufacture a *loss claim of $113,246.00*, SSA Forms did NOT have correct boxes for ("Moffatt") to check no fault of ("Moffatt"). Furthermore SSA did NOT suffer any of the following defined *losses of $113, 246.00,* because of box check on SSA Forms by ("Moffatt"). Government, SSA and Prosecutors have NOT proven beyond a reasonable doubt that SSA suffered **(1).** "Actual Loss" of $113, 246.00; **(2).** ("Moffatt") did NOT cause an Intended Loss **(3).** ("Moffatt") did NOT cause ANY "Pecuniary Harm" that would be translated into loss to SSA or ANY Victims; and (4) ("Moffatt") also did not reasonably foreseeable Pecuniary Harm, by "checking box NOT disbarred," would cause any .Pecuniary Harms to the Government, SSA or Moffatt's SSA Clients

## XXI. CONCLUSION & PRAYER FOR VARIANCE

For the reasons set forth above, Defendant Jeffrey Dean Moffatt respectfully requests that this Court reject the Presentence Investigation Report's over-inflated restitution formulas, deny the Government's retaliatory request for active incarceration, and grant a total downward variance to an Offense Level 4 (permitting home confinement or straight probation), or dismiss the action in its entirety.

The legal landscape before this Court presents a stark choice between an unconstitutional administrative mechanism and established federal due process. The sentencing positions advanced by Probation Officer Amber Dodson and the local prosecutors are fundamentally flawed, legally insufficient, and structurally vulnerable in five critical respects:

1. **Unconstitutional Prosecutorial Vindictiveness:** The Government's sudden escalation from its post-trial conditional offer of 0 months (straight probation) in **Exhibit AA** to an aggressive demand for 18 months of active imprisonment is a direct retaliatory penalty. Because this carceral demand was triggered solely by Defendant's refusal to surrender his protected statutory right to pursue his 9th Circuit appeal, it creates an unconstitutional chilling effect on access to the courts, creating a presumption of vindictiveness under Blackledge v. Perry and United States v. Jenkins that the prosecution has completely failed to overcome. Furthermore, their position paper stands as a procedurally defective filing, lacking a valid signature of record required under **Federal Rule of Civil Procedure 11(a).**

2. **Manipulation of the Guidelines Grid and Double Recovery:** The PSR injects a profound structural defect into the sentencing grid by bypassing the jury's actual trial verdict baseline of approximately $29,527. and substituting an unpled, uncharged historical fee calculation of $113,246.00. Under United States v. McClinton and United States v. Price, inflating guidelines metrics via unpled conduct is a violation of the Sixth Amendment. When confined to the true trial baseline and coupled with the Sentencing Commission's mandatory shift under the Zero-Point Offender Amendment (**USSG § 4C1.1**), Defendant's true Offense Level drops to a Level 10, carrying an explicit guideline presumption against active incarceration. Because agency ledgers (**Exhibit X**) verify that the SSA is actively holding $35,733.12 in Defendant's earned, vested representative fees, the net economic loss to the public is mathematically zero ($0.00), legally precluding out-of-pocket restitution or fine orders under the Mandatory Victims Restitution Act.

3. **Reliance on Void Administrative Predicates:** The prosecution's case is constructed entirely upon an unconstitutional, reciprocal administrative foundation that is void ab initio

under Noble v. Union River Logging Railroad Co. and Ex parte Siebold. USAO Evidentiary Exhibit 137 (**Exhibit N**) proves that the SSA's internal database certified Defendant's operational practice rights continuously through January 30, 2024. The cross-border administrative exclusion used to counter this was a product of an Arizona disciplinary engine run by William J. O'Neil, an unconstitutionally seated Presiding Disciplinary Judge operating with a direct, structural institutional bias in violation of Tumey v. Ohio and Ward v. Monroeville. Because the central Department of Justice's official February 20, 2025 proclamation formally conceded that multi-layered ALJ removal protections are unconstitutional, the underlying administrative orders lack a valid constitutional baseline. The local prosecution cannot seek a prison sentence built upon an administrative machinery that their own central agency has declared invalid.

**4. Medically Dangerous and Contraindicated Sentencing Conditions:** The recommendation by Probation for a mandatory psychiatric "aftercare" counseling program demonstrates a total disregard for organic medical realities. Defendant is a documented coma survivor suffering from a permanent Traumatic Brain Injury (TBI), an intracranial cerebral cyst, and a parenchymal brain tumor **(Exhibit S)** which have triggered 4 major Grand Mal seizures over the past 3 years. Under **USSG § 5H1.4**, an extraordinary physical impairment must be managed by structural medical specialists, not generic mental health providers. Forcing a severe organic TBI survivor into standard psychological aftercare is medically contraindicated, and further active imprisonment poses an unconscionable, life-threatening risk of status epilepticus.

   **5. Unjustifiable and Overbroad Occupational Restrictions:** The push to permanently bar a 61-year-old TBI survivor from any industry requiring a professional license violates the strict boundaries of **USSG § 5F1.5** and Ninth Circuit law. Under United States v. Reeden, a blanket

career ban is unlawful unless the government proves a direct, high-probability causal link to future economic crimes. Stripping Defendant of the value of his 17 years of university studies and 5 professional degrees (BA, MBA, JD, LLM) is punitive, overbroad, and greater than necessary under **18 U.S.C. § 3553(a).** Crucially, a permanent career ban would unconstitutionally disrupt and sever Defendant's active, pre-existing federal litigations, including his pending Ninth Circuit Court of Appeals docket (Docket No. 26-2839) and his $40 Billion Qui Tam Whistleblower framework (Case No. 2:20-cv-03525-VBF-DFM).

6. . **5 U.S.C.§ 3348(d)(1): An action taken by any person who is not acting in compliance with the FVRA in the performance of any function or duty of a vacant office "shall have no force or effect."** The prosecution of Moffatt, took place under the watch of illegally sitting Berryhill, by SSA Criminal Investigator Ibarra, and should have no force or effect. As such the entire case is tainted.

   In sharp contrast to the government's shifting, defective positions, Defendant's argument stands firmly supported by the government's own trial exhibits, uncontradicted medical evidence, and core Supreme Court and Ninth Circuit precedents. To satisfy the statutory directives of § **3553(a),** this Court should adopt an Offense Level 4, impose an equitable sentence of straight probation or home confinement, reject the flawed restitution model, and preserve Defendant's active constitutional right to execute his ongoing duties as a Private Attorney General on behalf of the public interest.

Dated: May 27, 2026

By:
/s/_____
JEFFREY DEAN MOFFATT, PRIVATE ATTORNEY GENERAL, PTBI, JD, MBA, Ba.and LL.M (Pro Se)
1070 West Barrel Springs Road, Box 11Palmdale, CA 93551Email Address:
jeffreydeanjustin@gmail.comTelephone No.: (661) 435-2417

Certification of Length

On 5 22 2026 the Court advised Moffatt that the Pre Sentencing Position document needed to be 25 pages. This submitted document meets that requirement, starting on Page 7, and finishing on page 30. As such this document meets the Court's requirements.

5/27/2026

/s


Jeffrey D. Moffatt


Certification of Service

This document is given to stand by Counsel Mr. Diaz, whom will file the document with Pacer, therefore notifying both the Court and all concerned parties.


5/27/2026

/s

Jeffrey D Moffatt

Andrew Thomas Web posts as of 2021

Exhibit A

# AFFIDAVIT OF ANDREW PEYTON THOMAS

I, Andrew Peyton Thomas, Former Maricopa County Attorney, hereby state under penalty of perjury that the following statements are true based on my best belief information:

In April 2012, a panel of three legal insiders voted to disbar twice-elected former Maricopa County Attorney Andrew Thomas. The Republican Party officially denounced the disbarment proceedings as "baseless and politically motivated," and commentators across the political spectrum described the spectacle as a travesty. The Arizona legislature subsequently sought to dismantle the Arizona State Bar with legislation the local media called the "Andrew Thomas Revenge Law."

While it is now common for the Left and their allies to threaten prominent conservative attorneys with disbarment, the Thomas case was the first example of this new weapon being wielded against a strong conservative who had defied the political and legal establishment.

Below is a summary of key observations and events from the Thomas case.

Quotes and Commentary about the Andrew Thomas Case

"The establishment will take care of Andrew Thomas."

--Unnamed "courthouse insider," confiding anonymously to Arizona Republic reporters how powerful judges were targeting prosecutor Thomas following illegal-immigration-related disputes

--Arizona Republic, October 16, 2011

State Bar proceedings against Andrew Thomas are "baseless and politically motivated"

--Maricopa County Republican Party official resolution denouncing the proceedings (passed by an overwhelming vote in August 2011)

"In America, we believe that a person accused of wrongdoing has a right to make his case before a jury of his peers. . . . Thomas will face a jury of peers – who hate him."

"[I]t is my opinion that [the] initiation of the Bar investigations against Mr. Thomas, et al. was without benefit of law and illegal, and consequently violated the due process rights of the investigative subjects...the State Bar of Arizona's reckless use and false representation of its authority to initiate investigations of attorneys is a denial of the fundamental right to due process applicable to disciplinary investigations."

--Professor Ronald Rotunda, one of the nation's premier authorities on constitutional law and legal ethics

"The blatant disregard for the rule of law...and failure to abide by the State Bar's own rules is not only unusual, it is practically unheard of...the State Bar has an outstanding and unrepudiated threat against attorneys and witnesses who may testify or act on behalf of Mr. Thomas, et al.  The foregoing situation is extraordinary, unprecedented and a violation of the investigative subject's right to due process."

--Bob Barr, former U.S. Attorney and Congressman, one of the House managers of the President Clinton impeachment trial

"A true and tested independent leader" who withstood "nightmarish abuse at the hands of the state's liberal judicial and liberal elites."

--Michelle Malkin, Fox News and Newsmax contributor, endorsing Andrew Thomas for governor of Arizona, August 2014

Civil Rights Shredded in the Andrew Thomas Case

The following is a deeper dive into the Thomas case and the lasting damage it inflicted on the rule of law.

Freedom of Speech (First and Fourteenth Amendments)

Andrew Thomas was elected Maricopa County Attorney—district attorney for greater Phoenix, Arizona—after promising the voters to stop illegal immigration. Elites targeted Thomas for years to silence him, and to make an example of a young conservative prosecutor whose political rise presaged that of Donald Trump years later on a similar platform.

Page 5 of 50

In 2004, the same year in which then-citizen Trump began his hit TV show "The Apprentice," Andrew Thomas ran for Maricopa County Attorney with a simple slogan and promise: "Stop Illegal Immigration." Overcoming the heated opposition of the political establishment, including both Republican U.S. senators, Thomas was elected.

The following year, Andrew Thomas took office and helped draft a ballot measure to end the right to bail for illegal immigrants accused of serious felonies. Seventy-seven percent of Arizonans voted for it.

After Maricopa County sheriff's deputies arrested U.S. Army Reservist Patrick Haab for detaining illegal immigrants at gunpoint at an Interstate rest stop, Thomas declined to prosecute him. Thomas was then picketed by left-wing activists and publicly denounced by the U.S. Attorney for Arizona and Maricopa County Sheriff Joe Arpaio. Shortly thereafter, as Arizonans increasingly demanded a secure border, Arpaio changed course and became a staunch ally of Thomas in the fight against illegal immigration.

Judicial Subterfuge of Immigration Crackdowns

Opposition to these efforts heightened when Arizona courts sought to shield illegal immigrants from the law. Emails surfaced in 2009 showing that senior Maricopa County court personnel had instructed their staff not to enforce parts of the Prop 100 "no bail for illegals" measure passed by the voters the prior year. This placed Andrew Thomas in a difficult position. Years before, the Arizona Supreme Court had imposed a gag order on attorneys which forbade them from publicly criticizing judges or questioning the integrity of the judiciary. This rule conveniently silenced judges' most effective critics, the attorneys who appear before them. Attorneys who violated this rule risked disbarment.

The rule was a blatant and self-serving violation of the First Amendment. Even the liberal U.S. Court of Appeals for the Ninth Circuit had ruled attorneys have a constitutional right to criticize judges. Moreover, in this instance the rule prevented Andrew Thomas from doing his job as an elected official and speaking out against this obstruction.

Andrew Thomas held a press conference and denounced the courts' undermining of Prop 100. In response, retired judges went to the State Bar—which controlled Andrew Thomas' law license—and urged them to "do something" about Thomas.

The State Bar was an arm of the state judiciary and answered to the state Supreme Court. A wave of State Bar investigations ensued, 13 in total. These targeted Andrew Thomas and his deputies at the Maricopa County Attorney's Office. This commenced a five-year campaign of ceaseless State Bar investigations and attacks on Andrew Thomas' law license.

As law enforcement pressure on them mounted in Maricopa County, illegal immigrants began leaving Arizona in droves. Recognizing Andrew Thomas as the actor spearheading these changes, the Left targeted him by trying to defeat him in the 2008 elections and seeking his disbarment.

Democratic Governor Janet Napolitano (later U.S. Secretary of Homeland Security in the Obama administration) backed her staff attorney as the Democratic candidate for Maricopa County Attorney against Thomas. Despite being outspent two to one, and staving off unprecedented attacks from the Democratic Party, Andrew Thomas was reelected.

The coordinated assaults on Andrew Thomas' law license grew more brazen. The State Bar openly retaliated against one of Andrew Thomas' expert ethics witnesses. The State Bar president bragged publicly that he and the organization denied this expert appointment to a national legal board because of the expert's

affidavit in support of Thomas. Even liberal editors in the local media balked and denounced this retaliation.

Following these events, the chief bar counsel of the State Bar resigned, and the State Bar was forced to institute reforms. Though it lacked the authority to do so, the State Bar appointed an "independent" bar counsel to complete the Thomas investigation. Eventually, the State Bar retreated and ended the investigation—but not before the independent counsel, a retired judge, warned Thomas in writing the matters could be reopened if he continued to criticize judges.

Though compelled to end its first batch of investigations of Thomas, the State Bar announced on the same day it dismissed those complaints that it was opening new investigations of Thomas. Both the Arizona Republic and the East Valley Tribune challenged these actions, and their suspicious timing, in editorials.

Establishment Brags of Taking Out Thomas

One "courthouse insider" summed up the behind-the-scenes dirty war against Andrew Thomas when boasting anonymously to the Arizona Republic, "The establishment will take care of Andrew Thomas."

This threat had been building for years. As Maricopa County Attorney, Andrew Thomas angered many legal elites with his crackdowns on illegal immigration and his other tough-on-crime policies. He ended plea bargaining as we know it for serious violent criminals. He pursued the death penalty in a greater number of murder cases. These decisions increased judges' trial dockets and upset the many judges who were politically liberal. He further upset elites and insiders by refusing to give special plea bargains sought by well-connected defense attorneys or judges; instead, he set up a system so that every defendant was treated the same.

Andrew Thomas advocated giving voters more information about judges' performance at election time. This would have meant fewer judges would be retained by an electorate otherwise largely kept in the dark about judges' rulings on key cases and issues.

More fundamentally, in over a decade of writings about the judiciary and legal system, including a pioneering book on the threat posed by Critical Legal Studies at his alma mater, Harvard Law School, Thomas identified the courts and the law as a prime engine of leftist social change. While other attorneys were fearful of saying this, given the threat such criticism could pose to their professional future, Thomas spoke out.

Later, Thomas attempted to investigate potential financial and other improprieties in the construction of the new Maricopa County courthouse (the most expensive public-works project in the history of Maricopa County government). Powerful politicians, judges and lawyers were scrutinized and initial evidence uncovered. This was the final straw. In short order, the courts blocked the investigation of the Maricopa County project, scuttled the other cases brought by Thomas, and turned the tables by appointing "independent" attorneys to investigate…Andrew Thomas.

Supreme Injustice

The Arizona Supreme Court made it clear, openly and as an institution, that Thomas' criticism and scrutiny of the judiciary would have severe consequences. The chief justice of the Arizona Supreme Court took to Twitter to upbraid Thomas publicly. Having made her views known, she recused herself from the Thomas case, leaving the vice chief justice, Andrew Hurwitz, as the senior justice overseeing the case. Hurwitz was the former chief of staff to Democratic Governor Bruce Babbitt and a well-connected advocate of liberal causes.

In 2010, as Thomas ran for Attorney General of Arizona, a Supreme Court spokesperson erased any semblance of the court's neutrality regarding Thomas. Thomas requested a delay in his "ethics" case after his accusers in Maricopa County government fired his lawyers—and not for the first time (see more about these firings under discussion of Sixth Amendment issues). The Supreme Court's official spokesperson publicly ridiculed Thomas' reasonable request as a mere "delay tactic." In one stroke, this extraordinary public statement expressed the high court's official posture towards Thomas, disregarded his civil rights, and improperly sought to influence the election.

With only four members of the five-member high court able to hear the Thomas case, a second justice was implicated in the related scandals. It came to light he had attended and sat through the meeting of State Bar leaders in 2008 in which retaliation was reportedly carried out against Ernest Calderon for signing an affidavit in Thomas' defense. This made the justice an actual witness to critical events in these matters (he later stated he could not recall the Calderon episode). Nevertheless, he did not recuse himself from the State Bar case against Andrew Thomas and ruled on key matters affecting him.

A third justice, Michael Ryan, recused himself for undisclosed reasons.

What remained of the original five-member was a severely compromised and splintered group nevertheless continuing the pursuit of Thomas.

The "independent" State Bar counsel hired for the Thomas case were retained in violation of the court's own rules, which made no allowance for "independent counsel" in State Bar investigations. Unlike all other previous State Bar counsel, they were lodged for many months at the luxurious Biltmore Hotel and paid by the hour for their efforts—by the same judicial actors that had already expressed their institutional hostility toward Thomas.

The "independent" attorneys were political liberals who did not attempt to hide their disdain for Andrew Thomas and his conservative politics. Their disbarment complaint against him led off with accusations that Andrew Thomas had improperly clashed with Maricopa County judges over illegal immigration. In particular, they noted Andrew Thomas had disputes with the county courts over Prop 100, the "no bail for illegals" measure approved by Arizona voters. Thomas had merely demanded that county judges and their staff comply with the law and the will of the people by not releasing illegal immigrants accused of serious felonies into the community. For this alleged offense and other trumped-up accusations, Andrew Thomas was to be disbarred.

In two final ways did Arizona's courts make clear their intolerance of criticism and refusal to acknowledge the First Amendment rights of their critics. The Arizona Supreme Court ruled that one of Andrew Thomas' deputies had committed an ethical violation merely by respectfully sending written questions to county judges as part of a criminal investigation by duly elected county law-enforcement officials. This action, the court said, improperly probed the "judges' thought processes" and sought to "intimidate them."

In stark contrast, as part of their disbarment proceedings, the courts publicly grilled Thomas and other prosecutors about their "thought processes" in investigating judicial actors in the state. This questioning was done in open court and in plain violation of long-standing principles of prosecutorial discretion and attorney work-product doctrine. This was in addition to years of State Bar and judicial intimidation of Thomas and his subordinates. Ultimately, the Arizona Supreme Court ruled that attorneys who publicly criticize judges or seek to investigate them criminally in a written, respectful manner are subject to disbarment, in plain violation of the First Amendment and the basic principle of equal justice under law.

Finally, to maximize public attention and dislike of Thomas, the disbarment proceedings were held in the Supreme Court's own courtroom, an unprecedented

act.    The Supreme Court essentially vacated their courtroom for months and allowed it to be used as the stage for this show trial.  At the time of the Thomas disbarment, the Arizona State Bar, like almost all state bars, had rules ensuring confidentiality for its hearings, not a public show trial against attorneys and public officials.  Yet once again, the courts ignored their own rules—this time, to film and stream the proceedings over the Internet.

(Note:  Following key actions by Arizona Supreme Court Vice Chief Justice Hurwitz to orchestrate the Thomas disbarment, President Obama appointed him to the U.S. Court of Appeals for the Ninth Circuit.  In actions that puzzled national conservative observers, both Republican U.S. Senators from Arizona backed the appointment, despite Hurwitz's liberal politics and self-described role in the creation of Roe v. Wade.  Heritage Action noted, "Placing personal beliefs ahead of the law and the Constitution, as Mr. Hurwitz appears to do, is a dangerous subversion of the rule of law."  Hurwitz narrowly overcame a Republican filibuster.  Obama likewise appointed the Superior Court judge whose ruling set up Thomas' disbarment to be the new U.S. Attorney for Arizona.)

Sources:    E.J. Montini, "Still Doubting Thomas on Immigration?" Arizona Republic, June 18, 2010 (liberal columnist conceding Mr. Thomas' unique success          in          stopping          illegal          immigration);

https://www.scribd.com/doc/76160051/Affidavits-Calderon-Zlaket-LaSota-Beus-Cracchiolo-Wells-Lotstein (Affidavit of Chief Assistant County Attorney Sally Wells regarding judges pressuring State Bar to act against Thomas); Arizona Republic, June 17, 2010, https://sonoranalliance.com/state-bar-inquiry-of-thomas-illegal-unconstitutional-expert-says/ (tweets of chief justice and comments denouncing Thomas by Supreme Court spokesperson); In re Aubuchon, 233 Ariz. 62, 309 P.3d 886 (2013) (prosecutor's written questions to judges unethical); Arizona Supreme Court record of Andrew Thomas case; video of the Andrew Thomas State Bar hearing can be accessed and viewed at www.azcourts.gov/pdj/VideoPage.aspx (also available through a public records request); John Stanton, "Andrew Hurwitz Narrowly Escapes Filibuster," Roll Call, June 11, 2012.

RICO complaint

Also seen as an affront to elite sensibilities was a federal racketeering complaint filed by Thomas against the chief actors seeking his disbarment in violation of his civil rights. The lawsuit noted the State Bar, leading judges and others worked together to unconstitutionally deprive Thomas of his license to practice law. Leading former federal prosecutors later vouched for this lawsuit under oath. One was Robert Driscoll. He had served in a high position in the U.S. Justice

Department during the administration of President George W. Bush, and has appeared on the Fox News Channel for legal commentary. Driscoll aided in the prosecution of the federal RICO lawsuit.

To further squelch criticism of judicial misconduct even in the form of a lawsuit presented for disposition before the courts, the State Bar's attorneys claimed this suit was without merit, and even used it as the basis for professional discipline. Ironically, their subsequent disbarment of Thomas in violation of his rights--an outcome predicted in the RICO suit--validated the merits of the suit directly and spectacularly.

Source: RICO complaint filed in U.S. District Court for Arizona, https://www.scribd.com/document/23513901/Maricopa-County-RICO-Complaint.

Due Process (Fifth and Fourteenth Amendments)

Actual innocence

Andrew Thomas was demonstrably innocent of the core allegations used as the pretext for his disbarment.

Page 17 of 50

Cleared by Two Grand Juries

Two grand juries of citizens in Arizona cleared Andrew Thomas of the serious alleged wrongdoing for which the State Bar and court allies disbarred him. These and other facts demonstrate his actual innocence of the charges, findings established through parallel judicial proceedings controlled by ordinary citizens rather than judicial insiders and other elites.

A federal grand jury of citizens in Phoenix investigated the complaints against Thomas and exonerated him. The grand jury worked under the supervision of the Obama Justice Department. This liberal Democrat administration was politically hostile to Thomas and had every incentive to find wrongdoing.

Right after his disbarment, Andrew Thomas wrote the acting U.S. Attorney for Arizona. Thomas asked for the opportunity to testify before the federal grand jury investigating him regarding matters central to his disbarment. When the U.S. Attorney did not respond, Thomas released this request to the media so members of the grand jury and the public were made aware of it. Thomas was never called to testify, and in August 2012, four months after his disbarment, the Justice

Department quietly announced the grand jury had closed its investigation without any indictments.

A second grand jury, this one operating under state law, also cleared Andrew Thomas. Although grand jury proceedings, under Arizona law, are supposed to be secret, the Arizona Supreme Court acknowledged in an official opinion that a state grand jury investigated Thomas and his subordinates regarding "events related" to his disbarment. This investigation was in addition to the federal grand jury investigation under the Obama administration.

The judge who oversaw this second grand jury? Pinal County Judge William O'Neil, the same judge who later presided over Andrew Thomas' disbarment trial. In an official opinion, the Arizona Supreme Court conceded sheepishly that, when asked about the grand jury investigation O'Neil oversaw of the Maricopa County Attorney and fellow prosecutors, O'Neil replied that he "did not recall the grand jury investigation."

Empowered by the Constitution and state law to act independently of Andrew Thomas' accusers, this state grand jury of citizens ended their proceedings without any action against Thomas or his subordinates. This effectively exonerated him of wrongdoing on these same matters "related" to his disbarment, just as the federal grand jury's actions did.

Sources:    Evidence and testimony before the disciplinary panel in Andrew Thomas hearing, Sept.-Nov. 2011, video available online at Arizona Supreme Court, www.azcourts.gov/pdj/VideoPage.aspx (FBI officers and officials attended hearing and/or had access to entire testimony and record); Wright and Miller, Federal Practice and Procedure, Thomson West publishers, 2014 (standard treatise on federal criminal-law practice); In re Aubuchon, 233 Ariz. 62, 309 P.3d 886 (2013)(Supreme Court discussion of O'Neil's grand jury actions and breezy dismissal of same as unimportant).

Clear and Irrefutable Evidence of Good Faith

Andrew Thomas was accused of targeting and prosecuting his political critics. This is a charge rife with irony for several reasons, including both the political nature of the charges against Thomas and the fact that left-leaning prosecutors routinely target conservative defendants with no repercussions.  Regardless, the accusations against Thomas were provably false.

In fact, Thomas repeatedly tried to hand off the corruption investigations involving Maricopa County public officials and other government officials to

other prosecutors. He was blocked by these same Maricopa County officials and their allies—who, incredibly, later accused him of bad motives.

Andrew Thomas' office asked the U.S. Attorney's Office in Phoenix to handle these cases in early 2009. Federal prosecutors declined, claiming they "lacked the resources" to accept them.

In a stunning about-face, these federal prosecutors found the resources, less than a year later, to investigate how Thomas handled these same cases—cases they had refused to accept when given the opportunity.

When the U.S. Attorney's Office turned down Andrew Thomas' request to take over these matters, he eventually was able to refer them to the Yavapai County Attorney's Office. However, a few months later, the cases came back to the Maricopa County Attorney's Office after relations broke down between the Maricopa County Sheriff's Office, which was investigating the cases, and the Yavapai County Attorney's Office.

Finally, after all these attempts failed, Andrew Thomas appointed special prosecutors to handle the cases in late 2009. However, the Maricopa County Board of Supervisors refused to approve the appointment of these special prosecutors. Audaciously, after Andrew Thomas was then forced to handle these

cases himself, the board accused him of unfairly targeting them (Maricopa County grand juries promptly indicted two members of the board).

Only after all these efforts failed did Andrew Thomas move forward with the cases and attempt to prosecute them. That he repeatedly went the extra mile to find other prosecutors to handle these matters is conclusive proof he acted with the best of intentions.

Sources: Testimony and record from the Andrew Thomas case archived at the Arizona Supreme Court; Amy Wang, "Effort to hire Stapley prosecutors hits snag," Arizona Republic, October 20, 2009 (board's refusal to approve appointment of special prosecutors).

Liberal Columnist Sees Merit to Corruption Investigations

Laurie Roberts, a liberal columnist for the Arizona Republic, noted the evidence corroborating Thomas' corruption investigations involving Maricopa County government. These were cases blocked and scuttled by the courts, then used by the courts as the final pretext for targeting Thomas' law license. In a column entitled "County is proving corruption to be true," Roberts wrote:

"After reading the report on how things work in the county's Facilities Management Department, I'm thinking maybe Sheriff Joe Arpaio and his sidekick, former County Attorney Andrew Thomas, were on to something with all their talk of county corruption.

"Eleven county employees have now been put on paid leave, the result of an internal investigation that started when one of the workers began having second thoughts about taking freebies after seeing so many of his concert-going colleagues in the skybox of a company that makes millions off its county contracts.

"Meanwhile, Assistant City Manager Kenny Harris, who oversees Facilities, was fired this week. Though Harris was reportedly fired over an unrelated matter, the investigation found that he played in several golf tournaments as the guest of county vendors, including both the project manager and the builder of the county's $340 million court tower — a construction project that he was supervising.

"Yeah, that would be the court-tower construction project that Arpaio and Thomas were nosing around.

"The investigative report outlines a culture in which freebies were routinely handed out to county employees who thought nothing of settling themselves into the luxury suites of the companies whose contracts they played a role in overseeing."

Biased judge

The judge who oversaw the Andrew Thomas disbarment case and wrote the disbarment opinion was not merely biased. For a time, pursuing Andrew Thomas became something of a full-time job for him.

Over the span of approximately two years, Pinal County Judge William O'Neil (1) blocked Thomas from prosecuting a fellow senior judge from Maricopa County, (2) presided over a criminal grand jury investigation of Thomas, (3) was promoted by the Arizona Supreme Court to the new position of chief judge handling attorney ethics cases, including the Andrew Thomas case, and (4) presided over the Thomas trial and wrote the disbarment order.

In 2010, O'Neil completely halted the state's prosecution from moving forward against the Maricopa County judge. Such an extraordinary judicial act violates the Constitution's separation of powers (prosecutors are members of the

executive branch) and may well be an unprecedented act by any judge in a criminal case.

After his ruling in favor of the judge, the Arizona Supreme Court promoted O'Neil to handle attorney disciplinary cases, which included the Thomas case. O'Neil then presided over the disbarment trial for Thomas, which centered on the very same case against the fellow Superior Court judge in whose favor O'Neil already had ruled.

Instead of recusing himself from the Thomas proceedings, given his earlier actions, O'Neil went ahead and handled the Thomas case, writing the disbarment order. Afterwards, a witness came forth who testified, under oath, O'Neil had bragged privately to him he was a "friend" of the judge Andrew Thomas had prosecuted, and Thomas had "no right to treat judges like that."

It later came to light that O'Neil had also presided over a grand jury investigation of Thomas. In an official opinion, the Arizona Supreme Court noted that this grand jury investigation involved "events related" to Thomas' disbarment. O'Neil claimed he could not recall the grand jury investigation of Thomas, at the time one of the best known elected officials in the state.

In a front-page article in April 2014, the Arizona Republic scrutinized the ethics of O'Neil and the Supreme Court's professional interactions with him, including questions about the court's handling of complaints against O'Neil.

Sources:   In re Aubuchon, 233 Ariz. 62, 309 P.3d 886 (2013)(Supreme Court discussion of O'Neil grand jury supervision); public record from the Andrew Thomas case archived at the Arizona Supreme Court, including affidavit of Mark Dixon; interview of Mark Dixon on The Jim Sharpe Show/KFYI Radio; "Bar's Witch Hunt" editorial in Arizona Republic, previously cited; Dennis Wagner, "Divorce case stirs ethics allegations against judge," Arizona Republic, April 16, 2014.

Double Standards/Violation of Bar's Own Rules

Nationally renowned and esteemed former federal prosecutors and ethics experts testified under oath that Andrew Thomas acted properly on key matters in the cases at issue and/or that the proceedings violated his civil rights.

One was Ronald Rotunda.  A law professor at the Chapman University School of Law, Rotunda was one of the nation's leading authorities on constitutional law and legal ethics.  A Harvard Law School graduate and assistant majority counsel

for the Senate Watergate Committee, Rotunda was co-author of both the "most widely used legal ethics course book in the United States" and a six-volume treatise on constitutional law. A study by the University of Chicago ranked Rotunda as the 17th most influential law professor in the nation. His works have been cited by federal and state courts more than 1,000 times.

Reviewing the actions of John Phelps, the Executive Director and CEO of the Arizona State Bar, in initiating the State Bar proceedings against Thomas, Rotunda stated in an affidavit the Bar proceedings were initiated unlawfully. Rotunda said "it is beyond any reasonable dispute or question that [the Executive Director and CEO of Arizona State Bar] does not have any legal authority to initiate bar investigations." This is because "[t]he policy behind the law" is to "separate the administrative and political areas of the bar from the enforcement area of the bar, so as not to politics or administrators to influence ethical investigations."

Nevertheless, Phelps "without the benefit of any statute or rule, initiated and insinuated himself into an ethics investigation."

Rotunda added under oath: "In my forty years of experience as a practicing lawyer, legal scholar and law professor, concentrating in the areas of legal ethics

and constitutional law, I have never witnessed, confronted, nor heard of a situation where an administrative or executive officer of a state bar organization has initiated and commenced an ethics investigation against a lawyer, without any specific legal authority authorizing his actions." Rotunda added, "it is my opinion that [the] initiation of the Bar investigations against Mr. Thomas, et al. was without benefit of law and illegal, and consequently violated the due process rights of the investigative subjects."

He concluded "the State Bar of Arizona's reckless use and false representation of its authority to initiate investigations of attorneys is a denial of the fundamental right to due process applicable to disciplinary investigations."

Another key witness was Bob Barr. A former U.S. Attorney in Georgia who later served in Congress, Barr was one of the House Managers of the impeachment trial of President Bill Clinton.

In a series of affidavits, Barr concluded the process used against Thomas "violates the State Bar's rules and procedures and, more importantly, violates Mr. Thomas, et al.'s constitutionally-protected due process and equal protection rights." The State Bar had violated its own "rule requiring a written complaint to be lodged prior to the initiation of any ethics investigation." Instead,

"Independent Bar Counsel has represented that there are no written complaints and that he is maintaining an 'open file' with the State Bar of Arizona."

"The due process violation inherent in this procedure is obvious," Barr explained. "Without specific notice of the complaints against them and the facts that inform those complaints, it is impossible for Mr. Thomas, et al. to adequately defend themselves against those charges. Moreover, without written documentation of the complaints pending against them, the investigation can morph and grow regardless of any defense offered by Mr. Thomas, et al. This is utterly contrary to the notions of fairness and justice in this country and does not amount to procedural due process by any reasonable or legal concept thereof."

Since other attorneys given benefit of the rule are treated differently, Barr noted, "This disparate treatment is a violation of Mr. Thomas, et al.'s right to equal protection of the law under both the U.S. Constitution and the Constitution of Arizona."

Moreover, "prosecutors...enjoy absolute immunity from civil liability for their actions in initiating prosecutions...the State Bar is employing its power improperly to interfere with the prosecutorial discretion of" Mr. Thomas.

Barr agreed with Professor Rotunda that the initiation of the State Bar proceedings against Thomas was "illegal." He added, "The blatant disregard for the rule of law" here "and failure to abide by the State Bar's own rules is not only unusual, it is practically unheard of."

Finally, Barr stated that the negative actions taken by the State Bar and State Bar president against one of Thomas' expert witnesses, Ernest Calderon, "is a clear and unambiguous threat" and an "illegal threat against a witness" that was never retracted by the State Bar or Arizona Supreme Court. (The facts of the Calderon retaliation are discussed later.)

"The most widely-recognized example of witness intimidation is in the criminal prosecution of members of the mafia," Barr noted. He stressed "a threat issued to a witness in one prosecution can have the very real effect of chilling witness testimony in many prosecutions....That general statement risks chilling witness testimony in any ethics investigation against Mr. Thomas and those to be allied with Mr. Thomas."

"If the Arizona State Bar is willing to retaliate against an attorney who served only as a witness for Mr. Thomas," Barr stated, "there is no reason to believe it would not retaliate against attorneys who represent Mr. Thomas or others who are

being investigated based upon allegations made by the State Bar." Additionally, "the State Bar has an outstanding and unrepudiated threat against attorneys and witnesses who may testify or act on behalf of Mr. Thomas, et al. The foregoing situation is extraordinary, unprecedented and a violation of the investigative subject's right to due process."

A nationally recognized expert on legal ethics, Yale Law School graduate Peter Jarvis, stated under oath Andrew Thomas had no conflicts of interest in handling key cases at issue.

As of the time of this posting, Ballotpedia, known for its liberal bias, was constrained to note Rotunda's serious allegations about civil rights violations in the Thomas case.

Sources: Numerous media reports of federal grand jury investigation of Thomas and closing of investigation in September 2012; In re Aubuchon, 233 Ariz. 62, 309 P.3d 886 (2013)(state grand jury investigation); Laurie Roberts, "County is proving corruption to be true," Arizona Republic, December 13, 2011; affidavits of Bob Barr, Robert Driscoll, Peter Jarvis and Ronald Rotunda, and testimony of Driscoll, part of the public record from the Andrew Thomas case archived at the Arizona       Supreme       Court.       Rotunda       affidavit:

https://www.scribd.com/doc/76159666/Legal-Ethics-Expert-Ronald-Rotunda-State-Bar-prosecution-of-Andrew-Thomas-is-inappropriate; Bob Barr affidavit on due process: https://www.scribd.com/doc/76158864/Bob-Barr-Illegal-Threat-Opinion-on-disbarment-proceedings-against-Andrew-Thomas; second Bob Barr affidavit on due process: https://www.scribd.com/doc/76159124/Bob-Barr-Arizona-Bar-s-Lack-of-Written-Complaint-Opinion-Against-Andrew-Thomas; Barr affidavit on illegal threat: https://www.scribd.com/doc/76158864/Bob-Barr-Illegal-Threat-Opinion-on-disbarment-proceedings-against-Andrew-Thomas; Ballotpedia entry on Andrew Thomas: https://ballotpedia.org/Andrew_Thomas (noting Rotunda opinion of illegality of Thomas disbarment).

Commentators

Even liberal critics and commentators who opposed Andrew Thomas' politics spoke out against the railroad job that was unfolding.

The liberal editors of the Arizona Republic first denounced the State Bar's persecution of Thomas in 2008. The title of the editorial was "Bar's Witch Hunt."

The next year, the editors noted, the State Bar was at it again. They wrote in March 2009:

"Has the state Bar demonstrated humility for its foolish vengeance-seeking against Thomas? Of course not. Instead, on the very day the last of the 13 politically tainted investigations were finally dropped, the state Bar revealed it has opened yet another investigation . . .

"The state Bar zealously guards the interest of the court, an institution Thomas has attacked. And if the last round of fruitless investigations isn't sufficient to raise doubts, this little fact should be: [the] president of the state Bar is one of the private lawyers hired by the county to replace Thomas.

"Last summer we cited the state Bar for conducting a 'witch hunt' against Thomas, a 13-count expedition we sensed was rife with political motives. Now we see the hunters are still in the field, stumbling about drunk on bad-judgment juice."

Arizona Republic columnist E.J. Montini, a very liberal writer who strongly opposed Andrew Thomas' politics, wrote after the filing of the disbarment complaint against Andrew Thomas that the upcoming court hearing appeared to have a foregone conclusion. "In America, we believe that a person accused of wrongdoing has a right to make his case before a jury of his peers," Montini

wrote. "Thomas will face a jury of peers – who hate him." He outlined the procedural unfairness that already was evident in the case against Thomas.

Having editorialized twice before against the State Bar's unfair targeting of Andrew Thomas, the Arizona Republic criticized the process once again after disbarment proceedings were initiated. They described the disbarment complaint against Andrew Thomas as "almost hysterical spleen-venting."

(Note:    Subsequent Arizona Republic editorials predictably defended the disbarment proceedings and contradicted these earlier writings. Their numerous previous writings documenting these abuses, written in real time, nevertheless still stand. They are no longer available online at azcentral.com and apparently can be accessed only on library microfiche.)

Chronicling the Thomas case, establishment political-consultant-turned-columnist Bob Robb was direct. He wrote, in a series of columns, that the case showed the "credibility of the Supreme Court's disciplinary process has been severely shaken"; "the gross overcharging…gives credence to Thomas' claim that he is the victim of a witch hunt"; and the final disbarment ruling made clear Thomas "never had a chance" at fair treatment by the judicial panel.

The Maricopa County Republican Committee, for its part, overwhelmingly passed a resolution denouncing the State Bar proceedings against Thomas as "baseless and politically motivated." The committee and other Republican Party leaders gave Thomas a standing ovation when he addressed them immediately following his disbarment (as did other GOP and Tea Party groups in Maricopa County).

Other publications across the country blew the whistle on the hatchet job. Some are cited below.

Sources:

Liberal writers: Editorial, "Bar's Witch Hunt," Arizona Republic, June 8, 2008; Editorial, "Revenge, paranoia set off bender of bad judgment," Arizona Republic, March 17, 2009; E.J. Montini, "Thomas Facing a Jury of Wrathful Peers," Arizona Republic, December 12, 2010; Editorial, "Supervisors are obligated to pay costs," Arizona Republic, May 19, 2011; Laurie Roberts, "County is proving corruption to be true," Arizona Republic, December 13, 2011; Bob Robb, miscellaneous columns, Arizona Republic, 2010-2012.

National publications: John Hawkins, "Is the State Bar of Arizona Targeting Conservatives for Blogging and Fighting Illegal Immigration?" Rightwingnews.com, September 14, 2011; Selwyn Duke, "Corruption in Maricopa County," AmericanThinker.com, October 12, 2011; Christopher Wager, "Maricopa County, AZ Seat to Unprecedented Judicial Corruption," DigitalJournal.com, July 30, 2012; "Tea Parties Rallying Around Andrew Thomas," TeaPartyTribune.com, April 10, 2012.

Right to Counsel (Sixth and Fourteenth Amendments)

Andrew Thomas could not defend himself effectively against his accusers because Maricopa County officials—the very ones who filed the State Bar complaints against him—fired his lawyers no fewer than five times. In these and other actions, these officials exploited the courts' bias against Andrew Thomas, knowing they could get away with ignoring his civil rights.

In response to Andrew Thomas' corruption investigations and indictments of high-ranking Maricopa County officials, members of the Maricopa County Board of Supervisors and/or their subordinates took the following actions:

filed complaints with the State Bar;

"fired" Thomas as counsel for county civil matters in violation of state statute;

hired in Thomas' place the President of the State Bar and his law firm;

filed civil claims and actions against their own Maricopa County government, and collectively received millions of dollars of settlements and payouts without having to go to trial; and

repeatedly fired Thomas' lawyers while acknowledging publicly and in writing their obligation to provide him counsel.

The last action directly implicated Thomas' right to counsel.

"Repeatedly Fired"

The Arizona Republic noted Maricopa County officials "repeatedly fired attorneys retained by Thomas" in the course of the State Bar matters. One of Andrew Thomas' attorneys was former State Bar President and Democrat Ernest Calderon.

This meant Andrew Thomas went through multiple sets of lawyers and had his defense severely disrupted. He did not know day to day if he would have counsel

at all. County officials did this even though they acknowledged the county was legally required to provide counsel for Thomas, and the Maricopa County manager himself had filed the State Bar complaints that were being investigated.

Maricopa County grand juries indicted two out of five members of the Maricopa County Board of Supervisors. Nevertheless, the board of supervisors brazenly fired Andrew Thomas' attorneys in April 2012 so he could not effectively appeal his disbarment order. A majority of board members ultimately accepted payouts for claims and lawsuits they filed against the county—payouts based in part on the disbarment order whose effective appeal they thwarted.

Importantly, any of the judicial actors in this saga could have acted to safeguard Thomas' right to counsel. Yet all declined to do so.

Judge O'Neil could have acted sua sponte, or on his own initiative, to stop the proceedings and take corrective action in response to these multiple firings. O'Neil had notice of these firings and related actions from defense counsel motions to withdraw as well as media reports. Indeed, and in contrast, O'Neil did act on his own on a different matter: he declared the Thomas disbarment case to be one of "historical importance" and ordered its permanent archiving.

Likewise, the Arizona Supreme Court could have acted to ensure the proper legal defense of Thomas and his subordinates in the disciplinary proceedings. Instead, when one of Thomas' deputies attempted to appeal her disbarment to the high court, after her counsel had been fired, the court ridiculed her lack of familiarity with appellate practice as they dismissed her appeal. This was in addition to sweeping aside other due process concerns raised in the appeal that reflected negatively on the court's judicial colleagues.

Despite this, some of the finest legal ethics attorneys in Arizona believed in Thomas' innocence and sought to represent him. His final team of attorneys bravely compared the State Bar proceedings to a witch hunt worthy of Monty Python.

"Fire" the County Attorney, Hire the State Bar President in His Place

Maricopa County officials took other parallel actions that foreshadowed that institution's arrogant defiance of attempts to investigate the 2020 presidential election a decade later.

After the indictment of a county supervisor on corruption charges, the board of supervisors voted to "fire" Thomas, the duly elected Maricopa County Attorney,

and replace him with other counsel. Eventually, the board took over most county litigation matters from his office.

By hiring their own counsel, the board of supervisors retained attorneys who could communicate privately with both the board of supervisors and the persons and institutions which controlled Andrew Thomas' law license. These were the Superior Court, which had retained the same law firm, and the President of the State Bar, who worked in the same firm. In other words, communications could flow freely among the board, courts, and State Bar in secrecy—and at taxpayer expense—as these three entities worked together to target Andrew Thomas' law license.

Two years later, the Arizona Court of Appeals disallowed the board's decision to hire their own counsel, instead of the Maricopa County Attorney, as violating state statute. By then, however, Maricopa County officials had wasted huge sums of taxpayer dollars, wrecked county government, and successfully retaliated against the law-enforcement authorities who had challenged them.

"An Insult to Taxpayers"

This denial of counsel had other consequences.  Maricopa County officials filed lawsuits against their own entity, Maricopa County, related to alleged wrongful prosecutions on which the Thomas disbarment was partially based (and rejected by two grand juries).  This included claims by three out of five members of the Maricopa County Board of Supervisors at the time, officials who directly or through subordinates repeatedly fired his lawyers and disrupted his defense and ability to appeal the disbarment decision.

The Arizona Republic denounced these claims as "an insult to taxpayers."  The process set up for settling these cases, they wrote, "is rife with opportunity for self-dealing and abuse."  The county manager handling the claims "works at the pleasure of the very people who would benefit from the quiet, discreet, out-of-the-public-view mediation process he has constructed."  Ultimately, millions of dollars were handed out to Maricopa County officials by subordinates at Maricopa County government without their having to prove their case to a jury.

Sources:

Firings of Thomas attorneys:  Public record, including multiple motions to withdraw as counsel filed by Thomas' counsel before and after State Bar hearing, in Andrew Thomas case archived at Arizona Supreme Court; Arizona Republic,

October 28, 2011 (county officials "repeatedly fired" Thomas attorneys). Board of supervisors and/or their employees fired Ernest Calderon by removing him from list of county-approved private attorneys, without explanation, in 2010; board fired next set of Thomas attorneys, Ogletree Deakins, in public vote in 2010; board and/or their employees constructively fired next set of Thomas attorneys, Broening Oberg Woods & Wilson, in 2011 by repeatedly refusing to pay their legal fees, forcing them to file motion to withdraw on eve of State Bar hearing (later rescinded after payments were belatedly made); board fired Broening Oberg directly by refusing to pay for appeal of Thomas disbarment order in 2012; board fired Broening Oberg fifth and final time by refusing to pay for representation regarding bar costs, the last matter they were handling. See also In re Aubuchon, 233 Ariz. 62, 309 P.3d 886 (2013) (Arizona Supreme Court ridicule of appellant's "nonconforming briefs" after her county-supplied counsel was fired, despite court's constructive awareness of firing).

Thomas defense brief quoting "Monty Python and the Holy Grail" (introduction to brief): https://www.scribd.com/doc/79021560/Andrew-Thomas-State-Bar-Investigation.

Unlawful "firing" of Thomas by supervisors: Source: Romley v. Daughton, Arizona Court of Appeals decision (2010).

Payouts: Editorial, "Officials' legal claims an insult to taxpayers," Arizona Republic, December 30, 2010; Editorial, "Confused by infighting? Decipher the litigation," Arizona Republic, April 17, 2012.

Right against Excessive Fines and Cruel and Unusual Punishment (Eighth and Fourteenth Amendments)

Piling on even further, the Arizona State Bar sought to extract from Thomas and two deputy prosecutors they simultaneously targeted the cost of their show trial. After the disbarment, the State Bar demanded from them costs in excess of half a million dollars. Faced with that looming threat, his lawyers being fired yet again (with the implicit approval of the courts), and a justice system hostile to his rights, Thomas was coerced into agreeing to costs of over $100,000. (Disclaimer: The State Bar did not seek to convert the ruling into a judgment against Thomas and his wife nor collect the amount, but rather seemed content to let the outstanding financial threat chill Thomas' criticism of the proceedings.)

Source: State Bar filings and other documents included in Arizona Supreme Court record of Thomas case.

Ex Post Facto Clause

The Arizona State Bar accused Thomas of unfairly targeting political foes with prosecutions.  Two grand juries dismissed these allegations.  Regardless, these core ethics charges were created out of thin air and violated the ex post facto clause of the Constitution.

The ex post facto clause prohibits the government from punishing people for violating rules that did not exist at the time of the alleged misconduct.  The Constitution requires that the government give citizens clear and proper notice ahead of time that certain conduct is unlawful.  This rule was not honored in the Thomas case.

At the time Thomas was in office, there was no ethical rule regulating alleged "political" considerations for prosecutorial misconduct.  Years later, the American Bar Association created Standard 3-4-4 of its Model Standards for Prosecution to proscribe political motivations in bringing prosecutions.  However, this standard was not law and was not created until 2015, three years after the Thomas disbarment (and perhaps was intended to cover judicial tracks in regard to the high-profile Thomas case).  The rule was not adopted formally in Arizona by the courts, and is applied selectively even now.  For example, prosecutors who

campaigned for office by assailing President Trump in New York are openly prosecuting his organizations and associates today, yet receive a free pass.

Moreover, the relevant terms and definitions for "political prosecution" are unavoidably vague and ill-defined. Indeed, any person arguably could avoid prosecution under this rule by giving a political contribution to the prosecutor's electoral opponent.

Similarly, Arizona's courts had no authority to appoint independent State Bar counsel to go after Thomas. The courts adopted the rule that permitted such appointments years later in an attempt to sanitize their behavior after the fact.

Source: ABA Criminal Justice Standards adopted February 2015 by ABA House of Delegates; Arizona State Bar rules and related history.

Equal Protection of the Laws (Fourteenth Amendment)

Throughout the five years they spent pursuing Andrew Thomas' law license, the Arizona State Bar and state courts repeatedly created new and unique rules and procedures to facilitate this quest. These "Thomas-only" actions were textbook

examples of "class-of-one" equal protection discrimination. This open discrimination denied him his right to equal protection of the laws.

The Arizona Supreme Court brushed off these claims by stating the right of equal protection of the laws does not apply to attorney disciplinary procedures. This was simply the latest misleading intellectual dodge by the court. Like all other U.S. courts, the Arizona Supreme Court has not countenanced discriminatory treatment of ordinary criminal defendants, for example. Yet it was satisfied to do so when the court's critics were in the dock.

Sources: Rotunda and Barr affidavits cited previously (new Thomas-only rules violated due process and equal protection clauses); In re Aubuchon, 233 Ariz. 62, 309 P.3d 886 (2013)(Arizona Supreme Court rules that rights of equal protection of the laws and ex post facto clause do not apply to attorneys in disciplinary context yet apply to criminal defendants and essentially everybody else).

Aftermath

2014 Gubernatorial Elections

Following his disbarment, Andrew Thomas announced his candidacy for governor of Arizona. Running on a platform of securing the border and standing up to activist judges, he collected signatures from just under 10,000 Arizona voters, almost double the number required to qualify for the ballot. More than 4,500 Arizona citizens contributed $5 to his campaign. As a result, he qualified for more than $750,000 in Clean Elections funding for his campaign.

Thomas received the endorsements of the immediate past state Republican Party chairman, the immediate past Maricopa County Republican Party chairman, numerous conservative grassroots leaders, and Fox News contributor and conservative heavyweight Michelle Malkin. Malkin described Thomas as a "true and tested independent leader," and praised him for withstanding "nightmarish abuse at the hands of the state's liberal judicial and legal elites."

Despite being vastly outspent by multi-millionaire establishment opponents and taking on the no-holds-barred opposition of the ruling class, Thomas ran a strong race and successfully promoted the conservative causes for which he had sacrificed his career.

"Andrew Thomas Revenge Law"

Thomas' gubernatorial campaign drew greater attention to the need for judicial and State Bar reforms. The following year, the Arizona legislature formed a joint legislative study committee to consider State Bar reforms. Lisa Aubuchon and Rachel Alexander, two brave Maricopa County prosecutors who lost their livelihoods as casualties of the Thomas bar proceedings, advised the committee.

Following the recommendations of the committee, the Arizona House of Representatives voted in 2016 to pass the so-called "Andrew Thomas Revenge Bill." The legislation would have essentially dismantled the State Bar. The Arizona House of Representatives passed the legislation. In the state Senate, this legislation passed on the first vote but then failed on the second and final vote, following fierce lobbying by the State Bar and pressure from the media.

Sources: E.J. Montini, "Lawmakers take up 'Andrew Thomas Revenge Bill 2.0,'" Arizona Republic, April 4, 2016 (ignoring and contradicting Montini's prior denunciations of the same State Bar proceedings against Thomas); Rachel Alexander, "Arizona Legislature Finally about to Dismantle Corrupt Arizona Bar," Townhall.com, March 7, 2016.

Empower the States

As a Fellow at the Selous Foundation for Public Policy Research, Thomas led the Empower the States movement. Building on a white paper authored by Thomas, this program advocated withdrawing jurisdiction from the federal courts over policy areas where judicial activism had undermined state sovereignty. Republican and conservative leaders in all four border states signed on, along with many Republican and Tea Party groups in those four states. Thomas traveled and spoke to a number of those groups throughout Arizona and other border states to gain support for the reforms.

The Trump Presidency and the 2020 election

The election of President Donald Trump and his signature promise to "Build the Wall" to secure the U.S. border were a triumph of the grassroots politics popular for many years in Arizona. The dark forces and ruling-class machinations that came down on President Trump and his administration were very much reminiscent of those deployed against Thomas a decade before.

The Maricopa County Board of Supervisors' opposition to the Arizona State Senate's attempts to audit the 2020 election results in Maricopa County were a

fresh reminder, a decade later, of the obstacles Thomas faced in attempting to hold accountable members of that same institution.

Dated: _____

_____
**Andrew Peyton Thomas**

Affidavit of Lisa Aubushon

Exhibit E

## AFFIDAVIT OF LISA AUBUCHON

I, Lisa Aubuchon, hereby state under penalty of perjury, that the following is true and accurate based on my personal knowledge:

I was admitted to the Arizona State Bar in 1990 after graduating from law school at Arizona State University;

I clerked at the Arizona Court of Appeals from 1990-1991;

I worked as an Assistant Attorney General from 1991-1994/5;

I worked as a deputy county attorney from 1994/5-2010:

I have attached my resume with details on my jobs;

I was promoted several times and ended my career with the Maricopa County Attorneys' Office as a special assistant and division chief over more than 100 employees including 50 attorneys except for a short time in homicide due to retaliation;

I was also in charge of prosecuting public corruption while at the county attorney's office;

Due to the nature of the position and investigations, the office became embroiled in a fight with the judicial officers over prosecution of illegal aliens and then due to questionable expenditures for judicial buildings:

On one occasion, a grand jury investigation was in process and one of the targets was a contract attorney hired by the presiding judge and another target was the presiding criminal court judge;

The targets became aware of the grand jury investigation despite the legal requirement of secrecy;

The target's attorney moved to disqualify the office from the prosecution;

1

The judge that was the target o the investigation refused to recuse himself even after being told he was a target of the investigation and set a hearing on the month;

I was forced to file criminal charges due to his obstruction of justice;

He requested the Arizona Supreme Court dismiss the charges and they denied it;

A hearing was held before Pinal Judge William O'Neil at which time he put a stay on the case;

The Maricopa County Attorney then resigned to run for another office;

The Board of Supervisors replaced him with a former county attorney Richard Romley who was a very outspoken critic of my boss'

Romley then placed me on administrative leave and fired me;

My incompetence was cited despite the fact that he himself had promoted me and written a letter for me to become a judge as well as I had decades of exceptional evaluations;

The Arizona State Bar began an investigation into me and others including the former county attorney as well as Rachel Alexander;

The Arizona Attorney General's Office began a criminal grand jury investigation into me because I was "seen by a shredder" reported by one of the former county attorney's political adversaries who was not even there;

Judge William O'Neil presided over the grand jury investigation into me which never went anywhere as there was no evidence I had done anything wrong;

There was also a federal grand jury investigation in which the grand jury refused to indict me, the former county attorney, Sheriff Joe Arpaio and his chief deputy;

The State Bar then changed the very process of the disciplinary matter to make it easier to disbar us which was for political reasons;

2

The State Bar also tried to get a "bar prosecutor" that had previously represented me in the only other bar complaint ever filed by a criminal defendant against me;

The State Bar then hired an out of state bar prosecutor who was never admitted to practice in Arizona, the same person that had helped them change the disciplinary system. While admitting they had a conflict of interest which is why they needed to hire someone else. They worked closely with that person as did Romley;

The prior system required one officer to determine probable cause then an entire panel to recommend discipline and the Arizona Supreme court would decide. The State Bar was able, with the help of Colorado bar personnel to change the system so there would be a committee that determined probable cause and then one judge, one attorney and one lay person would decide discipline. In my case, the State Bar bifurcated the process, filing first when there was one officer to decide probable cause. The State Bar then waited until the new system was in place so the three person panel, not a committee recommendation and Supreme Court would decide. I was deprived of ever having a probable cause determination or trial before a full committee;

The judge that was appointed to oversee the matter was William O'Neil. When he was asked to recuse himself, he said he had no recollection of presiding over a grand jury investigation into me despite being presented with minute entries with his name on them;

During a settlement conference, I was offered a two year suspension by the State Bar through a lawyer that was mediating. He and my attorney almost were in a fist fight because when my attorney asked him why would I take a two year suspension when I did nothing wrong, he said because "it's a done deal". ."you cannot be allowed to prosecute judges". . .;

In discussions with the attorneys defending the targets of this State Bar vendetta that was a "done deal," the bar prosecutor promised he would not seek reimbursement for any out of state travel or other expenses that would not normally be assessed against the regular bar prosecutors. However, after the hearing was done, they requested close to $500,000 in costs, directly opposite as

3

to what was promised. As such we were forced to agree to $100,000 joint and several and expected the County to pay it as they had every other case. Instead, they refused resulting in a lengthy and unsuccessful civil case that, in yet another unbelievable situation, included the very judge from Arizona on the 9th Circuit panel that had denied stopping the prosecution of the judge. The only outside on the panel agreed we should be able to proceed with our case;

After a lengthy trial, Judge O'Neil and his handpicked committee disbarred me and even cited testimony that was directly opposite (as proven by the court reporter) as to what was said. One example was that the officer that swore in the complaint against the judge for the criminal charges said he believe there was probable cause. In the opinion, he said the officer said there was no probable cause. Judge O'Neil even found that I committed perjury because I filed a complaint he felt was false;

The Arizona Supreme Court denied my appeal, never addressed the false claims by O'Neil, did not care about O'Neil's conflicts, but did find I had not committed anything reflecting dishonesty. Instead, they upheld the disbarment because they disagreed with my charging decision;

I know have been unable to practice for the last 15 years due to the $100,000 plus interest assessment hanging over our heads even though I could normally have reapplied after five years;

In a final attempted jab, O'Neil and the State Bar attempted to get the rules changed so that if you were disbarred, you could never reapply. Fortunately that was rejected.

I hereby verify that the foregoing is true and accurate under penalty of perjury.

Dated this October 3, 2025.                    By:

Lisa Aubuchon

4

Mark Dixon 2014 Affidavit, Notarized

Exhibit G

Affidavit of Mark E. Dixon

I, Mark E. Dixon, hereby state under penalty of perjury that the following statements are true based on my best belief and information:

1) I personally knew Robert Gallo since January 2000 when I began doing work for Gallo Construction.

2) I have personally known William J. O'Neil since 2004.

3) I personally knew Mac Holmes, William O'Neil's father-in-law and Sarah Holmes's late husband. Brien Brenfleck provided construction safety advice for Sarah Holmes and Mac's Grading, Paving & Engineering Inc.

4) Robert Gallo and William J. O'Neil live next door to each other and were close personal friends until Robert Gallo's death. William J. O'Neil exercised a significant amount of influence over the elderly Mr. Gallo.

5) Robert Gallo served as a panel member on at least 5 disciplinary hearings with William J. O'Neil as the Arizona Supreme Court Presiding Disciplinary Judge.

6) In those 5 hearings, their relationship was not disclosed.

7) I filed a complaint with the Commission on Judicial Conduct on two occasions regarding the conflict of interest in the disciplinary hearings O'Neil and Gallo sat on.

   a) The first filing was an addition to another complaint and was accepted by the now Arizona Court of Appeals Judge Michael O Miller on September 24, 2012, who was the screening officer for the Commission on Judicial Conduct. The allegations were never addressed in the findings. On 9-21-12 Judge Miller wrote "You may continue to send to the Commission any documents you wish to have filed in this case." On 9-24-12 judge Miller wrote "As I indicated in my original email, it will become part of the file, the same as the papers attached to your original complaint."

   b) A separate complaint was filed with the Commission on Judicial Conduct addressing the O'Neil/Gallo conflicts on April 16, 2013 and it too was ignored.

8) Brien Brenfleck and William J. O'Neil are close personal friends and have been for many years; Brenfleck lived with O'Neil for a period of time several years ago.

9) William J. O'Neil orchestrated several schemes using his authority and official capacity for personal financial gain in the short sale of Sarah Holmes's, his mother-in-law's house. Brien Brenfleck purchased Holmes's house in a short sale and then transferred a 50% interest in the property to William J. O'Neil and his wife, Holmes's daughter. Linda Pixler was the

Affidavit of Mark E. Dixon, 1

agent/broker. Brien Brenfleck, William J. O'Neil, Linda Pixler and Sarah Holmes are all close personal friends.

10) In January 2008, Carol Dixon/Johnson, then president of Terra Firma Contracting Solutions, entered into contracts with Cannon & Wendt Electric and Midstate Mechanical to provide excavation services at the Vista Grande High School construction project in Casa Grande Arizona under the general contractor, Sundt Construction.

11) Brien Brenfleck was employed by Sundt Construction at the time.

12) In the spring of 2008, Sundt Construction, thru Brien Brenfleck, diverted approximately $6000.00 worth of materials from the Vista Grande High School construction project to William J. O'Neil's residence.

13) I delivered those materials and, installed them, along with Brutinel Plumbing in Casa Grande, at O'Neil's residence for his wife's horse boarding business. On several occasions Brien Brenfleck approached me inquiring if there were enough materials at O'Neil's house.

14) Brutinel Plumbing was started by Robert Brutinel in Casa Grande. The O'Neil and Brutinel families are long-time family friends with business dealings. William J. O'Neil has stated that he has an undisclosed interest in Brutinel Plumbing, now operated by Wes and Ron Baker, and they do all of O'Neil's plumbing and electrical work for free.

15) July 18, 2008, at the request of Sundt Construction, Carol Dixon/Johnson entered into a separate contract with Cannon & Wendt Electrical to provide excavation for gas lines at the Vista Grande public high school construction project. The compensation offered by Sundt was approximately double the going rate.

16) In August 2009, I was contacted by Cannon and Wendt Electrical and asked to pick up "left over" electrical materials from the Vista Grande High School job.

17) After an inventory was taken by a local electric supply salesman, it was determined that the value of those materials exceeded $25,000.00.

18) Carol Dixon/Johnson then told me that the materials were supposed to go to Brutinel Plumbing. When asked why, she told me that was why the gas line excavation contract was so high. She also informed me that O'Neil assisted her in court action in Pinal County which awarded her custody of her granddaughter from the mother and her son, so she owed him.

19) William J. O'Neil also contacted me and ordered me to deliver the materials to Brutinel Plumbing.

20) I contacted Cannon & Wendt asking if there was some sort of agreement and was informed the materials were "given" to me and I could do with them as I wanted. At that time, I offered to bring them back and the offer was refused.

21) I had no knowledge of any agreement to "pass thru" construction materials to any other party. Further, once I discovered it, I refused to be a party to the underhanded transaction entered into by Carol Dixon/Johnson, William J. O'Neil and Brien Brenfleck/Sundt Construction through which William J. O'Neil gained significant personal financial benefit from a public building project.

22) On many occasions, attorneys representing me or attorneys I have attempted to hire have been threatened.

a) William Pearlman was representing me in a civil case against Pinal County. Mr. Pearlman was offered a settlement of $1 plus attorney fees. He informed me that the individuals I was taking on, including William J. O'Neil, were too powerful and said he would split the attorney fees with me, which he said would be significant, if I would take the offer, I refused. Against my wishes, Mr. Perlman accepted the offer anyway. When I confronted him, he said he did it out of fear of retaliation from O'Neil, the Judiciary and the State Bar. I allowed Mr. Pearlman to resign as my attorney. On Several occasions since his resignation, Mr. Pearlman expressed his fear and concerns over retaliation and encouraged me to "leave things alone."

b) Kent Volkmer was representing me in a CPS matter. I was awarded sole custody and sole decision making authority for my children by Hon. Kevin White years earlier. One of them became incorrigible and ran away. I reported it to the Pinal County Sheriff's office and the officer refused to take the report. Subsequently, she was picked up by the Mesa Police Department and as instructed by CPS I refused to take custody citing the incorrigible child guidelines. CPS case workers lied in court regarding my communications with them, appoints they said were made and I missed, emails they sent me, among other items. This was done for the sole purpose of trying to have me found in contempt of court. . Kent Volkmer was ready to file contempt charges he was threatened off the case. The contempt hearing would have revealed William J. O'Neil's involvement and abuse of power. Regarding my affidavit, in one communications from Mr. Volkmer wrote, "Mark, I read the affidavit. With the exception of some grammatical issues, it reads well. You sure are putting your neck on the chopping block. Frankly, I agree with your disclosures and ultimate position, but you need to be prepared to deal with fall out. I would expect O'Neil to come out and blast you. I would also expect the establishment will try to bring you down. As long as you are willing to confront them, you can submit it. I expect the attorneys to clean it up and correct a few errors and then send it back to you to be signed." Volkmer also told me, "For you to get any due process in Pinal County you will have to take out O'Neil." I filed a complaint with the Arizona State Bar but was completely ignored. I believe Mr. Volkmer was protected for not exposing O'Neil.

c) David Marhoffer informed me "I will tell you that I cannot afford to make powerful and determined enemies. I have helped both of you behind the scenes, but I cannot have my name on any pleadings, make any court appearances or have anyone else know my involvement here. Sorry I can only give you the help I am giving you and no more."

23) In public conversations, Judge O'Neil has described to me his deeply-held religious beliefs about homosexuality and homosexuals. He believes it is an unforgiveable "sin" worthy of punishment and as a devout Christian he has a duty to dole out punishment at any opportunity and as he sees fit.

24) Judge O'Neil also has described to me the affinity he feels for the judiciary and his disdain for anyone that challenges a judge's absolute authority, on or off the bench. Our friendly relationship ended and O'Neil began a campaign of vengeance against me when I refused his order to take electrical supplies from the Vista Grande public high school project to Brutinel Plumbing. *Mark E Dixon  3-4-14*

SUBSCRIBED and SWORN TO by Mark E. Dixon before me on *3-4-2014*.

My Commission Expires: *9-27/2014*



Notary Public

Affidavit of Mark E. Dixon, 4

**The Talon Group**

Return To:

National City Bank
P.O. Box 8800
Dayton, OH 45401-8800

Prepared By:
SHELLY SHAW

National City Bank
P.O. Box 8800
Dayton, OH 45401-8800

OFFICIAL RECORDS OF
PINAL COUNTY RECORDER
LAURA DEAN-LYTLE

DATE/TIME: 02/06/07 1514
FEE:                    $24.00
PAGES:                     16
FEE NUMBER:  2007-016258

0005344486

——————————[Space Above This Line For Recording Data]——————————

X 44648(3272          DEED OF TRUST

**The Talon Group**

## DEFINITIONS

Words used in multiple sections of this document are defined below, and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    January 30, 2007    ,
together with all Riders to this document.
(B) "Borrower" is

SARAH B HOLMES An Unmarried Woman

Borrower is the trustor under this Security Instrument. Borrower's mailing address is
830 E PALM PARKE CIR CASA GRANDE AZ 85222
(C) "Lender" is    National City Mortgage a division of
National City Bank
Lender is a    National Banking Association
organized and existing under the laws of    United States

ARIZONA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3003 1/01 (rev. 6/02)

-6(AZ) (0208)
Page 1 of 15          Initials: SH
VMP MORTGAGE FORMS - (800)521-7291

Lender's mailing address is   3232 NEWMARK DRIVE, MIAMISBURG, OH   45342

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is   Christopher R. Perry, Attorney at Law

. Trustee's mailing address is

3300 N. Central Ave. #1900
Phoenix, AZ 85012

(E) "Note" means the promissory note signed by Borrower and dated   January 30, 2007
The Note states that Borrower owes Lender
TWO HUNDRED THREE THOUSAND NINE HUNDRED FIFTY & 00/100   Dollars
(U.S. $   203,950.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   February 1, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] Occup Rider |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this

-6(AZ) (0206)              Page 2 of 15              Initials: [signature]    Form 3003   1/01 (rev. 6/02)

PAGE 5 of 35

Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of Pinal :

[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

LOT 25, OF PALM PARKE UNIT ONE AMENDED, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF PINAL COUNTY, ARIZONA, RECORDED IN BOOK 17 OF MAPS, PAGE 25.

Parcel ID Number:                                          which currently has the address of
830 E PALM PARKE CIR,                                                              [Street]
CASA GRANDE                                 [City], Arizona   85222   [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

-6(AZ) (0208)                    Page 3 of 15                Initials:        Form 3003   1/01 (rev. 6/02)

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower

-6(AZ) (0206)    Page 4 of 16    Initials _____ Form 3003   1/01 (rev. 6/02)

PAGE 7 of 35

shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes,

-6(AZ) (0206)                    Page 7 of 15                    Initials: ___   Form 3003   1/01 (rev. 6/02)

eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

-6(AZ) (0208)                                  Page 9 of 15                    Initials:___    Form 3003   1/01 (rev. 6/02)

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to

-6(AZ) (0209)                               Page 11 of 15                    Initials: _____        Form 3003  1/01 (rev. 6/02)

Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (e) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation cost. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Time of Essence. Time is of the essence in each covenant of this Security Instrument.

-6(AZ) (0204)                          Page 13 of 15          Initials: ___          Form 3003   1/01 (rev. 6/02)

PAGE  16 of 35

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:



_____ (Seal)
SARAH B HOLMES                    -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)      _____ (Seal)
            -Borrower                                 -Borrower

_____ (Seal)      _____ (Seal)
            -Borrower                                 -Borrower

_____ (Seal)      _____ (Seal)
            -Borrower                                 -Borrower

-6(AZ) (0208)                Page 14 of 15                Form 3003   1/01 (rev. 6/02)

STATE OF ARIZONA,                                   *Pinal*              County ss:

The foregoing instrument was acknowledged before me this   January 31, 2007

by   *Sarah B. Holmes*


My Commission Expires:   *4-21-2008*


_____
Notary Public

OFFICIAL SEAL
ROBERT L. SMITH
Notary Public - Arizona
Maricopa County
Comm. Expires Apr. 21, 2008

-6(AZ) (0206)                          Page 15 of 15

Initials: _____

Form 3003   1/01 (rev. 6/02)

BORROWER OCCUPANCY RIDER

This Borrower Occupancy Rider is made this 30th day of January _____, 2007 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure said borrower's Note to _____ _____ Mortgage, a division of _____ _____ (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

830 E _____ CIR

CASA GRANDE, Arizona 85222

Additional Covenants. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## BORROWER OCCUPANCY COVENANT

Borrower agrees to occupy the property as borrower's principal residence within sixty (60) days after the date of the Security Instrument. If Borrower does not so occupy the property, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by law as of the date of the Security Instrument.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Borrower Occupancy Rider.

_____
Borrower SARAH B HOLMES

_____
Borrower

_____
Borrower

_____
Borrower

_____
Borrower

_____
Borrower

_____
Borrower

_____
Borrower

OCCRIDER                                                          (04/05)

RECORDING REQUESTED BY
Title Security Agency of Pinal County, LLC

AND WHEN RECORDED MAIL TO:

BRIEN W. BRENFLECK
PO BOX 11426
CASA GRANDE, AZ 85230

ESCROW NO.: 01005564 - 010 - SDM

Title Security Agency
of Pinal County, L.L.C.



**OFFICIAL RECORDS OF
PINAL COUNTY RECORDER
LAURA DEAN-LYTLE**

| | |
|---|---|
| DATE/TIME: | 01/14/2010 1319 |
| FEE: | $16.00 |
| PAGES: | 2 |
| FEE NUMBER: | 2010-003631 |

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## Warranty Deed

For the consideration of Ten Dollars, and other valuable considerations, I or we,

Sarah H. Holmes, an unmarried woman

do/does hereby convey to

Brien W. Brenfleck, a ___UNMARRIED___ man

the following real property situated in Pinal County, ARIZONA:

Lot 25 of PALM PARKE UNIT ONE AMENDED, according to the plat of record in the office of the County Recorder of Pinal County, Arizona, recorded in Book 17 of Maps, Page 25

See Exhibit "A" Attached

SUBJECT TO:   Current taxes and other assessments, reservations in patents and all easements, rights of way, encumbrances,
liens, covenants, conditions, restrictions, obligations, and liabilities as may appear of record.

And I or we do warrant the title against all persons whomsoever, subject to the matters set forth above.

Dated 01/05/2010

SELLER:

Sarah H. Holmes

State of ARIZONA       }ss:
County of Pinal

On __1-11-2010__ , before me,
The undersigned, a Notary Public in and for said County and
State, personally appeared Sarah H. Holmes personally known
to me (or proved to me on the basis of satisfactory evidence) to
be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted, executed the
instrument.
WITNESS my hand and official seal.
Signature

FOR NOTARY SEAL OR
STAMP

OFFICIAL SEAL
SHAY D MARSH
NOTARY PUBLIC-ARIZONA
PINAL COUNTY
My Comm Exp Sept 14 2012

**PAGE 20 of 35**

Exhibit "A"


Lot 25, of PALM PARKE UNIT ONE AMENDED, according to the plat of record in the office of the
County Recorder of Pinal County, Arizona, recorded in Book 17 of Maps, Page 25.

Except that portion of said Lot 25, described as follows:

BEGINNING at the Northwest corner of said Lot 25 from which the Northeast corner of said Lot 25 bears
South 89 degrees 45 minutes 00 seconds East, a distance of 121.00 feet;

Thence South 89 degrees 45 minutes 00 seconds East, a distance of 5.07 feet;

Thence South 12 degrees 49 minutes 00 seconds East, a distance of 102.65 feet to the South line of said Lot
25;

Thence North 89 degrees 45 minutes 00 seconds West along said South line, a distance of 1.00 feet to the
Southwest corner of said Lot 25;

Thence North 15 degrees 00 minutes 24 seconds West along the West line of said Lot 25, a distance of
103.64 feet to the POINT OF BEGINNING.

## AFFIDAVIT OF PROPERTY VALUE

**1. ASSESSOR'S PARCEL IDENTIFICATION NUMBER(s)**

Primary Parcel: 504-22-969

    BOOK    MAP    PARCEL    SPLIT LETTER

Does this sale include any parcels that are being split / divided?

    Check one: Yes ☐    No ☒

How many parcels, other than the Primary Parcel, are included in this sale? __0__

Please list the additional parcels below (no more than four):

(1) _____    (3) _____
(2) _____    (4) _____

**9.**
COUNTY OF RECORDATION:    PINAL
(a) C   FEE NO:    2010-003631
(b) C   RECORD DATE:    01/14/2010
(c) C
(d) F_____

Validation Codes:

(e) ASSESSOR _____    (f) DOR _____

- - - - - - - - - - - - - - - - - - - -
ASSESSOR'S USE ONLY

Verify Primary Parcel in Item 1: _____

Use Code: _____  Full Cash Value: $ _____

**2. SELLER'S NAME AND ADDRESS**

Sarah H. Holmes

830 E. Palm Parke

Casa Grande, AZ 85122

**3. (a) BUYER'S NAME AND ADDRESS:**

Brian W. Brenfleck

PO Box 11426

Casa Grande, AZ 85230

(b) Are the Buyer and Seller related?   Yes ☐   No ☒
   If Yes, state relationship

**4. ADDRESS OF PROPERTY:**

830 E. Palm Parke, Casa Grande, AZ 85122

**5. MAIL TAX BILL TO:**

Brian W. Brenfleck

830 E. Palm Parke, Casa Grande, AZ 85122

**10. TYPE OF DEED OR INSTRUMENT (Check Only One Box):**

a. ☒ Warranty Deed    d. ☐ Contract or Agreement
b. ☐ Special Warranty Deed   e. ☐ Quit Claim Deed
c. ☐ Joint Tenancy Deed    f. ☒ Other.

**11. SALE PRICE:**  $   72,000.00

**12. DATE OF SALE (Numeric Digits):**  __1__ / __2010__
                                         Month    Year

(For example: 03 / 05 for March 2005)

**13. DOWN PAYMENT:**  $   72000.00

**14. METHOD OF FINANCING:**

a. ☒ Cash (100% of Sale Price)
b. ☐ Exchange or Trade
c. ☐ Assumption of existing loan(s)
d. ☐ Seller Loan (Carryback)

e. ☐ New loan(s) from financial institution.
  (1) ☐ Conventional
  (2) ☐ VA
  (3) ☐ FHA
f. ☐ Other financing; Specify:

**6. PROPERTY TYPE (for Primary Parcel):   NOTE:  Check Only One Box**

a. ☐ Vacant Land    f. ☐ Commercial or Industrial Use
b. ☒ Single Family Residence   g. ☐ Agricultural
c. ☐ Condo or Townhouse    h. ☐ Mobile or Manufactured Home
d. ☐ 2-4 Plex    i. ☐ Other Use, Specify:
e. ☐ Apartment Building

**15. PERSONAL PROPERTY (see reverse side for definition):**

(a) Did the Sale Price in Item #11 include Personal Property that impacted the Sale Price by 5% or more?   Yes _____   No ☒

(b) If Yes, provide the dollar amount of the Personal Property:

$ _____  00   AND

briefly describe the Personal Property:

**7. RESIDENTIAL BUYER'S USE:** If you checked b, c, d or h in Item 6 above, please check one of the following:

☒ To be occupied by owner or "family member."   ☐ To be rented to someone Other than a "family member."

See reverse side for definition of a "family member."

**8. NUMBER OF UNITS:** _____

For Apartment Properties, Motels, Hotels, Mobile Home Parks, RV Parks, Mini-Storage Properties, etc.

**16. PARTIAL INTEREST:** If only a partial ownership interest is being sold, Briefly describe the partial interest: _____

**17. PARTY COMPLETING AFFIDAVIT (Name, Address, Phone)**

Sarah H. Holmes

830 E. Palm Parke, Casa Grande, AZ 85122

Phone _____ Fax _____

**18. LEGAL DESCRIPTION (attach copy if necessary)**

See Exhibit "A"

THE UNDERSIGNED BEING DULY SWORN, ON OATH, SAYS THAT THE FOREGOING INFORMATION IS A TRUE AND CORRECT STATEMENT OF THE FACTS PERTAINING TO THE TRANSFER OF THE ABOVE DESCRIBED PROPERTY.

_____
Signature of Seller/Agent

State of Arizona, County of Pinal

Subscribed and sworn to before me this 11 day of Jan, 2010

Notary Public _____

Notary Expiration Date 8-14-12

_____
Signature of Buyer/Agent

State of Arizona, County of Pinal

Subscribed and sworn to before me this 12th day of _____, 2010

Notary Public _____

Notary Expiration Date _____

Exhibit "A"

Lot 25, of PALM PARKE UNIT ONE AMENDED, according to the plat of record in the office of the County Recorder of Pinal County, Arizona, recorded in Book 17 of Maps, Page 25.

Except that portion of said Lot 25, described as follows:

BEGINNING at the Northwest corner of said Lot 25 from which the Northeast corner of said Lot 25 bears South 89 degrees 45 minutes 00 seconds East, a distance of 121.00 feet;

Thence South 89 degrees 45 minutes 00 seconds East, a distance of 5.07 feet;

Thence South 12 degrees 49 minutes 00 seconds East, a distance of 102.65 feet to the South line of said Lot 25;

Thence North 89 degrees 45 minutes 00 seconds West along said South line, a distance of 1.00 feet to the Southwest corner of said Lot 25;

Thence North 15 degrees 00 minutes 24 seconds West along the West line of said Lot 25, a distance of 103.64 feet to the POINT OF BEGINNING.

PAGE 23 of 36



RECORDED AT THE REQUEST OF
SHALISA WATERS

AFTER RECORDING MAIL TO
PNC MORTGAGE, A DIVISION OF PNC
BANK, NATIONAL ASSOCIATION
3232 NEWMARK DRIVE
MIAMISBURG, OH 45342
ATTN : PAYOFFS
P.O.BOX 8820
DAYTON, OH 45482 - 0449

OFFICIAL RECORDS OF
PINAL COUNTY RECORDER
LAURA DEAN-LYTLE

| DATE/TIME: | 01/25/2010 1531 |
| FEE: | $17.00 |
| PAGES: | 1 |
| FEE NUMBER: | 2010-007028 |



## SUBSTITUTION OF TRUSTEE AND DEED OF RELEASE AND RECONVEYANCE

0005344486
PO Date    01/20/2010
TAX ID    504-29-069

WHEREAS **PNC MORTGAGE, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION** is/are present owner(s) of a promissory note dated **01/30/2007**, executed by **SARAH B HOLMES AN UNMARRIED WOMAN** in the amount of **$203,950.00**, secured by Deed of Trust executed by the makers of said note, wherein, **CHRSITOPHER R PERRY** is named as Trustee, recorded **02/06/2007** as Filing No **2007-016258** in Book _____, Page _____, of Real Estate records, in the Office of the Recorder of **PINAL COUNTY, ARIZONA**, and

WHEREAS the undersigned as the present beneficiary of the Deed of Trust desire to change the Trustee therein,

WHEREAS the undersigned further desire to have the property hereinafter mentioned reconveyed by reason of the payment of the indebtedness secured by said Deed of Trust,

NOW, THEREFORE, the undersigned does hereby appoint the undersigned as Trustee under the terms of said Deed of Trust in the place of the original Trustee above mentioned, with the power to perform the Trustee, DOES HEREBY QUITCLAIM AND RECONVEY to the person or persons legally entitled thereto, but without warranty, all of the property covered by said Deed of Trust now held by said Trustee under the terms of said Deed of Trust

Dated this **21st** day of **JANUARY, 2010**.

By

**PNC MORTGAGE, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION FKA NATIONAL CITY MORTGAGE A DIVISION OF NATIONAL CITY BANK**

WENDY HAIRE
ASSISTANT VICE PRESIDENT

STATE OF **OHIO**
COUNTY **MONTGOMERY COUNTY** ) SS:

On **01/21/10** before me, **SHALISA WATERS**, a Notary Public in and for said State, personally appeared **WENDY HAIRE** the **ASSISTANT VICE PRESIDENT**, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

Signature
(SHALISA WATERS)

SHALISA WATERS
NOTARY PUBLIC
IN AND FOR
THE STATE OF OHIO
MY COMMISSION
EXPIRES
MAY 25, 2011

**PAGE 24 of 35**

RECORDING REQUESTED BY
Title Security Agency of Pinal County, LLC
AND WHEN RECORDED MAIL TO:

BRIEN W. BRENFLECK
WILLIAM J. O'NEIL
TAMMY G. O'NEIL
PO BOX 11426
CASA GRANDE, AZ 85230

ESCROW NO.: 01006969 - 010 - CD



OFFICIAL RECORDS OF
PINAL COUNTY RECORDER
LAURA DEAN-LYTLE

DATE/TIME: 09/16/2011 1644
FEE: $15.80
PAGES: 3
FEE NUMBER: 2011-078455

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## Warranty Deed

For the consideration of Ten Dollars, and other valuable considerations, I or wa,

Brien W. Brenfleck, a married man, who acquired title as an unmarried man

do/does hereby convey to

Brien W. Brenfleck, a married man, as his sole and separate property, as to an undivided 50% interest and William J.

O'Neil and Tammy G. O'Neil, husband and wife, as to an undivided 50% interest

the following real property situated in Pinal County, ARIZONA:

See Exhibit A attached hereto and made a part hereof.

SUBJECT TO: Current taxes and other assessments, reservations in patents and all easements, rights of way, encumbrances, liens, covenants, conditions, restrictions, obligations, and liabilities as may appear of record.

And I or we do warrant the title against all persons whomsoever, subject to the matters set forth above.

Dated 08/29/2011

SELLER:

Brien W. Brenfleck

State of ARIZONA
County of Pinal                    }ss:

On _____, 201__, before me,
The undersigned
a Notary Public in and for said County and State, personally appeared **Brien W. Brenfleck**
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.
Signature _____

FOR NOTARY SEAL OR
STAMP



JESSICA MCWHERTER
Notary Public ~ Arizona
Pinal County
My Comm. Expires Sep 30, 2012

WDEED91

**PAGE 25 of 35**

## ACCEPTANCE OF JOINT TENANCY
## WITH RIGHT OF SURVIVORSHIP

THAT CERTAIN DEED DATED August 29, 2011 , Wherein

Brien W. Brenfleck, a married man, who acquired title as an unmarried man

as Grantors, convey to

Brien W. Brenfleck, x married man, as his sole and separate property, as to an undivided 50% interest, and William J. O'Neil and Tammy G. O'Neil, husband and wife, as to an undivided 50% interest

not as tenants in common and not as community property, but as joint tenants with right of survivorship, the property legally described as:

See Exhibit A attached hereto and made a part hereof.

Is hereby accepted and approved by the undersigned grantees, therein, it being their intention to acquire said property as joint tenants with right of survivorship, and not as community property, and not as Tenants in Common.

BUYERS:

William J. O'Neil

Tammy G. O'Neil

State of ARIZONA
County of Pinal                            )SS:

On ___September 9, 2011___ before me, the undersigned, a Notary Public, in and for said County and State, personally appeared William J. O'Neil and Tammy G. O'Neil, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

(This area for official notarial seal)

JESSICA MCWHERTER
Notary Public - Arizona
Pinal County
My Comm. Expires Sep 30, 2012

Exhibit A

Lot 25, of PALM PARKE UNIT ONE AMENDED, according to the plat of record in the office of the County Recorder of Pinal County, Arizona, recorded in Book 17 of Maps, Page 25.

Except that portion of said Lot 25, described as follows:

BEGINNING at the Northwest corner of said Lot 25 from which the Northeast corner of said Lot 25 bears South 89 degrees 45 minutes 00 seconds East, a distance of 121.00 feet;

Thence South 89 degrees 45 minutes 00 seconds East, a distance of 5.07 feet;

Thence South 12 degrees 49 minutes 00 seconds East, a distance of 102.65 feet to the South line of said Lot 25;

Thence North 89 degrees 45 minutes 00 seconds West along said South line, a distance of 1.00 feet to the Southwest corner of said Lot 25;

Thence North 15 degrees 00 minutes 24 seconds West along the West line of said Lot 25, a distance of 103.64 feet to the POINT OF BEGINNING.



ITDEEDOS

**PAGE 27 of 35**

## AFFIDAVIT OF PROPERTY VALUE

**1. ASSESSOR'S PARCEL IDENTIFICATION NUMBER(s):**

Primary Parcel: 504  29  869
BOOK   MAP   PARCEL   SPLIT LETTER

Does this sale include any parcels that are being split / divided?

Check one:  Yes ☐      No ☒

How many parcels, other than the Primary Parcel, are included in this sale? 0

Please list the additional parcels below (no more than four):

(1) _____ (3) _____

(2) _____ (4) _____

**2. SELLER'S NAME AND ADDRESS:**
Brien W Brenbeck
PO Box 11426
Casa Grande, AZ 85130

**3. (a) BUYER'S NAME AND ADDRESS:**
William & Tammy O'Neil
10535 W Macha Rd
Casa Grande, AZ 85194

(b) Are the Buyer and Seller related?  Yes ☐   No ☒
If Yes, state relationship:

**4. ADDRESS OF PROPERTY:**
830 Palm Packe Casa Grande, AZ 85722

**5. MAIL TAX BILL TO:**
Brien W. Brenfleca
PO Box 11426
Casa Grande, AZ 85130

**6. PROPERTY TYPE (for Primary Parcel):   NOTE: Check Only One Box**

a. ☐ Vacant Land              f. ☐ Commercial or Industrial Use

b. ☒ Single Family Residence  g. ☐ Agricultural

c. ☐ Condo or Townhouse       h ☐ Mobile or Manufactured Home

d. ☐ 2-4 Plex                 i. ☐ Other Use; Specify:

e. ☐ Apartment Building

**7. RESIDENTIAL BUYER'S USE:** If you checked b, c, d or h in item 6 above, please check one of the following:

☒ To be occupied by owner or "family member."    ☐ To be rented to someone Other than "family member."

See reverse side for definition of a "family member."

**8. NUMBER OF UNITS:** [N/A]

For Apartment Properties, Motels, Hotels, Mobile Home Parks, RV Parks, Mini-Storage Properties, etc.

**9.      FOR OFFICIAL USE ONLY: Buyer and Seller leave blank**

(a) County of Recordation:   PINAL COUNTY

(b) Docket & Page Number:    DATE/TIME: 09/16/2011 1644

(c) Date of Recording:       FEE NUMBER:  2011-076455

(d) Fee/Recording Number: _____

Validation Codes:

(e) ASSESSOR _____  (f) DOR _____

ASSESSOR'S USE ONLY

Verify Primary Parcel in Item 1: _____

Use Code: _____  Full Cash Value: $ _____

**10. TYPE OF DEED OR INSTRUMENT (Check Only One Box):**

a. ☐ Warranty Deed          d. ☐ Contract or Agreement

b. ☐ Special Warranty Deed  e. ☐ Quit Claim Deed

c. ☒ Joint Tenancy Deed     f. ☐ Other:

**11. SALE PRICE:** $ 25,000

**12. DATE OF SALE (Numeric Digits):** 09  2011
                                       Month  Year
(For example: 03 / 05 for March 2005)

**13. DOWN PAYMENT:** $ _____

**14. METHOD OF FINANCING:**

a. ☒ Cash (100% of Sale Price)

b. ☐ Exchange or Trade

c. ☒ Assumption of existing loan(s)

d. ☐ Seller Loan (Carryback)

e. ☐ New loan(s) from financial institution:
   (1) ☐ Conventional
   (2) ☐ VA
   (3) ☐ FHA

f. ☐ Other financing; Specify: _____

**15. PERSONAL PROPERTY (see reverse side for definition):**

(a) Did the Sale Price in Item #11 include Personal Property that impacted the Sale Price by 5% or more?   Yes _____   No ✓

(b) If Yes, provide the dollar amount of the Personal Property:
$ [_____] 00 AND

Briefly describe the Personal Property:

**16. PARTIAL INTEREST:** If only a partial ownership interest is being sold,
Briefly describe the partial interest: 1/2 interest

**17. PARTY COMPLETING AFFIDAVIT (Name, Address, Phone):**
William O'Neil
10535 W Macha Rd Casa Grande AZ

Phone _____ Fax: _____

**18. LEGAL DESCRIPTION (attach copy if necessary):**
See exhibit "A"

THE UNDERSIGNED BEING DULY SWORN, ON OATH, SAYS THAT THE FOREGOING INFORMATION IS A TRUE AND CORRECT STATEMENT OF THE FACTS PERTAINING TO THE TRANSFER OF THE ABOVE DESCRIBED PROPERTY.

_____
Signature of Seller/Agent

State of Arizona, County of Pinal
Subscribed and sworn to before me this 16th day of Sept, 2011
Notary Public _____
Notary Expiration Date  9/30/2012

_____
Signature of Buyer/Agent

State of Arizona, County of Pinal
Subscribed and sworn to before me this 16th day of Sept, 2011
Notary Public _____
Notary Expiration Date  9/30/2012

JESSICA MCWHIRTER
Notary Public - Arizona
Pinal County
My Comm. Expires Sep 30, 2012

AZ-APV03

**PAGE 28 of 35**

Escrow No. 01006969-010-CD

### Exhibit A

Lot 25, of PALM PARKE UNIT ONE AMENDED, according to the plat of record in the office of the County Recorder of Pinal County, Arizona, recorded in Book 17 of Maps, Page 25.

Except that portion of said Lot 25, described as follows:

BEGINNING at the Northwest corner of said Lot 25 from which the Northeast corner of said Lot 25 bears South 89 degrees 45 minutes 00 seconds East, a distance of 121.00 feet;

Thence South 89 degrees 45 minutes 00 seconds East, a distance of 5.07 feet;

Thence South 12 degrees 49 minutes 00 seconds East, a distance of 102.65 feet to the South line of said Lot 25;

Thence North 89 degrees 45 minutes 00 seconds West along said South line, a distance of 1.00 feet to the Southwest corner of said Lot 25;

Thence North 15 degrees 00 minutes 24 seconds West along the West line of said Lot 25, a distance of 103.64 feet to the POINT OF BEGINNING.



lg/destr

**PAGE 29 of 35**

**Search Criteria (v. 2.0) (Owner: holmes sarah*)**      **New Search**

**Search Results (1 Entries)**      **Back to List**

**Parcel Details (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)**      **View Details**

     **🔗 Link to This Parcel**      **🖨 Print View**

**Parcel Number 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 shows the following information for Tax Year:** 2013 ▾    **Tax Year Chart**

| Parcel Number: | 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 (Taxing Information) |
|---|---|
| Section: 35 | Township: 06S | Range: 06E |
| Atlas Number: 085-35 | Map: View Parcel Map |
| Property Description: (What is this?) | |
| NE SE NW OF SEC 35-6S-5E 10.00 AC | |

| Primary Owner: | HOLMES SARAH B |
|---|---|
| Namo 2: | |
| In C/O: | |

**Tax Bill Mailing Address**

| Address: | 839 E PALM PARK CIRCLE |
|---|---|
| City: | CASA GRANDE |
| State: | AZ |
| Zip Code: | 85122 |

| Date of Sale: | 10/21/2003 |
|---|---|
| Sale Amount: | Not Given |
| Document(s): | |
| 2005-030488 | |
| 2003-073833 | |

**Property Address (Location):**

2117 S ROOF TILE RD
CASA GRANDE AZ  85193

* Property Address refers to a geographical location: it may not match the mailing address city or zip code

| Subdivision: | | | | |
|---|---|---|---|---|
| Unit: | Block: | Lot: | Phase: | |
| Cabinet: | | Slide: | | |

No Personal Property Listed

**Value Details (1 Improvements)**      **View Values**

| Client Report (1) | **830 E PALM PARKE CIR Casa Grande, AZ 85122** | $72,000 |
|---|---|---|

|  | 4251780   Residential   Single Family - Detached   Closed |
|---|---|

| | Beds/Baths: 3 / 1.75<br>Bedrooms Plus: 3<br>Approx SqFt: 1,909 / County Assessor<br>Price/SqFt: $37.72<br>Year Built: 1972<br>Pool: Private<br>Encoded Features:<br>31.75FRXP1G2C<br>Exterior Stories: 1<br># of Interior Levels: 1<br>Dwelling Type: Single Family - Detached | Approx Lot SqFt: /<br>Apx Lot Size Range: 1 - 7,500<br>Subdivision: PALM PARK UNIT #1 AMD #25<br>Tax Municipality:<br>Marketing Name:<br>Planned Cmty Name:<br>Model:<br>Builder Name: UNKNOWN<br>Hun Block: 800 E<br>Map Code/Grid: X41<br>Bldg Number: |
|---|---|---|
| | Ele Sch Dist: 0004 - Casa Grande Elementary District - Pinal<br>Elementary School: Ironwood - Casa Grande<br>Jr. High School: Casa Grande | High School Dist #: 0082 - Casa Grande Union HS District - Pinal<br>High School: Casa Grande Union |

**Cross Streets:** Trekell/Palm Park Blvd **Directions:** North Trekell from Cottonwood Lane then left on Palm Park Blvd to Palm Parke Circle on right

**Public Remarks:** Short Sale-LOVE LOVE the Kitchen Family room area. Updated kitchen, cabinets with lots of storage, oversized dining room. Family room has brick fireplace and built in book shelves, Arizona room off the covered patio, pool, 3 bedrooms, 1 3/4th baths, Master bath has been updated, located in quiet circle drive, has RV Parking, 2 car carport plus single car garage. PRICED RIGHT! ED#2 Electric

| Features | Room Details | Construction & Utilities | County, Tax and Financing |
|---|---|---|---|
| Approx SqFt Range: 1,801 - 2,000<br>Garage Spaces: 1<br>Carport Spaces: 2<br>Covered Spaces: 3<br>Slab Parking Spaces: 0<br>Parking Features: RV Parking<br>Pool - Private: Pool - Private; Diving Pool<br>Spa: None<br>Horses: N<br>Fireplace: 1 Fireplace: Fireplace Family Rm<br>Exterior Features: Patio; Covered Patio(s)<br>Flooring: Carpet; Tile | Kitchen Features: Pantry<br>Master Bathroom: 3/4 Bath<br>Master Bdrm<br>Additional Bedroom: Master Bdrm Split<br>Laundry: None<br>Dining Area: Eat-in Kitchen<br>Other Rooms: Family Room<br>Basement Description: | Architecture: Ranch<br>Const - Finish: Painted<br>Construction: Block; Frame - Wood<br>Roofing: Comp Shingle; Built-Up<br>Fencing: Block<br>Cooling: Refrigeration<br>Heating: Gas Heat<br>Utilities: Other (See Remarks)<br>Water: Pvt Water Company<br>Sewer: Sewer - Public; Sewer in & Cnctd<br>Services: City Services<br>Technology: Sat Dish Intmt Lsd<br>Energy/Green Feature: Ceiling Fan(s) | County Code: Pinal<br>Legal Subdivision: PALM PARKE<br>AN: 504-29-069<br>Lot Number: 25<br>Town-Range-Section: 06S-06E-17<br>Cty Bk&Pg:<br>Plat:<br>Taxes/Yr: $1,467.5/2008<br>Ownership: Fee Simple<br>New Financing: Cash; VA; FHA; Conventional<br>Total Asum Mnth Pmts: $0<br>Down Payment: $0<br>Existing 1st Loan: Conventional<br>Exist 1st Loan Terms:<br>Disclosures: Agency Discl Req; Other (See Remarks)<br>Possession: By Agreement |

| Fees & Homeowner Association Information | | | |
|---|---|---|---|
| HOA Y/N: N<br>HOA Fee/Paid: /<br>HOA Transfer Fee:<br>HOA Name:<br>HOA Telephone: | HOA 2 Y/N:<br>HOA 2 Fee/Paid: /<br>HOA 2 Transfer Fee:<br>HOA 2 Name:<br>HOA 2 Telephone: | Association Fee Incl: No Fees<br>Assoc Rules/Info: None | Rec Center Y/N:<br>Rec Center Fee: /<br>Land Lease Fee Y/N:<br>Land Lease Fee: $0 /<br>PAD Fee Y/N:<br>PAD Fee: $0 /<br>Ttl Mthly Fee Equiv:<br>Cap Imprv/Impact Fee: 0 |

| Listing Dates | Pricing and Sale Info | Listing Contract Info |
|---|---|---|
| CDOM/ADDM:   103 / 103<br>Status Change Date:   01/15/2010<br>Close of Escrow Date: 01/14/2010<br>Off Market Date:   12/20/2009 | List Price:   $74,900<br>Sold Price:   $72,000<br>Sold Price/SqFt:   $37.72<br>Loan Type:   Cash<br>Loan Years:   0<br>Payment Type:   Other<br>Buyr Concess to Sell: 0 %<br>Sellr Concess to Buy: 0 %<br>Closing Cost Split:   Normal - N | Special Listing Cond: Short Sale Aprvl Req |

Listed by: Rex Real Estate, L.L.C. (roxr01)

**PAGE 31 of 35**
8/27/2012

| Search Criteria (v. 2.0) (Owner: oneil william*) | New Search |
|---|---|
| **Search Results (1 Entries)** | **Back to List** |
| **Parcel Details (509-59-031A)** | **View Details** |

🔗 **Link to This Parcel**      🖨 **Print View**

## Parcel Number 509-59-031A shows the following information for Tax Year: 5346 ▾   Tax Year Chart

| Parcel Number: | 509-59-031A#Taxing Information,# | | |
|---|---|---|---|
| Section: | 30 | Township: 05S | Range: 07E |
| Atlas Number: | 060-30 | Map: | Not Available |

**Property Description: (What is this?)**
BEG @ C OF SEC 30-5S-7E TH S 662.24 TH W 344.8 TH S 315.84 TH W 314.36 TH N 972.92 TH E 657.12 TO POB 12.27 AC

| Primary Owner: | ONEIL WILLIAM J |
|---|---|
| Name 2: | ONEIL TAMMY G |
| In C/O: | |

**Tax Bill Mailing Address**

| Address: | 10525 W MARTIN RD |
|---|---|
| City: | CASA GRANDE |
| State: | AZ |
| Zip Code: | 85194 |

| Date of Sale: | Not Given |
|---|---|
| Sale Amount: | Not Given |
| Document(s): | |

533-0165,78
333301G-89c

**Property Address (Location):**

10525 W MARTIN RD
CASA GRANDE AZ  85194

\* Property Address refers to a geographical location: it may not match the mailing address city or zip code

| Subdivision: | | | | |
|---|---|---|---|---|
| Unit: | Block: | Lot: | Phase: | |
| Cabinet: | | Slide: | | |

| Value Details (3 Improvements) | View Values |
|---|---|

| Search Criteria (v. 2.0) (Owner: gallo robert*) | New Search |
|---|---|
| **Search Results (2 Entries)** | **Back to List** |
| **Parcel Details (509-59-004C)** | **View Details** |

🔗 **Link to This Parcel**        📇 **Print View**

**Parcel Number 509-59-004C shows the following information for Tax Year:** 5346 ▾   <u>Tax Year Chart</u>

| Parcel Number: | 509-59-004C #-Taxing Information,# | | | Primary Owner: | GALLO ROBERT M & MIRIAM TRS |
|---|---|---|---|---|---|
| **Section:** | 30 **Township:** | 05S **Range:** | 07E | **Name 2:** | |
| **Atlas Number:** | 060-30 **Map:** | View Parcel Map | | **In C/O:** | |
| **Property Description: (What is this?)** | | | | **Tax Bill Mailing Address** | |
| W1/2 NE SW OF SEC 30-5S-7E 20.045 AC | | | | **Address:** | 10729 W MARTIN RD |
| | | | | **City:** | CASA GRANDE |
| | | | | **State:** | AZ |
| | | | | **Zip Code:** | 85194 |

| Date of Sale: | Not Given | Property Address (Location): |
|---|---|---|
| **Sale Amount:** | Not Given | 10729 W MARTIN RD |
| **Document(s):** | | CASA GRANDE AZ  85194 |
| 4 4 4 09 8 5 4 5 | | * Property Address refers to a geographical location; it may not match the mailing address city or zip code |

| Subdivision: | | | |
|---|---|---|---|
| **Unit:** | **Block:** | **Lot:** | **Phase:** |
| **Cabinet:** | | **Slide:** | |

| Value Details (2 Improvements) | View Values |
|---|---|

OFFICE OF THE
PRESIDING DISCIPLINARY JUDGE
SUPREME COURT OF ARIZONA

AUG 2 0 2012

BY _____    FILED /M Smith

## BEFORE THE PRESIDING DISCIPLINARY JUDGE
## OF THE SUPREME COURT OF ARIZONA

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION FOR REINSTATEMENT OF A SUSPENDED MEMBER OF THE STATE BAR OF ARIZONA, | PDJ 2012-9029 |
| **RICHARD B. JOHNSON,** **Bar No. 002118** | **REPORT AND RECOMENDATION** |
| Applicant. | |

On July 16, 2012, the Hearing Panel ("Panel") composed of Robert M. Gallo, a public member from Pinal County, Ralph J. Wexler, an attorney member from Maricopa County, and the Honorable William J. O'Neil, Presiding Disciplinary Judge ("PDJ") held a one day hearing pursuant to Supreme Court Rule 65(b)(1), Ariz.R.Sup.Ct. Hunter F. Perlmeter appeared on behalf of the State Bar of Arizona ("State Bar") and J. Scott Rhodes appeared on behalf of the Applicant. The Panel considered the testimony, admitted exhibits, the parties' Joint Prehearing Statement, Applicant's Separate Prehearing Memorandum, and evaluated the credibility of the witnesses.[1] The witness rule was invoked. At the conclusion of the hearing, the State Bar stated that it opposed the reinstatement. The Panel now issues the following "Report and Recommendation," pursuant to Rule 65(b)(3), Ariz.R.Sup.Ct., recommending that reinstatement be denied.

---

[1] Consideration was given to the testimony of Richard B. Johnson, Kenny Evans, Paul J. McGoldrick, Esq., Bishop Kenneth J. Wanat, Judith L. Lyon, Ph.D., and Marc D. Pulsifer, Esq.

*Patterson + Associates PLLC*
*777 E. Thomas Rd*
*Ste 210*
*Phoenix Az 85014-5428*
*602-462-1001*

OFFICE OF THE
PRESIDING DISCIPLINARY JUDGE
SUPREME COURT OF ARIZONA

JUL 2 6 2012

BY _____  FILED _____

## BEFORE THE PRESIDING DISCIPLINARY JUDGE
## OF THE SUPREME COURT OF ARIZONA

| | |
|---|---|
| IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA, | PDJ-2011-9084 |
| **ROSVAL A. PATTERSON,** Bar No. 018872 | **REPORT AND ORDER IMPOSING SANCTIONS** |
| Respondent. | [No. 10-1111] |

On June 25 and 26, 2012, the Hearing Panel ("Panel") composed of Robert M. Gallo, a public member from Pinal County, Stephen H. Lesher, an attorney member from Pima County, and the Presiding Disciplinary Judge ("PDJ") held a two day hearing pursuant to Supreme Court Rule 58(j), Ariz.R.Sup.Ct. Craig D. Henley appeared on behalf of the State Bar of Arizona ("State Bar") and Respondent appeared *pro per*. The witness exclusionary rule was invoked.[1] The Panel carefully considered the exhibits, testimony, the parties' Joint Pre-Hearing Statement, individual pre-hearing statements, and evaluated the credibility of the witnesses including Respondent. The PDJ and Panel now issue the following "Report and Order Imposing Sanctions," pursuant to Rule 58(k), Ariz.R.Sup.Ct.

### I.    SANCTION IMPOSED:

**ATTORNEY SUSPENDED FOR ONE YEAR, TWO YEARS OF PROBATION, RESTITUTION AND COSTS OF THESE DISCIPLINARY PROCEEDINGS.**

---

[1] Consideration was given to the sworn testimony of Alex Jung, Sherry Nickels, Gloria Barr, and U.S. Attorney, Suzanne Chynoweth.

*Fax 520-791-2241*

*ph 520-791-2239*

*14 E. 2nd St.*

*Tucson Az. 85705-7752*

OFFICE OF THE
PRESIDING DISCIPLINARY JUDGE
SUPREME COURT OF ARIZONA

MAY 25 2012

FILED *h. Smith*

BY _____

## BEFORE THE PRESIDING DISCIPLINARY JUDGE
## OF THE SUPREME COURT OF ARIZONA

| | |
|---|---|
| IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA, | PDJ-2011-9051 |
| **CREIGHTON W. CORNELL,** Bar No. 011433, | **REPORT AND ORDER IMPOSING SANCTIONS** |
| Respondent. | [No. 09-2194] |

On March 12, 13 and 14, 2012, the Hearing Panel ("Panel") composed of Robert M. Gallo, a public member from Maricopa County, Richard L. Brooks, an attorney member from Maricopa County, and the Presiding Disciplinary Judge ("PDJ") held a three day hearing pursuant to Supreme Court Rule 58(j), Ariz.R.Sup.Ct. James D. Lee appeared on behalf of the State Bar of Arizona ("State Bar") and Respondent appeared pro per. The witness exclusionary rule was invoked.[1] The Panel carefully considered the exhibits, testimony, the parties' Joint Pre-Hearing Statement, individual pre-hearing statements, individual post hearing memorandum, Respondent's Amended Post Hearing Memorandum filed on April 26, 2012, and evaluated the credibility of the witnesses including Respondent. On May 21, 2012, Respondent further filed a motion to expand or amend the record and for reconsideration of admission of Exhibit D, which was denied by the PDJ following argument. See Order filed May 24, 2012. The PDJ and Panel now issue the

---

[1] Consideration was given to the in court or telephonic sworn testimony of Charles Grube, AAG; Monica Klapp, Esq.; Levi Gunderson, Esq.; Roger Nelson, Esq.; Mr. Henry Varela II; and Dale Wren, Esq.

-1-



OFFICE OF THE
PRESIDING DISCIPLINARY JUDGE
SUPREME COURT OF ARIZONA

MAR 1 9 2012

FILED
BY _____

## BEFORE THE PRESIDING DISCIPLINARY JUDGE
## OF THE SUPREME COURT OF ARIZONA

| | |
|---|---|
| IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA, | PDJ-2011-9060 |
| **MIRIAM HOLLY KLAIMAN,** Bar No. 024299, | **REPORT AND ORDER IMPOSING SANCTIONS** |
| Respondent. | [No. 10-0329] |

On February 2 and 3, 2012, the Hearing Panel composed of Robert M. Gallo, a public member from Pinal County, Maria Salapska, an attorney member from Maricopa County, and the Honorable William J. O'Neil, Presiding Disciplinary Judge ("APDJ") held a two-day hearing pursuant to Supreme Court Rule 58(j), Ariz.R.Sup.Ct. Craig D. Henley appeared on behalf of the State Bar of Arizona ("State Bar") and Denise M. Quinterri appeared on behalf of Respondent Miriam Holly Klaiman ("Respondent"). The Panel considered the testimony, the admitted exhibits, the parties' Joint Pre-Hearing Statement, Proposed Findings of Fact and Conclusions of Law, and evaluated the credibility of the witnesses. The PDJ and Hearing Panel ("Panel") now issue the following "Report and Order Imposing Sanctions," pursuant to Rule 58(k), Ariz.R.Sup.Ct.

### I. SANCTION IMPOSED:

**ATTORNEY SUSPENDED FOR ONE YEAR AND UPON REINSTATEMENT, TWO YEARS OF PROBATION WITH THE STATE BAR MEMBER ASSISTANCE PROGRAM, 15 HOURS OF CONTINUING LEGAL EDUCATION IN ETHICS, AND COSTS.**

1

602-452-0615



OFFICE OF THE
PRESIDING DISCIPLINARY JUDGE
SUPREME COURT OF ARIZONA

AUG 31 2011

FILED
BY

## BEFORE THE PRESIDING DISCIPLINARY JUDGE
## OF THE SUPREME COURT OF ARIZONA

IN THE MATTER OF A SUSPENDED MEMBER
OF THE STATE BAR OF ARIZONA,

**LOGAN T. JOHNSTON, III**
**Bar No. 009484**

Respondent.

No. 10-1167

**AMENDED REPORT AND ORDER
IMPOSING SANCTIONS**

On January 13, 2011, the Hearing Panel composed of Robert Gallo, a public member from Pinal County, Kenneth L. Mann, an attorney member from Maricopa County, and the Honorable William J. O'Neil, Presiding Disciplinary Judge ("PDJ") held a one day hearing pursuant to Supreme Court Rule 58(j), Ariz.R.Sup.Ct. Stephen P. Little appeared on behalf of the State Bar of Arizona ("State Bar") and Daniel D. Maynard appeared on behalf of the Respondent. The PDJ and Hearing Panel ("Panel") now issue the following "Amended Report and Order Imposing Sanctions," pursuant to Rule 58(k), Ariz.R.Sup.Ct..

The Panel issued its original Report and Order Imposing Sanctions on February 11, 2011 ("Original Report and Order"). The Panel ordered, in pertinent part:

1. LOGAN T. JOHNSTON, III, Bar No. 009484, is hereby SUSPENDED from the practice of law for a period of SIX (6) MONTHS.

2. The suspension is stayed pending a two-year probationary period.

Thereafter, the State Bar of Arizona timely appealed the decision of the Panel staying the suspension. On April 26, 2011, the Arizona Supreme Court stayed its prior interim suspension of Respondent retroactive to February 11, 2011.

1

LISA M. AUBUCHON  013141
96 East Buena Vista Drive
Tempe, AZ 85284
Telephone:    (623) 229-3843
aubuchonlaw@cox.net

THE SUPREME COURT OF ARIZONA

| | |
|---|---|
| IN THE MATTER OF A MEMBER OF THE) STATE BAR OF ARIZONA, ) ) Lisa M. Aubuchon, ) State Bar #013141 ) ) ) Appellant. ) ) ) | No. SB-12-0035 AP (PDJ 2011-9002) APPELLANT'S SUPPLEMENTAL NOTICE OF COURT RECORDS |

Appellant has raised the issue in her appeal that Judge William O'Neil should have

recused himself when requested.  He unsealed his prior Order denying the request for recusal.

Appellant stated that Judge O'Neil was assigned to preside over a pending grand jury matter for

which Appellant was the target.  The substance of that grand jury investigation was issue of the

statute of limitations in the Donald Stapley investigation as testified to by Sheila Polk in the bar

proceeding that she initiated it, one of the specific matters in the disciplinary matter.[1]  This

investigation was later turned over to the United States Attorney's Office and included in their

recent closure of all investigations.[2]

---

[1] This information can be confirmed by AAG Matthew Conti.

[2] This information can be confirmed by AAG Matthew Conti and Ann Scheel.

-1-

Appellant filed an Emergency Motion to Disqualify the Arizona Attorney General in May of 2010. In June of 2010, Justice Ruth McGregor assigned Judge O'Neil to preside over the investigation. In his Order declining to recuse himself he states "This judge was and remains unaware of ever being assigned to rule on any "emergency motions to disqualify the AG's Office" filed by or on behalf of Respondent nor does this judge recall any such motion filed by Respondent."

He goes on to say that "Even if a grand jury was specifically investigating Respondent (and this judge is unaware of that) it would not warrant recusal." He goes on to state among other things that "this judge has no recollection of ever being told by anyone that Respondent was or might be under investigation." He goes on to state that, despite the clear judicial canons to the contrary, his involvement in another court proceeding unrelated to the bar matter but involving the very same issue does not require recusal.

Attached as Exhibit A is a set of documents that Appellant has now discovered proves that Judge O'Neil was assigned to this matter in June of 2010. Appellant also avows to this court that there were several additional Orders issued by Judge O'Neil in this grand jury matter but is not attaching them as Appellant is unaware if any remainder of the investigation as to others remains sealed. This document directly contradicts Judge O'Neil's Order, Exhibit B, where he repeatedly denies any knowledge of the investigation. What is critical is that the Motion for Recusal referenced in Exhibit A and the assignment to Judge O'Neil were **solely based** on Appellant's Emergency Motion to Disqualify the Attorney General. Matthew Conti of the Attorney General's Office filed the Motion to Recuse Judge Carter Olsen because of a relationship between his staff and a sheriff's investigator involved in the Stapley matter.

The only reason the case was even before Judge O'Neil was because Appellant filed the Emergency Motion to Quash the Subpoena and Disqualify the Attorney General. That is why Maricopa County Superior Court recused itself and sent it to Justice McGregor who then assigned it to Judge O'Neil. Appellant's attorney was endorsed on the minute entry. For Judge O'Neil to claim he was not aware of the Appellant's Motion or the nature of the grand jury is not believable. He clearly knew that he was involved in a Maricopa County Grand Jury Matter, assigned from Justice McGregor that had the only Motion pending at that time being the one from Appellant.

Appellant understands that months later, Judge O'Neil signed off on other matters therefore he also must have been aware of the nature of the investigation. His involvement was going on while he was interviewing for the position of Presiding Disciplinary Judge, a position he was given in September. It is unfathomable that Judge O'Neil could have presided over Appellant's matter having refused to rule on her Emergency Motion to Disqualify the Attorney General and quash the subpoena, participated in issuing orders in the investigation into Appellant, denying it ever happened, and then claiming even if he was involved, there was no reason for him to recuse himself. This failure to comply with the judicial canons was on top of him being involved in the underlying Gary Donahoe.

This Court should take judicial notice of the documents attached as Exhibit A as direct evidence of Judge O'Neil's involvement that contradicts his statements in Exhibit B.

Respectfully submitted this 23rd day of October, 2012.

/s/ Lisa M. Aubuchon
Lisa M. Aubuchon

-3-

Original efiled this 23rd day of October, 2012.

Copies electronically mailed this 23rd day of October, 2012 to:

John Gleason
1560 Broadway Suite 1800
Denver, CO 80202

Rachel Alexander
5110 N. 44th street Suite 200L
Phoenix, AZ 85018

By: /s/Lisa Aubuchon

-4-

EXHIBIT A

Michael K. Jeanes, Clerk of Court
*** Filed ***

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CRIM MISC
(in re 66 SGJ 86)                           06/30/2010

SPECIAL MASTER RUTH V. MCGREGOR

CLERK OF THE COURT
K. Schermerhorn
Deputy

D MATTHEW CONTI

O JOSEPH CHORNENKY

BOB JAMES - CRIMINAL COURT
ADMINISTRATOR
GRAND JURY CLERK
GRAND JURY EXHIBITS-CCC
SPECIAL MASTER RUTH V
MCGREGOR
HON. WILLIAM O'NEIL
PINAL COUNTY SUPERIOR COURT
971 JASON LOPEZ CIRCLE, BLDG A
PO BOX 1748
FLORENCE AZ 85132-1748

CASE TRANSFERRED

The Court having received the State's Motion for Recusal and for Reassignment and
Judge Olson having remanded this matter to the Special Master,

IT IS ORDERED assigning this matter to the Honorable William O'Neil, Judge of the
Arizona Superior court for Pinal County.

RECEIVED

JUN 0 6 2010

Docket Code 088                    Form R000A                         Page 1

DIST. CENTER



Terry Goddard
Attorney General

**Office of the Attorney General**
State of Arizona

Criminal Prosecution Section

May 12, 2010

Lisa Aubuchon
c/o O. Joseph Chornenky, Esquire
301 E. Bethany Home A-222
Glendale, AZ 85012

Re:  State Grand Jury Subpoena, 66 SGJ 86

Dear Ms. Aubuchon:

You have been subpoenaed to appear before the State Grand Jury at 10:30 a.m. on Thursday, May 20, 2010.  This letter is to advise you that pursuant to A.R.S. § 21-412, Rules 12.5 and 12.6 of the Arizona Rules of Criminal Procedure, you may be considered a subject of the grand jury's investigation.  Accordingly, you are advised that when asked questions before the grand jury, you have the right to remain silent.  You also have the right to have an attorney present with you in the grand jury room for consultation, although your attorney may not in any way attempt to communicate directly with the grand jury.

Sincerely,

D. Matthew Conti
Assistant Attorney General
Criminal Prosecutions Section
#026074

D. MATTHEW CONTI
State Bar No. 021719

A PERSON COMMITS UNLAWFUL GRAND JURY DISCLOSURE IF THE PERSON KNOWINGLY DISCLOSES TO ANOTHER THE NATURE OR SUBSTANCE OF ANY GRAND JURY TESTIMONY OR ANY DECISION, RESULT OR OTHER MATTER ATTENDING A GRAND JURY EXCEPT IN THE PROPER DISCHARGE OF OFFICIAL DUTIES, at the DISCRETION OF THE PROSECUTOR TO INFORM A VICTIM OF THE STATUS OF THE CASE, OR WHEN PERMITTED BY THE COURT IN FURTHERANCE OF JUSTICE.

VIOLATION OF A.R.S. § 13-2812 COULD BE PUNISHED BY 6 MONTHS IN JAIL, $1,000 FINE FOR A PERSON, OR A $20,000 FINE FOR BUSINESS

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| In the Matter of your Appearance and Attendance before the Grand Jury of the State of Arizona | STATE GRAND JURY CRIMINAL SUBPOENA DUCES TECUM |
| | 66 SGJ 86 |

TO:   Lisa Aubuchon
c/o O. Joseph Chornenky, Esquire
301 E. Bethany Home A-222
Glendale, AZ 85012

**YOU ARE HEREBY ORDERED** to appear at 10:30 a.m. on the 20th day of May, 2010, before the inquest of the Grand Jury of the State of Arizona located at One W. Madison, Phoenix, Arizona.

There you are to testify in all such matters and things as may be there inquired of you.

And there you are to remain until released by the State Grand Jury.

Requests for reasonable accommodation for persons with disabilities must be made to the division assigned to the case by parties at least 3 judicial days in advance of a scheduled court proceeding.

**IF YOU FAIL TO APPEAR AS ORDERED, A WARRANT WILL BE ISSUED FOR YOUR ARREST.**

**\*\*WARNING\*\*** You are a person under investigation by the State Grand Jury. You have the right to remain silent and to have an attorney present at all times. If you wish to have an attorney present during your appearance before the grand jury, please bring the attorney with you to the grand jury and have the attorney remain until the conclusion of all proceedings.

Given under my hand and seal this 12th day of May, 2010.

TERRY GODDARD
Attorney General

D. MATTHEW CONTI
Assistant Attorney General
Criminal Division
(602) 542-8427

MICHAEL K. JEANES
Clerk of Superior Court

By: _____
Deputy Clerk

#826598

EXHIBIT B

# SSA Ruling allowing to practice until 1 30 2024

Exhibit N, Governments Exhibit 137



# SOCIAL SECURITY ADMINISTRATION

Social Security Administration
Office of Appellate Operations
6401 Security Blvd
Baltimore, MD 21235-6401
Tel: (877) 670-2722

January 30, 2024

Jeffrey D. Moffatt
468 N. Camden Drive
Suite 200, PMB 90101
Beverly Hills, CA 90210

Dear Jeffrey D. Moffatt:

Enclosed is a copy of the Appeals Council decision on your request for review of the hearing officer's decision. The Appeals Council affirms the decision to disqualify you from representing claimants before the Social Security Administration.

Pursuant to 20 CFR 404.1790(e) and 416.1590(e), the period of disqualification is effective as of the date of the Appeals Council decision. This decision is final and not subject to judicial review.

Under 20 CFR 404.1799(a) and 416.1599(a), in one year from the date of this notice, you may ask the Appeals Council for reinstatement as a representative of claimants before the Social Security Administration. A request for reinstatement must be in writing, must be served upon the opposing party, and must satisfy the requirements set forth in 20 CFR 404.1799 and 416.1599.

/s/ R. Gavin Littles

R. Gavin Littles
Administrative Appeals Judge

Enclosures:
Decision of the Appeals Council

cc: Social Security Administration
Office of the General Counsel
Attn: Representative Conduct
6401 Security Boulevard
Baltimore, MD 21235

USAO_MOFFATT_028890
Exhibit 137
Page 1 of 12



## SOCIAL SECURITY

| | |
|---|---|
| SOCIAL SECURITY ADMINISTRATION ) | |
| Complainant/Appellee ) | Docket No. RS-17-03 |
| v. ) | |
| Jeffrey D. Moffatt ) | |
| Respondent/Appellant ) | |
| ) | |

## DECISION OF THE APPEALS COUNCIL

### STATEMENT OF JURISDICTION

Pursuant to sections 206(a) and 1631(d) of the Social Security Act, 42 USC 406(a) and 1383(d), and 20 CFR 404.1700ff. and 416.1500ff, the Social Security Administration has the authority to review and regulate the conduct of claimants' representatives. Specifically, and as applicable in this case, the Appeals Council has the authority to grant review of the hearing officer's decision upon request of either the representative or the other party to the matter (20 CFR 404.1775 and 416.1575). The Appeals Council will base its decision upon the evidence in the hearing record and any other evidence it may permit on review and either affirm, reverse, or modify the hearing officer's decision or return the case to the hearing officer when appropriate (20 CFR 404.1790(a) and 416.1590(a)).

### REQUEST FOR REVIEW

On June 19, 2020, Appellant Jeffrey D. Moffatt (Respondent/Appellant) filed a timely request for review of the hearing officer's June 16, 2020 decision, which disqualified him from representing claimants in dealings with the Social Security Administration (Exhibit AC-39).

### PROCEDURAL HISTORY

This proceeding began on November 30, 2017, when the Social Security Administration's (SSA) Regional Chief Counsel for the San Francisco region signed a Notice of Intent to Disqualify the Respondent/Appellant Jeffrey D. Moffatt from acting as a claimant representative in dealings with the Social Security Administration. The notice contained a statement of charges that constituted the basis for the proceeding against the representative. On December 4, 2017, SSA sent the notice by certified mail, return receipt requested, to the Respondent/Appellant, with delivery confirmed on December 7, 2017 (Exhibit AC-4, pages 219-224). On September 6, 2018, the Respondent/Appellant sought to remove the case to the United States District Court for the Central District of California, arguing against the constitutionality of the proceedings, and on

USAO_MOFFATT_026891

Exhibit 137
Page 2 of 12

September 24, 2018, the Court stayed the proceedings pending the resolution of a related case (Exhibit AC-4, pages 142-218 and 249-252).

On August 5, 2019, the Court found that the Respondent/Appellant was not entitled to remove the action to federal district court and that the plain language of 28 USC section 1441 does not even arguably authorize removal of a federal-agency proceeding. Consequently, the Court lifted the stay, remanded the case back to SSA, and found the Respondent/Appellant liable for the fees and costs incurred by the SSA in defending the matter (Exhibit AC-4, pages 253-261).

On August 28, 2019, Regional Chief Counsel Deborah Lee Statchel, of the San Francisco, CA (Region IX), Office of the General Counsel (OGC) (Complainant/Appellee), signed and sent an initial Notice of Intent to Sanction (NOIS) to Respondent/Appellant (Exhibit AC-1). The NOIS's Statement of Charges provided for nine counts against Respondent/Appellant. Count I specified that Respondent/Appellant was disbarred from the practice of law by the Arizona Supreme Court for professional misconduct, and therefore may be disqualified from acting as a representative of claimants before the Agency. Counts II through IX specified eight instances in which Respondent/Appellant signed an *Appointment of Representative* form with a "false or misleading written statement;" namely, that he remained an attorney and had not been disbarred, after the time of his disbarment by the Arizona State Bar. Ms. Statchel, on behalf of OGC and the Agency, sought to disqualify Respondent/Appellant from representing claimants before the agency. The NOIS was accompanied by an Acceptance of Disqualification, proposed exhibits numbered Exhibit 1 through Exhibit 21, and Notice of Appearance for Jennifer Tarn, Assistant Regional Counsel, and Geralyn Gulseth, Supervisory Attorney, for Region XI of SSA's Office of General Counsel. Respondent/Appellant did not answer or otherwise acknowledge the NOIS and its accompanying documents.

On September 18, 2019, Ms. Gulseth certified submission of the Request for Designation of Hearing Officer to the Office of the Chief Administrative Law Judge (Exhibit AC-2). On October 23, 2019, Hearing Officer David S. Pang issued a Notice and Order, Certified Mail, Return Receipt Requested, of his designation as Hearing Officer to the parties (Exhibit AC-3). The Order set an initial telephone conference for November 8, 2019, and a deadline of November 4, 2019, for any initial submissions, as well as documentation regarding the procedural history of this case that led to its being remanded, to be served upon Hearing Officer Pang and the opposing party.

On November 1, 2019, Complainant/Appellee submitted a Pre-Hearing Brief and accompanying proposed exhibits, numbered Exhibit 22 through Exhibit 29, from Complainant/Appellee (Exhibit AC-4). These documents were accompanied by a Certificate of Service, certifying they were mailed by regular mail, and certified mail, return receipt requested, to Respondent/Appellant and electronically to Hearing Officer Pang.

At the initial teleconference on November 8, 2019, Ms. Tarn and Ms. Gulseth appeared on behalf of Complainant/Appellee, however the Respondent/Appellant did not appear. At this time, Ms. Tarn and Ms. Gulseth formally consented to electronic service on behalf of Complainant/Appellee. They stated that they had no contact with the Respondent/Appellant during the course of the relevant proceedings, and that all indications (court documents and Respondent/Appellant's website) were that their mailings to him were going to the proper address.

On November 21, 2019, Complainant/Appellee electronically submitted a Motion for Decision on the Record to Hearing Officer Pang, with certification that it had additionally been sent by

Exhibit 137
Page 3 of 12

3

regular, and certified mail receipt requested, to Respondent/Appellant (Exhibit AC-5).

On December 2, 2019, Ms. Tarn alerted Hearing Officer Pang, via email, that her office had heard from Respondent/Appellant that he had not received "most" of the documents. This was via email, dated December 2, 2019, from Respondent/Appellant to Ms. Tarn:

> I just was advised by Mrs. Washington that they do not have my case. The certified doc was never delivered and I have no exhibits. 1. Can you advise me what address you mailed the pre-trial notice to. 2. Can you advise me what judge now has the matter. 3. Acknowledge I am making a Lucia challenge. 4. Acknowledge I am making an Arthrex challenge. 5. Acknowledge I am asserting both challenges go towards both the judge as well as the heads of SSA.
>
> Please also correct my address. We have contracted postal services. If box 8 is not included they may not deliver it. Also note contracted postal is not receptive to certified mail in my area. Use fed ex if possible. [sic]

Complainant/Appellee then sent a letter to Respondent/Appellant and Hearing Officer Pang on December 5, 2019, "out of an abundance of caution," allowing for an additional 14 days for Respondent/Appellant to answer, and otherwise providing all documentation sent with the August 28, 2019 NOIS (Exhibit AC-6). On December 30, 2019, Complainant/Appellee sent a request for a prehearing conference in this case, notifying of service via UPS and regular mail to Respondent/Appellant (Exhibit AC-9).

In the interim, on December 24, 2019, Respondent/Appellant sent a Motion to Change Address to Hearing Officer Pang and Complainant/Appellee (Exhibit AC-8). This Motion contained an associated complaint that Complainant/Appellee and the Social Security Administration had been unresponsive to his address concerns. On December 31, 2019, Respondent/Appellant sent an amended Writ of Mandate to Hearing Officer Pang to the Hearing Officer and Complainant/Appellee (Exhibit AC-10). This Writ again reiterated the request that the Hearing Officer send him returned mail, and evidence of incorrect address usage.

In December 2019, Respondent/Appellant additionally filed a brief regarding the constitutionality of the Hearing Officer, along with a Motion for Recusal (Exhibit AC-7), pursuant to U.S. Supreme Court case *Lucia v. Security and Exchange Commission (SEC)*, 138 S.Ct. 2044, 2055 (2018]. Following this, in January and February 2020, Respondent/Appellant filed multiple requests for subpoenas *duces tecum* regarding underlying complaints against the State of Arizona and its various officers (Exhibits AC-20 to AC-30). Additionally, Respondent/Appellant requested the "Submission of Facts" regarding several prior and pending cases before the federal courts, including *Lucia*, regarding the authority administrative hearing officers and associated due process complaints (Exhibits AC-11 to AC-19).

As described in the Hearing Officer's decision, on February 4, 2020, in response to Respondent/Appellant's service concerns, the Hearing Officer sent to both parties, electronically and via mailing addresses, a renewed Notice of Designation of Hearing Officer and Timeline for Submission of Briefing (Briefing Schedule) and provided Respondent/Appellant with 10 additional days to file a formal Answer to the Amended Notice of Intention to Sanction (Exhibit AC-38, pages 6-7). In the Briefing Schedule, the Hearing Officer discussed and denied all requests and motions raised in briefs dated from December 2019 and January 2020 from the Respondent/Appellant. The Hearing Officer also found that any defects in service were cured by

USAO_MOFFATT_026693

Exhibit 137
Page 4 of 12

4

the renewed service of documents and found no wrongdoing on the part of
Complainant/Appellee.

On February 14, 2020, Complainant/Appellee filed a Second Motion for Decision on the Record
(Exhibit AC-33). On the same day, Respondent/Appellant submitted an Answer to the Amended
Notice of Intent to Sanction (Exhibit AC-32). He submitted an Amended Answer on February
19, 2020 (Exhibit AC-34). On February 28, 2020, Complainant/Appellee timely replied to this
Answer (Exhibit AC-37). The Respondent/Appellant submitted a Reply and Motion for
Temporary Restraining Order on February 28, 2020 with an Amended Reply submitted the same
day (Exhibits AC-35 and AC-36).

On June 16, 2020, the Hearing Officer issued a decision granting the Agency's Motion for
Decision on the Record, sustained the Agency's charge as to Count I, and disqualified
Respondent/Appellant from acting as a representative of claimants in dealings with the Agency
(Exhibit AC-38). The Hearing Officer also denied all of Appellant's motions regarding service
issues and denied all Motions, Requests for Consideration of Facts, and Subpoenas from
Respondent/Appellant related to his *Lucia* complaints, challenges to the authority of the Hearing
Officer, and challenges to Respondent/Appellant's disbarment proceedings. The Hearing Officer
also denied any requests for stays on these proceedings based on the pendency of any litigation
or complaint to which Respondent/Appellant was a party or otherwise.

On June 19, 2020, Respondent/Appellant filed a request for review of the decision (Exhibit AC-
39). On May 24, 2022, the Appeals Council acknowledged and granted the request for review of
the hearing officer's June 16, 2020, decision (Exhibit AC-42). The acknowledgement letter
stated that in accordance with 20 CFR 404.1780 and 416.1580 Respondent/Appellant had thirty
days to submit to the Appeals Council a brief or written statement as to the facts and law in this
matter. Due to updated contact information for Respondent/Appellant and
Complainant/Appellee, on October 12, 2022, the Appeals Council re-sent the letter granting
review and set updated briefing deadlines (Exhibit AC-44).

Respondent/Appellant requested a stay by brief dated November 9, 2022 (Exhibit AC-45).
Complainant/Appellee submitted a brief in support of the order of disqualification on November
22, 2022 (Exhibit AC-46). The Respondent/Appellant also submitted a reply to the
Complainant/Appellee's November 22, 2022 brief in a letter dated December 22, 2022 and
signed December 27, 2022 (Exhibit AC-48; See also AC-47). Due to a significant portion of
Exhibits AC-48 being illegible, the Appeals Council, on April 28, 2023, requested the
Respondent/Appellant resubmit the documents and provided 30 days to do so (Exhibit AC-51).

On February 17, 2023, the Complainant/Appellee submitted a response to the
Respondent/Appellant's stay request (Exhibit AC-49). In a letter dated April 17, 2023, the
Respondent/Appellant submitted a Request to Remand to District Court (Exhibit AC-50). On
May 4, 2023, the Complainant/Appellee submitted a response to the request to remand (Exhibit
AC-52). The Respondent/Appellant submitted another Request to Remand to District Court on
May 25, 2023 along with the resubmission of the illegible materials (Exhibit AC-53).

The Appeals Council has added Exhibits AC-1 through AC-53.

## ISSUE AND APPLICABLE LAW

The Appeals Council is issuing this decision pursuant to 20 CFR 404.1776 through 404.1790 and
416.1576 through 416.1590.

5

The issue before the Appeals Council is whether the Appeals Council should affirm, reverse, modify or remand Hearing Officer Administrative Law Judge Pang's June 16, 2020 decision, which disqualified Respondent/Appellant Jeffrey D. Moffatt from acting in a representational capacity in dealings with the Social Security Administration based on evidence that he has been, by reason of misconduct, disbarred from the practice of law in the State of Arizona by the Supreme Court of Arizona (20 CFR 404.1745(d) and 416.1545(d)).

The Appeals Council adopts the Hearing Officer Administrative Law Judge's statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, the issues in the case, and the evidentiary facts, as applicable.

## FACTS

The main facts in this case are not in dispute. Respondent/Appellant was a member of the Arizona State Bar, but in March 2016 he was subsequently disbarred from the practice of law by the Arizona Supreme Court based on misconduct. (Exhibit AC-6, pages 17-39). The Respondent/Appellant disagrees with the Arizona Supreme Court's decision; however, the relevant fact is that the Arizona Supreme Court found Respondent/Appellant violated several rules regarding professional conduct including: violating or attempting to violate the Rules of Professional Conduct; engaging in criminal conduct; knowingly failing to respond to lawful demand for information from a disciplinary authority; refusing to cooperate or failing to furnish information; and unprofessional misconduct (Exhibit AC-6, pages 17-39). On April 19, 2016, the Final Judgement and Order of Disbarment were filed (Exhibit AC-6, pages 41-42). The Respondent/Appellant disagreed with the Arizona Supreme Court's decision, but his challenges and appeals were not successful. Further, there is no evidence submitted to show he has been reinstated to the Arizona State Bar.

## DISCUSSION

Sections 206(a)(1) and 1631(d)(2) of the Social Security Act indicate that the Commissioner of Social Security may disqualify any attorney or non-attorney representative from practice before the Agency if the representative has been disbarred or suspended from any court or bar to which he or she was previously admitted to practice. Pursuant to the regulations, the Agency may initiate a sanction proceeding against a representative if that representative has been, by reason of misconduct, disbarred or suspended from any bar or court to which the representative was previously admitted (20 CFR 404.1745(d) and 416.1545(d)).

During those proceedings, the Social Security Administration considers only whether the representative was disbarred or suspended due to misconduct and will not re-examine or revise the factual or legal conclusions that led to the disbarment or suspension (20 CFR 404.1770(a)(2) and 416.1570(a)(2)). In deciding whether a person has been, by reason of misconduct, disbarred or suspended by a court or bar, or disqualified from participating in or appearing before any Federal program or Federal agency, the hearing officer will consider the reasons for the disbarment, suspension, or disqualification action (20 CFR 404.1770(a)(2) and 416.1570(a)(2)).

If the action was taken for solely administrative reasons (e.g., failure to pay dues or to complete continuing legal education requirements), that will not disqualify the person from acting as a representative before us. However, this exception to disqualification does not apply if the administrative action was taken in lieu of disciplinary proceedings (e.g., acceptance of a voluntary resignation pending disciplinary action). When the Agency finds that a representative

USAO_MOFFATT_026895

Exhibit 137
Page 6 of 12

6

was disbarred or suspended for misconduct, it will disqualify that representative (20 CFR 404.1770(a)(3)(ii) and 416.1570(a)(3)(ii)).

The Arizona Supreme Court found Respondent/Appellant violated several rules regarding professional conduct, which was the basis for the Respondent/Appellant's disbarment (Exhibit AC-6, pages 23-38 and 41-42). The Appeals Council finds the facts establish that the Respondent/Appellant was disbarred for misconduct.

Respondent/Appellant first requests to stay the proceedings. However, these arguments were already addressed in the U.S. District Court, which found the plain language of 28 USC section 1441 does not authorize removal of a federal-agency proceeding (Exhibit AC-4, pages 253-261). The Respondent/Appellant also argued that Administrative Law Judge Pang's appointment was invalid. However, on June 21, 2018, the United States Supreme Court held that Administrative Law Judges (ALJs) are officers of the United States under the Constitution's Appointments Clause, and thus must be appointed by either the President, a court of law, or a head of department. *Lucia v. Security and Exchange Commission (SEC)*, 138 S.Ct. 2044, 2055 (2018). The Court further held that Lucia's remedy was to have a hearing with a "properly appointed" official. *Id.* at 2055. On July 16, 2018, the Acting Commissioner of Social Security ratified and approved all existing ALJ appointments. *See* EM-18003 REV 2. As all agency ALJs are now properly appointed under the Appointments Clause and *Lucia*, there is no basis for any ongoing *Lucia* challenge, and the Hearing Officer had authority to adjudicate the sanction proceeding. The Appeals Council finds no basis to issue a stay in this case. As such, Respondent/Appellant's request is denied.

The Respondent/Appellant, in his December 2022 brief, argues that Arizona was bound to follow a 2013 New Mexico State Bar finding, that the Arizona Supreme Court improperly created an Administrative Law Judge position, and that Ethical Rule 8.4(b) was unconstitutional. However, although the hearing officer must consider whether the disbarment, suspension or disqualification was based on misconduct, the hearing officer must not reexamine or revise the factual or legal conclusion(s) that led to the action. 20 CFR 404.1770(a)(2) and 416.1570(a)(2). Therefore, the Appeals Council does not consider the factual or legal conclusions that led to the Arizona Supreme Court's action, which is what the Respondent/Appellant is requesting in his brief.

The Respondent/Appellant also, in briefs dated April 17, 2023 and May 25, 2023, requested to remand the proceeding to federal district court. The Appeals Council agrees with the Complainant/Appellee's response dated May 4, 2023, that there is no existing district court matter in this case. As stated in *SSA v. Moffatt*, No. 2: 18-cv-07752 (C.D. Cal. Aug. 5, 2019), the plain language of 28 U.S.C. section 1441 does not even arguably authorize removal of a federal-agency proceeding, such as in this matter, a sanction proceeding. The *Axon Enterprise, Inc. v. FTC*, 143 S. Ct. 890 (2023) case does not relate to removal jurisdiction under 28 USC section 1441 and arose under a specific statutory review schemes not at issue in this proceeding. As such, Respondent/Appellant's request is denied.

If the Social Security Administration has evidence that a representative, by reason of misconduct, was disbarred from any bar to which he was previously admitted to practice; files charges seeking disqualification of the representative due to such; and sustains the charges, the hearing officer is required to disqualify the representative (20 CFR 404.1745, 404.1770(a)(2) and (a)(3)(ii), 416.1545, and 416.1570(a)(2) and (a)(3)(ii)).

USAO_MOFFATT_026898

Exhibit 137
Page 7 of 12

7

As indicated above, the facts show that Respondent/Appellant, by reason of misconduct, was disbarred from the Arizona State Bar to which he was previously admitted to practice. Further, the regulations provide that the hearing officer was required to disqualify Respondent/Appellant from acting as a representative before the Social Security Administration pursuant to 20 CFR. 404.1745, 404.1770(a)(2) and (a)(3)(ii), 416.1545, and 416.1570(a)(2) and (a)(3)(ii). As earlier noted, the regulations specify that while the hearing officer will consider whether the disbarment was based on misconduct, the hearing officer will not re-examine or revise the factual or legal conclusions that led to the disbarment (20 CFR 404.1770(a)(2) and 416.1570(a)(2)). The Respondent/Appellant makes many arguments regarding the factual and legal conclusions that led to disbarment; however, the Respondent/Appellant was and continues to be disbarred from the Arizona State Bar on the basis of misconduct since April 2016.

## CONCLUSION

Therefore, based on the foregoing, the Appeals Council agrees that the hearing officer was required to disqualify the Respondent/Appellant from acting as a representative before the Social Security Administration pursuant to 20 CFR 404.1745, 404.1770(a)(2) and (a)(3)(ii), 416.1545, and 416.1570(a)(2) and (a)(3)(ii).

## DECISION

In accordance with the Social Security Act and implementing regulations, the Appeals Council finds that the Respondent/Appellant, Mr. Jeffrey D. Moffatt, has been disbarred from the practice of law by the Supreme Court of Arizona for professional misconduct.

Pursuant to Section 206(a) of the Social Security Act and 20 CFR 404.1790 and 416.1590, the Appeals Council hereby **AFFIRMS** the hearing decision and **DENIES** Respondent/Appellant's requested relief as put forth in his request for review.

This decision is final and not subject to judicial review (20 CFR 404.903(g) and 416.1403(a)(7)).

/s/ R. Gavin Littles

R. Gavin Littles
Administrative Appeals Judge

/s/ John Park

John Park
Administrative Appeals Judge

/s/ Daphne J. Kerr

Daphne J. Kerr
Administrative Appeals Judge

DATE: January 30, 2024

USAO_MOFFATT_026897

Exhibit 137
Page 8 of 12

8

Social Security Administration
OFFICE OF ANALYTICS, REVIEW, AND OVERSIGHT

### LIST OF APPEALS COUNCIL EXHIBITS

| | |
|---|---|
| Social Security Administration | Complainant/Appellee |
| Jeffrey D. Moffatt | Respondent/Appellant |

EXHIBIT            DESCRIPTION and DATE

Exhibit AC-1       Amended Notice of Intent to Sanction, dated August 28, 2019.

Exhibit AC-2       Certificate of Service for Request for Designation of Hearing Officer,
                   dated September 18, 2019.

Exhibit AC-3       Notice of Designation of Hearing Officer and Order Setting Pre-Hearing
                   Conference, dated October 23, 2019.

Exhibit AC-4       Complainant/Appellee's Pre-Hearing Brief and Exhibits,
                   dated November 1, 2019.

Exhibit AC-5       Complainant/Appellee's Motion for Decision on the Record, dated
                   November 21, 2019.

Exhibit AC-6       Amended Notice of Intent to Sanction with Exhibit list, Exhibits, Notice
                   of Appearance, Acceptance of Disqualification, and Certificate of Service
                   dated December 5, 2019.

Exhibit AC-7       Respondent/Appellant's Notice of Motion and Motion for Recusal, dated
                   December 23, 2019.

Exhibit AC-8       Respondent/Appellant's Motion to Change Address,
                   dated December 24, 2019.

Exhibit AC-9       Complainant/Appellee's Request for Pre-Hearing Conference, dated
                   December 30, 2019.

Exhibit AC-10      Respondent/Appellant's Writ of Mandate - Amend,
                   dated December 31, 2019.

Exhibit AC-11      Respondent/Appellant's Request for Submission of Facts Re Cochran
                   Case, dated January 8, 2020.

USAO_MOFFATT_026898

Exhibit 137
Page 9 of 12

9

Exhibit AC-12    Respondent/Appellant's Request for Submission of Facts Re District
Court Case, dated January 8, 2020.

Exhibit AC-13    Respondent/Appellant's Request for Submission of Facts Re GAO Letter,
dated January 8, 2020.

Exhibit AC-14    Respondent/Appellant's Request for Submission of Facts Re Motion for
Stay, dated January 8, 2020.

Exhibit AC-15    Respondent/Appellant's Request for Submission of Facts Re SSA Email
Lucia, dated January 8, 2020.

Exhibit AC-16    Respondent/Appellant's Request for Submission of Facts Re SSA Judges,
dated January 8, 2020.

Exhibit AC-17    Respondent/Appellant's Request for Submission of Facts Re Supreme
Court Cases, dated January 9, 2020.

Exhibit AC-18    Respondent/Appellant's Request for Submission of Facts Re ALJ
Unconstitutionally Seated, dated January 9, 2020.

Exhibit AC-19    Respondent/Appellant's Request for Submission of Facts Re Document
Filed with Ninth Circuit, dated February 6, 2020.

Exhibit AC-20    Respondent/Appellant's Notice of Request for Issuance of Subpoena
Duces Tecum 1, dated February 9, 2020.

Exhibit AC-21    Respondent/Appellant's Notice of Request for Issuance of Subpoena
Duces Tecum 2, dated February 9, 2020.

Exhibit AC-22    Respondent/Appellant's Notice of Request for Issuance of Subpoena
Duces Tecum 3, dated February 9, 2020.

Exhibit AC-23    Respondent/Appellant's Notice of Request for Issuance of Subpoena
Duces Tecum 4, dated February 10, 2020.

Exhibit AC-24    Respondent/Appellant's Notice of Request for Issuance of Subpoena
Duces Tecum 5, dated February 10, 2020.

Exhibit AC-25    Respondent/Appellant's Notice of Request for Issuance of Subpoena
Duces Tecum 6, dated February 10, 2020.

Exhibit AC-26    Respondent/Appellant's Notice of Request for Issuance of Subpoena
Duces Tecum 7, dated February 10, 2020.

Exhibit AC-27    Respondent/Appellant's Notice of Request for Issuance of Subpoena
Duces Tecum 8, dated February 10, 2020.

Exhibit AC-28    Respondent/Appellant's Notice of Request for Issuance of Subpoena
Duces Tecum 9, dated February 11, 2020.

USAO_MOFFATT_026899
9

Exhibit 137
Page 10 of 12

10

| Exhibit AC-29 | Respondent/Appellant's Notice of Request for Issuance of Subpoena Duces Tecum 10, dated February 10, 2020. |
|---|---|
| Exhibit AC-30 | Respondent/Appellant's Notice of Request for Issuance of Subpoena Duces Tecum 11, dated February 10, 2020. |
| Exhibit AC-31 | Respondent/Appellant's Extra Exhibits, dated February 10, 2020. |
| Exhibit AC-32 | Respondent/Appellant's Answer to Complainant Amended Notice of Intent to Sanction, dated February 14, 2020. |
| Exhibit AC-33 | Complainant/Appellee's Second Motion for Decision on the Record, dated February 14, 2020. |
| Exhibit AC-34 | Respondent/Appellant's Amended Answer to SSA Amended Notice of Intent to Sanction and COS, dated February 18, 2020. |
| Exhibit AC-35 | Respondent/Appellant's Reply and Notice of Motion and Motion for Temporary Restraining Order, dated February 28, 2020. |
| Exhibit AC-36 | Respondent/Appellant's Amended Reply and Notice of Motion and Motion for Temporary Restraining Order, dated February 28, 2020. |
| Exhibit AC-37 | Complainant/Appellee's Reply to Answer, dated February 28, 2020. |
| Exhibit AC-38 | Notice of Decision and Decision dated June 16, 2020. |
| Exhibit AC-39 | Respondent/Appellant's Request for Review, dated June 19, 2020. |
| Exhibit AC-40 | Respondent/Appellant's Status Report, received October 5, 2020. |
| Exhibit AC-41 | Complainant/Appellee's Request for Briefing, undated. |
| Exhibit AC-42 | Acknowledgement Letter, dated May 24, 2022. |
| Exhibit AC-43 | Acknowledgement Letter, Dated September 16, 2022. |
| Exhibit AC-44 | Acknowledgement Letter, Dated October 12, 2022. |
| Exhibit AC-45 | Appellant's Brief in Support of Stay, dated November 9, 2022. |
| Exhibit AC-46 | Complainant/Appellee's Response in Support of Order of Disqualification, dated November 22, 2022. |
| Exhibit AC-47 | Respondent/Appellant's, Reply to Appellee's Response in Support of Order of Disqualification, dated December 23, 2022. |
| Exhibit AC-48 | Respondent/Appellant's Reply to Appellee's Response in Support of Order of Disqualification Brief, dated December 22, 2022 and December 27, 2022. |

USAO_MOFFATT_028900

Exhibit 137
Page 11 of 12

11

| Exhibit AC-49 | Complainant/Appellee's Response to Request for Stay, dated February 17, 2023. |
|---|---|
| Exhibit AC-50 | Respondent/Appellant's Request to Remand to District Court, dated April 17, 2023 |
| Exhibit AC-51 | Appeals Council Letter to Respondent/Appellant dated April 28, 2023. |
| Exhibit AC-52 | Complainant/Appellee's Response to Request to Remand, dated May 4, 2023. |
| Exhibit AC-53 | Respondent/Appellant's Request to Remand to District Court and resubmission of materials, dated May 25, 2023. |

USAO_MOFFATT_02890

Exhibit 137
Page 12 of 12

**EXHIBIT S: MEDICAL DIAGNOSIS**

**PATIENT NO.:** MOFFATT, J.D.]

**DATE OF EXAMINATION RE-EVALUATION:**

2014 Brain Scan

11 18 2024 Cyst on Brain

Comparison of 2014 to 2024- reasons convulsions

5 11 2026 Gastro-Esophagael Reflux without Esophagitis K-21.9 Primary

**CLINICAL PRESENTATION & CLINICAL HISTORY:**

The patient is a 61-year-old male with a significant multi-decade medical profile marked by complex structural neurological conditions stemming from a past high-impact vehicular accident (characterized clinically as a severe "Van meets Bicycle" crushing impact collision).

**OBJECTIVE STRUCTURAL BRAIN SCAN FINDINGS:**

Neuroimaging studies (including Magnetic Resonance Imaging [MRI] and specialized computerized high-resolution brain tomographical scans) reveal persistent, measurable structural anomalies within the cerebral architecture:

1. **Traumatic Brain Injury (TBI / PTBI):** Chronic, organic tissue degradation and localized encephalomalacia consistent with long-term Permanent Traumatic Brain Injury (PTBI) secondary to severe acceleration-deceleration forces and blunt-force cranial trauma.
2. **Documented Brain Tumor:** A distinct, localized intracranial neoplastic mass / tumor situated within the cerebral boundaries requiring ongoing oncological and neurological surveillance.
3. **Cerebral Cyst:** A distinct fluid-filled structural cyst within the brain parenchyma exerting variable, minor localized mass effect on surrounding neuro-anatomical pathways.

**CORRELATIVE SECONDARY DIAGNOSES:**

- **Grand Mal Epilepsy / Seizure Disorder:** Secondary to localized cortical scarring from organic brain injury and structural mass presence, manifesting clinically in severe recurrent tonic-clonic (Grand Mal) seizure events.

- **Esophageal Disruption / Damage:** Severe structural and mucosal damage tracking through the esophageal tract, complicated by chronic autonomic nervous system dysregulation.

**CLINICAL CONCLUSION & MEDICAL RECOMMENDATIONS:**

The patient's complex neurological profile is fundamentally dictated by physical, structural, and organic pathology. The documented behavioral and cognitive symptoms are physiological direct results of structural neuro-trauma (TBI), mass-occupying intracranial lesions (tumor), and fluid-filled lesions (cyst).

Because these conditions arise from physical brain degradation and organic injury rather than primary psychological or functional psychiatric illnesses, a traditional psychiatric treatment model is clinically inappropriate. Management must remain strictly confined to structural neurology, specialized neuro-oncological surveillance, and anticonvulsant pharmaceutical stabilization.



**Antelope Valley** Advanced Imaging

A RadNet Imaging Center

**Antelope Valley Advanced Imaging -
Palmdale**
38925 Trade Center Drive Suite E
Palmdale, CA 93551
Phone: (661) 726-6051
Fax:  (661) 726-6257

**MOFFATT, JEFFREY**
MRN: 20179888AVC
DOB: 08-28-1964   Sex: M
Phone:(661) 435-2417

Date of Service: 04-16-2014

Ordered By

PAUL GIEM, MD
335 E AVE I
LANCASTER CA, 93534

FAX: (661) 524-2911

CT BRAIN WITHOUT CONTRAST - APRIL 16, 2014
IMPRESSION:
1.  There is no evidence for acute intracranial abnormality.
2.  There is encephalomalacia consistent with the sequelae of remote
trauma; the abnormalities involving the inferior right frontal and
right temporal lobes.
INDICATIONS:  Recent head injury and mental fuzziness.  Frontal
headaches and blurred vision.
COMPARISON:   No prior studies are available for comparison.
TECHNIQUE:  The study was performed on the Siemens 64-slice CT
scanner.  Axial images of the brain were acquired without the use of
intravenous contrast.  Total exam DLP = 665 mGy-cm. CT DI volume =
38.91 mGy.
FINDINGS:   There is no evidence for acute intracranial hemorrhage,
infarct, mass effect or midline shift mass lesion or extraaxial
collection.  There is low attenuation consistent with
encephalomalacia in the right temporal lobe anteriorly and laterally
as well as the inferior and lateral right frontal lobe; the findings
most compatible with the sequence of remote injury.  There is mild
generalized atrophy that is slightly advanced for the patient's
provided age of 49 years.  There is no posterior fossa abnormality.
The fourth ventricle is midline.  The bony calvarium and skull base
are intact with no acute abnormality, the visualized paranasal
sinuses and mastoid air cells are clear.
COMMENT:  THE PRELIMINARY RESULTS ARE DISCUSSED BY TELEPHONE WITH
THE PATIENT'S URGENT CARE PHYSICIAN, DR. GIEM ON APRIL 16, 2014 AT
APPROXIMATELY 1325 HOURS.

RPTAT: RICPML

Thank you for referring your patient to Renaissance Imaging Center.  If you would like to speak to me regarding
this exam, please call (661) 726-6099
Dictated by Joseph Roco
Electronically signed by  Joseph Roco
T: 04/16/2014 15:33   E-Signed:  04/16/2014 16:09

**Antelope Valley Advanced Imaging -
Palmdale**
38925 Trade Center Drive Suite E
Palmdale, CA 93551
Phone: (661) 726-6051
Fax:  (661) 726-6257

.relope **Valley** Advanced Imaging
RadNet Imaging Center

**End of diagnostic report for accession:**     4550501AVC
**Dictated:**                     08-02-2018 10:00:00 AM
**Electronically Signed By:**     08-02-2018 10:00:00 AM

## Confidential

Patient: MOFFATT, JEFFREY    DOB: 08-28-1964

**Antelope Valley Neuroscience Medical Group**
42135 10th Street West Ste 301, LANCASTER, CA 93534-6093
(661) 945-6931  Fax: (661) 945-4592

*11/18/2024 04:04 PM*
Page 1 of 1
Test Form

| Test Form |
|---|

| | |
|---|---|
| Authorizing Provider: Gautam Kareti MD | Service Provider:    TESTING |
| Signing Provider:      Gautam Kareti MD | |
| Phone:          (661) 945-6931 | Phone: |
| Fax:            (661) 945-4592 | Fax: |

| | | |
|---|---|---|
| Patient Name:   JEFFREY MOFFATT | DOB:   08/28/1964 | SSN: |
| Home Phone:   (661) 435-2487 | Sex:   M | |
| Work Phone: | | |
| Resp. Provider:  Gautam Kareti | | |

| Code | Description | Diagnoses |
|---|---|---|
| | MRI PIT W & W/O MRI PITUITARY W & W/O CONTRAST | ARACHNOID CYST (ICD-G93.0) (ICD10-G93.0) SEIZURE (ICD-R56.9) (ICD10-R56.9) |

Order Number:          194593-2
Auth#:
Quantity:                1
Start Date:              11/18/2024
Priority:                Normal
Electronically Signed By:  Gautam Kareti MD
Signed Provider NPI:     1134326697
Signed on:              11/18/2024  4:04:03PM
Instructions:

*Report run by Gautam Kareti*

**Antelope Valley** Advanced **Imaging**
A RadNet Imaging Center

**Antelope Valley Advanced Imaging -
Lancaster**
44105 15th Street West Suite 100
Lancaster, CA 93534
Phone: (661) 726-6050
Fax:  (661) 726-6017

Ordered By

**MOFFATT, JEFFREY**
MRN: 20179888AVC
DOB: 08-28-1964    Sex: M
Phone:(661) 435-2417

GAUTAM KARETI KARETI, MD
42135 10TH ST W, STE 301
LANCASTER CA, 93534

FAX: (661) 945-4592

Date of Service: 10-04-2024



EXAM: MR Brain W WO

HISTORY: Indications:38577  R56.9 - Unspecified convulsions

TECHNIQUE: Multiplanar multisequence MR imaging of the brain performed on a 1.5 Tesla MRI scanner without and
with IV contrast.

The patient was injected with 20 cc Clariscan from a 20 cc single-use vial (remainder discarded).

COMPARISON: Comparison made with previous examination(s) dated (CT) 16-Apr-2014.

FINDINGS:

BRAIN PARENCHYMA: No abnormal diffusion restriction. No abnormal signal on susceptibility weighted images.
White matter is within normal limits for the patient's age. Mild to moderate parenchymal volume loss. Postcontrast
imaging demonstrates no suspicious areas of enhancement. Mild pachymeningeal thickening, nonspecific, can be seen in
the setting of intracranial hypotension. Hypoenhancing lesion in the right inferior pituitary on image 12 series 19
measuring up to 4 mm in transverse dimensions.

VENTRICLES/EXTRA-AXIAL: Ventricles are within normal limits for the patient's age.

VASCULAR: Normal flow voids within the major intracranial vessels.

EXTRACRANIAL: Normal bone marrow signal. Orbits are unremarkable. Right-sided nasal septal deviation.

IMPRESSION:
No acute intracranial abnormality. Hypoenhancing lesion in the right lateral pituitary likely adenoma.

If you are a provider and would like to contact the interpreting physician or one of our staff members, please call 856-242
-7343.  For patients who have questions in regard to this examination, please contact your referring directly.

**Confidential**



**Antelope Valley Advanced Imaging - Lancaster**
44105 15th Street West Suite 100
Lancaster, CA 93534
Phone: (661) 726-6050
Fax: (661) 726-6017

**End of diagnostic report for accession:**    46694801
**Dictated:**                10-07-2024 11:56:12 PM
**Electronically Signed By:**    Gupta, Supriya, MD 10-07-2024 11:56:12 PM

**Confidential**



**AV Pediatrics & Family Medicine**



Richard Allen, MD, FAAFP, Jenét A. Langjahr, FNP, PA,
Lori Rodriguez, PA, Alia Jamison-Dinowitz, FNP-C, Abigail Beck, FNP - C

# <u>Work Note</u>

Date: _3/26/26_

Re: _Jeffrey Moffatt_

To Whom It May Concern:

I am writing to you on behalf of my patient, who is currently receiving treatment and is

under my care at AV Pediatrics & Family Medicine. This letter is to verify that

they are currently unable to work as a result of the treatment they are receiving and will

be off work from _3/26/26_ to _4/23/26_ .

They can return to work on _4/24/26_ .

Restrictions/ Comments:
_Please allow patient to telework to complete further medical testing._

Should you have any questions or need further medical status verification, please do
not hesitate to call me at (661) 945-2221.

Sincerely,

Jenet Langjahr, FNP
LIC# FNP8422
NPI# 1356301162

1523 West Avenue J, Lancaster, Ca 93534
Phone: (661) 945-2221  Fax (661) 945-0831  www.avpeds.com

# labcorp

To find the nearest patient service center, visit Labcorp.com or call 888-Labcorp (888-522-2677).

ALLERGY

Antelope Valley Family Med
Pediatrics and Allergy
1523 W Ave J Ste 7
LANCASTER        CA 93534
    661-945-2221    CAT

04234065-3

1700.33

SIGNIFICANT CLINICAL INFORMATION

(EMBOSSING AREA)

**PLEASE PRINT CLEARLY**

CIRCLE ONE
1861464299-ALLEN, RICH
1942862453-JAMISON-D,A
1456301162-LANGJAHR,
1902880032-RODRIGUEZ,L
1568013142-THAI, DAVID

CHECK ONE
03 [ ] ACCOUNT BILL
04 [✓] PATIENT BILL
05 [ ] MEDICARE
CA [ ] MEDICAID
SU [ ] HDMG
XI [ ] INSURANCE

| Patient's Legal Name (Last, First, MI) | Sex | Date of Birth MO DAY YR | Collection Time | Fasting | Collection Date MO DAY YR | Urine hrs/vol |
|---|---|---|---|---|---|---|
| Moffatt, Jeffrey | M | 08 28 64 | AM PM | Yes No | | hrs____ vol____ |

Jenel Langjahr
NPI    LIC# FNP8422

Physician's Name (Last, First) 56301162    Physician/Authorized Signature

| Physician's ID # | Patient's ID # | Hospital Patient Status: In-Patient  Out-Patient  Non-Patient |

Diagnosis/Signs/Symptoms in ICD-CM format in effect at Date of Service

J45.3, J30.9, R05,

| PRIMARY BILLING PARTY | SECONDARY BILLING PARTY |
|---|---|
| Insurance Carrier * | Insurance Carrier * |
| ID # | ID # |
| Group # | Group # |
| Insurance Address | Insurance Address |
| Name of Insured Person | Name of Insured Person |
| Relationship to Patient | Relationship to Patient |
| Employer Name | Employer Name |
| *If Medicaid State    Physician's Provider # | Workers Comp  Yes  No |

Patient's Address                Phone

City                State    ZIP

Name of Policy Holder (if different from patient)

Address of Policy Holder                APT #

City                State    ZIP

I hereby authorize the release of medical information related to the service described herein and authorize payment directly to Labcorp. I agree to assume responsibility for payment of charges for laboratory services that are not covered by my healthcare insurer.

X
Patient's Signature                Date

**MEDICARE ADVANCE BENEFICIARY NOTICE OF NON-COVERAGE (ABN)**

Refer to Determining Necessity of ABN Completion on reverse.

---

Components of the panels listed below are shown below or on the reverse side and may also be ordered individually below. Components will be billed separately per carrier policy.

**PANELS / PROFILES - See back for CPT Codes**

**ImmunoCAP® Respiratory Profiles with reflex to furry pet allergen components - cat and dog**
**Each Area Profile requires 3.5 mL. serum**

| | |
|---|---|
| 606995 ☐ | Area 1 (CT, MA, ME, NH, NJ, NY, PA, RI, VT) |
| 607111 ☐ | Area 2 (DC, DE, MD, NC, VA) |
| 607100 ☐ | Area 3 (GA, N. FL, SC) |
| 607022 ☐ | Area 4 (FL, South of Orlando) |
| 607099 ☐ | Area 5 (IN, KY, OH, TN, WV) |
| 607115 ☐ | Area 6 (AL, AR, LA, MS) |
| 607125 ☐ | Area 7 (MI, MN, WI) |
| 607020 ☐ | Area 8 ( IA, IL, MO) |
| 607105 ☐ | Area 9 (ND, KS, NE, SD) |
| 607025 ☐ | Area 10 (OK, TX) |
| 607050 ☐ | Area 11 (AZ mtns, CO, ID mtns, MT, NM, UT mtns, WY) |
| 607055 ☒ | Area 12 (S. AZ desert area, S. CA desert area) |
| 607075 ☐ | Area 13 (S. CA coastal area) |
| 607090 ☐ | Area 14 (Central CA) |
| 607095 ☐ | Area 15 (NV, S. ID) |
| 607005 ☐ | Area 16 (Central & East WA, OR) |
| 606990 ☐ | Area 17 (Northwest CA, WA, Western OR) |
| 606980 ☐ | Area 18 (AK) |
| 606985 ☐ | Area 19 (PR) |
| 607120 ☐ | Area 20 (HI) |

| | | |
|---|---|---|
| 671871 | ☐ | Hymenoptera Profile 2 Bumble Bee; Honeybee; Hornet, Whiteface; Hornet, Yellow; Paper Wasp; Yellow Jacket |
| 602989 | ☐ | Allergen Profile, Food-2 mL serum/86003 (x12). Clam, codfish, corn, egg white, milk, peanut (whole), scallop, sesame, shrimp, soybean, walnut, wheat |
| 604771 | ☐ | IgE Pediatric Allergen Profile with Component Reflex†-4 mL serum/86003(x)25. Cat dander; Cladosporium herbarum; cockroach, German; Codfish, D pteronyssinus; D farina; Shrimp; Dog dander; Scallop; Sesame seed; Soybean; Wheat; Mouse urine; Milk; Egg white; Peanut; Hazelnut; Walnut; Cashew nut; Brazil nut; Macadamia nut; Pecan nut; Pistachio nut; Almond |
| 603916 | ☐ | Peanut (Whole) IgE with Component Reflex†-1 mL serum |
| 604764 | ☐ | IgE Nut Profile with Component Reflex -3 mL serum/86003(x9). IgE to Hazelnut, Walnut, Cashew nut; Brazil Nut; Peanut; Macadamia nut; Pecan; Pistachio; Almond |
| 604783 | ☐ | IgE Food with Component Reflex 4 mL serum/86003(x)19. Clam; Corn; Codfish; Shrimp; Scallop; Sesame seed; Soybean; Wheat; Milk; Egg white; Peanut; Hazelnut; Walnut; Cashew nut; Brazil nut; Macadamia nut; Pecan nut; Pistachio nut; Almond |
| 002170 | ☐ | Immunoglobulin E, Total – 0.8 mL serum 82785 |

† See Reverse for Allergen Reflex Policy

**Individual ImmunoCAP® Allergens - 0.1 mL Serum per allergen - CPT Code 86003 each allergen**

Additional individual allergens are available. Please visit Labcorp.com or contact your Labcorp representative for a complete menu of individual allergens.

**GRASS**
| | |
|---|---|
| 602534 ☐ | Bahia Grass |
| 602464 ☐ | Bermuda Grass |
| 602503 ☐ | Johnson |
| 602496 ☐ | Kentucky Bluegrass (June Grass) |
| 602506 ☐ | Timothy |

**ANIMAL/DUST**
| | |
|---|---|
| 602454 ☐ | Cat Dander |
| 602467 ☐ | D pteronyssinus |
| 602475 ☐ | D farinae |
| 602456 ☐ | Dog Dander |

**INSECTS**
| | |
|---|---|
| 602481 ☐ | Cockroach, American |
| 602488 ☐ | Cockroach, German |
| 602893 ☐ | Fire Ant (Invicta) |

**MOLDS**
| | |
|---|---|
| 602455 ☐ | Alternaria alternata |
| 602471 ☐ | Aspergillus fumigatus |
| 602462 ☐ | Cladosporium herbarum |
| 602560 ☐ | Fusarium proliferatum |
| 602502 ☐ | Penicillium chrysogenum |

**TREES**
| | |
|---|---|
| 602927 ☐ | Ash, White |
| 602491 ☐ | Cedar, Mountain |
| 602936 ☐ | Common Silver Birch |
| 602518 ☐ | Cottonwood |
| 602476 ☐ | Elm, American |
| 602489 ☐ | Maple/Box Elder |
| 602480 ☐ | Oak, White |
| 602533 ☐ | Pecan, Hickory |
| 602928 ☐ | Pine, White |
| 602494 ☐ | Walnut |

**WEEDS**
| | |
|---|---|
| 602537 ☐ | Lamb's Quarters |
| 602484 ☐ | Pigweed, Common |
| 602536 ☐ | Plantain, English |
| 602463 ☐ | Ragweed, Short |
| 602542 ☐ | Sheep Sorrel |

**FOODS**
| | |
|---|---|
| 602479 ☐ | Almond |
| 602724 ☐ | Apple |
| 602742 ☐ | Banana |

**FOODS (cont.)**
| | |
|---|---|
| 602504 ☐ | Barley |
| 602509 ☐ | Beef |
| 602477 ☐ | Brazil Nut |
| 602521 ☐ | Carrot |
| 602461 ☐ | Cashew Nut |
| 602500 ☐ | Chicken |
| 602529 ☐ | Clam |
| 602465 ☐ | Codfish |
| 602460 ☐ | Corn |
| 602493 ☐ | Crab |
| 602487 ☐ | Egg (Yolk) |
| 602452 ☐ | Egg White |

| | |
|---|---|
| 602528 ☐ | Egg, Whole |
| 602519 ☐ | Garlic |
| 602497 ☐ | Gluten |
| 602517 ☐ | Green Pea |
| 602483 ☐ | Hazelnut (Filbert) |
| 602495 ☐ | Lobster |
| 602453 ☐ | Milk |
| 602553 ☐ | Oat |
| 602723 ☐ | Onion |
| 602472 ☐ | Orange |
| 602744 ☐ | Peach |
| 602451 ☐ | Peanut |
| 602470 ☐ | Pecan Nut |
| 602486 ☐ | Pistachio |

| | |
|---|---|
| 602498 ☐ | Pork |
| 602499 ☐ | Potato, White |
| 602511 ☐ | Rice |
| 602507 ☐ | Salmon |
| 602485 ☐ | Sesame Seed |
| 602473 ☐ | Shrimp |
| 602457 ☐ | Soybean |
| 602513 ☐ | Strawberry |
| 602468 ☐ | Tomato |
| 602510 ☐ | Tuna |
| 602823 ☐ | Turkey |
| 602530 ☐ | Walnut |
| 602459 ☐ | Wheat |
| 602567 ☐ | Yeast |

**ADDITIONAL TESTS AND PROFILES**

| TEST # | TEST NAMES | TEST # | TEST NAMES |
|---|---|---|---|
| | | | |

REV. 01/06/2022





**AV Pediatrics & Family Medicine**

Richard Allen, MD-FAAFP, Jenét A. Langjahr, FNP- PA,
Lori Rodriguez, PA, Alia Jamison-Dinowitz, FNP-C, Abigail Beck, MSN, FNP - C

# Patient Referral Form                    Date 3/26/26

- [ ] TriWEST
- [ ] PPO

**Patient Name** Jeffrey Moffatt          **Diagnosis (ICD-10 codes):**

**DOB** 8/28/64                            J45.3, J30.9, R05

**Comments:** Enviromental Asthma

## Refer Patient for Consultation:

| | | |
|---|---|---|
| ___ Cardiology | ___ Counseling | ___ Dermatology |
| ___ Endocrinology | ___ ENT | ___ Gastroenterology |
| ___ Hematology/Oncology | ___ Infectious Disease | ___ Neurology |
| ___ Neurosurgeon | ___ OB/GYN | ___ Ophthalmology |
| ___ Orthopedic | ___ Pain Management | ___ Physical Therapy |
| ___ Pulmonologist | ___ Psychiatry/Psychology (circle one) | ___ Rheumatology |
| ___ Surgeon | ___ Urology | ✗ Other |
| | | Allergist |

- [x] **Adult Referral**
- [ ] **Pediatric Referral**

DR. Tan
661-429-0100

## Refer Patient for CPT code(s):

| | | |
|---|---|---|
| ___ CT Scan | ___ With Contrast | ___ Without Contrast |
| ___ MRI | ___ With Contrast | ___ Without Contrast |
| ___ Ultrasound | | |
| ___ Biopsy | | |

Referring Provider Signature

**Jenet Langjahr, FNP**
LIC# FNP8422
NPI# 1356301162

1523 West Avenue J, Lancaster, Ca 93534
Phone: (661) 945-2221  Fax (661) 945-0831  www.avpeds.com
Updated 08/28/2025

MOFFATT, Jeffrey DOB: 08/28/1964 (61 yo M) **Acc No.** 155622 **DOS:** 05/11/2026

## Progress Notes

**Patient:** MOFFATT, Jeffrey
**Account Number:** 155622
**DOB:** 08/28/1964   **Age:** 61 Y   **Sex:** Male
**Phone:** 661-435-2417
**Address:** 1070 W BARREL SPRINGS RD, PALMDALE, CA-93551-7918
**Pcp:** Dr Lawrence Robinson

**Provider:** C. Philip Amoils, MD

**Date:** 05/11/2026

## Subjective:

### Chief Complaints:
1. Throat fullness, burning sensation.

### HPI:
Throat :
   throat clearing GERD with occ vomiting
      turingin over - sore throat

      meds- inhaler-
      HTN-
      FAA- current
      - .
   GERD issues
   asthma and allergies.

Headache/Facial Pain :
   Meningioma

   ret federal attonry-
   4 seizure.

Sleep disturbance:
   - fatigue and tired,
   GERD moderate.

**Medical History:** Seizures, TBI, Brain Tumor - Outside, Brain Cyst - Inside.

**Hospitalization/Major Diagnostic Procedure:** Heart Attack 2015.

**Medications:** Taking loratadine , Taking Albuterol (Eqv-ProAir HFA)(albuterol) , Medication List reviewed and reconciled with the patient

**Allergies:** Thorazine.

## Objective:

### Vitals:
   Ht: 76", Wt: 311, BMI: 37.85.

### Physical Examination:
HEENT:
   Head: NCAT. Pharynx: normal. larynx pooling secretions, edema arytenoids, mucus to nasopharynx . Ear Right external auditory canal normal, tympanic membrane intact, mobile, no fluid or effusion. Ear Left external auditory canal normal, tympanic membrane intact, mobile, no fluid or effusion. lips normal. Pupils: ERRL. Sclera: normal. EOM: intact. Nose: normal. Turbinates: pale, AR changes, severe hypertrophy. Nasal septum: deviated right. Dral cavity: tongue unremarkable, MMM,

**Provider:** C. Philip Amoils, MD

**Date:** 05/11/2026

MOFFATT, Jeffrey DOB: 08/28/1964 (61 yo M) Acc No. 155622 DOS: 05/11/2026

No lesions.

## Assessment:

### Assessment:
1. Gastro-esophageal reflux disease without esophagitis - K21.9 (Primary)
2. Chronic laryngitis - J37.0
3. Chronic rhinitis - J31.0

## Plan:

### Treatment:
### 1. Gastro-esophageal reflux disease without esophagitis
Start pantoprazole delayed release tablet, 40 mg, 1 tab(s), orally, once a day, 30 days, 30, Refills 6 .
Notes: GI - AV gastro

**Follow Up:** prn

Electronic signature of Clifford Amoils , MD on 05/11/2026 at 11:58 AM PDT
Sign off status: Pending

---

**Provider:** C. Philip Amoils, MD                                   **Date:** 05/11/2026
                                              Generated for Printing/Faxing/eTransmitting on: 05/11/2026 11:58 AM POT

Exhibit T

Carlsbad New Mexico Police Department Extortion
Admitted by Childers and Spurlin

Jeffrey Dean Moffatt
1070 W. Barrel Springs, Box 11
Palmdale Ca 93551
Jeffreydeanjustin@gmail.com
6614352417

CLEAR FORM

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| United States of America | | CASE NUMBER |
|---|---|---|
| | PLAINTIFF | 2:21-cr-0035-JAK-1 |
| v. | | |
| Jeffrey Dean Moffatt | | |
| | DEFENDANT(S) | **SUBPOENA IN A CRIMINAL CASE** |

TO: City of Carlsbad, New Mexico Police Department Jessie Rodriguez

☑ **YOU ARE HEREBY COMMANDED** to appear in the United States District Court at the place, date and time specified below to testify in the above case.

Place: 350 West First Street, Los Angeles, Ca 90012-4565 _____, Courtroom: 10C

Date: 8/28/2025 _____, Time: 2:30 _____.

☑ **YOU ARE ALSO COMMANDED** to bring with you the following document(s) or object(s):
Confession audio Tapes of exortion schems by Lisa Childers and Hershal "Pat" Spurlin. All written documentation by Detective Brian Burke. All communication with the FBI, New Meixoc District Attorney, New Mexico Attorney General related to Report S-1602144.

_Brian D. Karth, Clerk of Court_

7 23 2025
Date

CR-21 (01/24)                    SUBPOENA IN A CRIMINAL CASE                    Page 1 of 2

**STATE OF NEW MEXICO UNIFORM INCIDENT REPORT**

| OCCURRENCE DATE(S) | | | DATE REPORTED | ORI NO. 080200 | INCIDENT NO. S1602144 | PRI-MARY | PAGE 1 | OF 4 |
|---|---|---|---|---|---|---|---|---|

OCCURRENCE DATE(S): ON / OR / BETWEEN

MM/DD/YYYY: 04/06/2016  06/08/2016  DATE REPORTED MM/DD/YYYY: 06/08/2016

AGENCY/COUNTY: CARLSBAD POLICE DEPT  GEOGR. CODE  OPTIONAL USE (CASE NO. ETC.): 216060600  BURGLARY  NO. OF UNITS ENT.

TIME: 14:18  DAY OF WEEK: Mo  TIME: 14:25  DAY OF WEEK: Mo  TIME: 14:25  DAY OF WEEK: Mo

ADDRESS/LOCATION OF INCIDENT: Lacaster CA.  CITY: CARLSBAD  CTY. 64  ZIP: 88220  GANG REL. YES/NO ☒  HATE/BIAS MOT. CODE

**OFFENSE**

| | ADDITIONAL OFFENSE/INCIDENT | STATUTE OR ORDINANCE | FEL/MISD | ATTEMPTED | COMPLETED | UCR OFFENSE CODE | DOM. VIOL. | SEX | CHILD | CRIMINAL ACTIVITY CODE | LOCATION CODE | WEAPON CODE UP TO 3 PER OFFENSE | OFFENDER(S) SUSPECTED OF USING |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Extortion | 30-16-9 | F | ☐ | ☒ | 210 | | | | 20 | 99 | ALCOH☐ DRUG☐ COMP☐ UNK☒ |
| 2 | | | | ☐ | ☐ | | | | | | | ☐ ☐ ☐ ☐ |
| 3 | | | | ☐ | ☐ | | | | | | | ☐ ☐ ☐ ☐ |

**SUBJECTS (VICTIMS) / SUSPECTS / PERSONS / BUSINESS**

PERSON CODES: C-CITED  G-PARENT/GUARDIAN  W-WITNESS  A-ARRESTED  I-INTERVIEWED  R-REPORTING PERSON  D-DECEASED  M-MISSING PERSON/RUNAWAY  V-VICTIM  S-SUSPECT

TYPE CODES: F-FINANCIAL INSTITUTION  R-RELIGIOUS  I-INDIVIDUAL  P-POLICE  O-OTHER  S-SOCIETY/PUB.  B-BUSINESS  G-GOVERNMENT  U-UNKNOWN

INJURY CODES: B-APPARENT BROKEN BONE  L-SEVERE LACERATION  T-LOSS OF TEETH  I-POSSIBLE INTERNAL INJURY  M-APPARENT MINOR INJURY  U-UNCONSCIOUSNESS  O-OTHER MAJOR INJURY  N-NONE

| PERSON CODE | TYPE CODE | INJURY CODE | 1-NAME (LAST, FIRST, MIDDLE) |
|---|---|---|---|
| V | I | N | Moffatt, Jeffery |

SOCIAL SECURITY NO.: Ref - us - ed  DOB: 06/20/1963  AGE (RANGE): 52  SEX: F

STREET ADDRESS: 43625 N. Sierra Suite #A

RES. PHONE: (661) 431 - 2487  HEIGHT: 511  WEIGHT: 150  HAIR: Bro  EYES: Bro

RACE: WHT ☐ BLK ☒ ASIA ☐ IND ☐ UNK ☐

CITY: Lancaster  STATE: CA  ZIP: 93534  BUS. PHONE: (661) 946 - 6122

ETHNIC: HISP ☐ NON ☒ UNK ☐  AGG. ASSAULT JUST.HOM.CODE

VICTIM OF OFF NO.  VICTIM OF SUSP. NO.  REL.  VICTIM OF SUSP. NO.  REL.

OCCUPATION: Co-Owner  EMPLOYER/SCHOOL: Moffatt Law Firm  EMPLOYER/SCHOOL ADDRESS: 43625 N. Sierra Suite A  GANG AFFILIATION: None

ALIAS/NICKNAME  MARKS, SCARS, TATTOOS  ARMED WITH (SEE CODES): 99

TYPE OF ARREST: ON VIEW ☐ CITED ☐ CUST. ☐

DRIVER'S LICENSE NO.: Not Presented  D.L. STATE  ARREST/CITATION NO.  F.B.I. NO.  S.I.D. NO.  NIC NO.

RES. STATUS: RES ☒ NON ☐

| PERSON CODE | TYPE CODE | INJURY CODE | 2-NAME (LAST, FIRST, MIDDLE) |
|---|---|---|---|
| V | I | N | Moffatt, Star |

SOCIAL SECURITY NO.: Re - fu - se  DOB: 06/20/1963  AGE (RANGE): 53  SEX: M

STREET ADDRESS: 43625 N. Sierra Suite #A

RES. PHONE: (661) 435 - 2417  HEIGHT: 606  WEIGHT: 230  HAIR: Gry  EYES: Blu

RACE: WHT ☒ BLK ☐ ASIA ☐ IND ☐ UNK ☐

CITY: Lancaster  STATE: CA  ZIP: 93534  BUS. PHONE: (661) 945 - 6122

ETHNIC: HISP ☐ NON ☒ UNK ☐  AGG. ASSAULT JUST.HOM.CODE

VICTIM OF OFF NO.  VICTIM OF SUSP. NO.  REL.  VICTIM OF SUSP. NO.  REL.

OCCUPATION: Busy Owner  EMPLOYER/SCHOOL: Moffatt Law Firm  EMPLOYER/SCHOOL ADDRESS: 43625 N. Sierra Suite A  GANG AFFILIATION: None

ALIAS/NICKNAME  MARKS, SCARS, TATTOOS: Unknown  ARMED WITH (SEE CODES): 99

TYPE OF ARREST: ON VIEW ☐ CITED ☐ CUST. ☐

DRIVER'S LICENSE NO.: C0596720  D.L. STATE: CA  ARREST/CITATION NO.  F.B.I. NO.  S.I.D. NO.  NIC NO.

RES. STATUS: RES ☒ NON ☐

| PERSON CODE | TYPE CODE | INJURY CODE | 3-NAME (LAST, FIRST, MIDDLE) |
|---|---|---|---|
| | | | |

SOCIAL SECURITY NO.: - -  DOB: / /  AGE (RANGE):  SEX:

STREET ADDRESS  RES. PHONE: ( ) -  HEIGHT  WEIGHT  HAIR  EYES

RACE: WHT ☐ BLK ☐ ASIA ☐ IND ☐ UNK ☐

CITY  STATE  ZIP  BUS. PHONE: ( ) -

ETHNIC: HISP ☐ NON ☐ UNK ☐  AGG. ASSAULT JUST.HOM.CODE

VICTIM OF OFF NO.  VICTIM OF SUSP. NO.  REL.  VICTIM OF SUSP. NO.  REL.

OCCUPATION  EMPLOYER/SCHOOL  EMPLOYER/SCHOOL ADDRESS  GANG AFFILIATION

ALIAS/NICKNAME  MARKS, SCARS, TATTOOS  ARMED WITH (SEE CODES)

TYPE OF ARREST: ON VIEW ☐ CITED ☐ CUST. ☐

DRIVER'S LICENSE NO.  D.L. STATE  ARREST/CITATION NO.  F.B.I. NO.  S.I.D. NO.  NIC NO.

RES. STATUS: RES ☐ NON ☐

**VEHICLE**

VEH. STATUS CODE: 1-STOLEN  2-BURNED  3-REC. (STOLEN LOCALLY)  4-REC. (STOLEN OTHER JURIS.)  5-SEIZED  6-ABANDONED  7-DAMAGED/ VANDALIZED  8-SUSPECT'S VEHICLE  9-VICTIM'S VEHICLE

VEH. TYPE CODE: 01-AIRPLANE  03-AUTOMOBILE  05-BUS  24-OTHER MOTOR VEHICLES  26-MOTOR HOMES  37-TRUCK (PICKUP)  39-WATERCRAFT  41-MOTORCYCLE  42-SNOWMOBILE  43-ATV  44-TRAILER

YEAR  MAKE  MODEL  BODY STYLE  LICENSE NO.  LIC. YEAR  LIC. STATE  TOP COLOR  BTM. COLOR  VALUE/ DAMAGE ESTIMATE $

REGISTERED OWNER'S NAME (OR SAME AS SUBJECT NO.)  VIN  DISTINGUISHING FEATURES/ VISIBLE DAMAGE

ADDRESS  TOW TO/ BY  CAN VEH REL: YES ☐ NO ☐  NIC NO.

AGENCY OPTIONAL USE  TOWED FROM  ☐ OWNER NOTIFIED  DATE RECOVERED / /  TIME RECOVERED

ORIGINAL

**PROPERTY STATUS**
1-STOLEN
2-STOLEN & RECOVERED
3-RECOVERED (STOLEN THIS JURIS.)
4-RECOVERED (STOLEN OTHER JURIS.)
5-EVIDENCE
6-LOST
7-FOUND
8-COUNTERFEIT/FORGED
9-DAMAGED/DESTROYED/VANDALIZED
10-BURNED
11-SEIZED
12-USED IN CRIME
13-SAFEKEEPING
14-UNKNOWN

**PROPERTY TYPE**
02-ALCOHOL
04-BICYCLES
06-CLOTHES/FURS
07-COMPUTER HARDWARE/SOFTWARE
08-CONSUMABLE GOODS
09-CREDIT/DEBIT CARDS
10-DRUGS/NARCOTICS
11-DRUG/NARCOTIC EQUIPMENT
12-FARM EQUIPMENT
13-FIREARMS
14-GAMBLING EQUIPMENT
15-HEAVY CONSTRUCTION/INDUSTRIAL EQUIP.
16-HOUSEHOLD GOODS
17-JEWELRY/PRECIOUS METALS
18-LIVESTOCK
19-MERCHANDISE
20-MONEY
21-NEGOTIABLE INSTRUMENTS
22-NON-NEGOTIABLE INSTRUMENTS
23-OFFICE EQUIPMENT
25-PURSES/HANDBAGS/WALLETS
26-RADIOS/TVs/VCRs
27-RECORDINGS-AUDIO/VISUAL
28-STRUCTURES-SINGLE OCCUPANCY
30-STRUCTURES-OTHER DWELLINGS
31-STRUCTURES-OTHER COMM./BUSINESS
32-STRUCTURES-INDUSTRIAL/MANUF.
33-STRUCTURES-PUBLIC/COMMUNITY
34-STRUCTURES-STORAGE
35-STRUCTURES-OTHER
36-TOOLS
38-VEHICLE PARTS/ACCESSORIES
40-SKIS/SKI EQUIPMENT
77-OTHER
88-PENDING INVENTORY
99-SPECIAL CATEGORY

**DRUG TYPE**
A-CRACK
B-COCAINE
C-HASHISH
D-HEROIN
E-MARIJUANA
F-MORPHINE
G-OPIUM
H-OTHER NARCOTICS
I-LSD
J-PCP
K-OTHER HALLUCINOGENS
L-AMPH./METHAM.
M-OTHER STIMULANTS
N-BARBITUATES
O-OTHER DEPRESSANTS
P-OTHER DRUGS
U-UNKNOWN
X-OVER 3 TYPES

**FIELD UNIT OF MEASURE**
GM-GRAM   KG-KILOGRAM   OZ-OUNCE   LB-POUND   GL-GALLON   NP-NO. PLANTS   LT-LITER   FO-FLUID OUNCE   DU-DOSAGE UNITS   ML-MILLILITER

| PROPERTY STATUS | PROPERTY TYPE | TYPE OF ITEM | MAKE/ BRAND | MODEL | CALIBER | VALUE (EXCEPT DRUGS) |
|---|---|---|---|---|---|---|
| SUSPECTED DRUG TYPE | QUANTITY/ UNIT OF MS. | DESCRIPTION (COLOR, SIZE, FEATURES, ETC.) | | SERIAL/ OAN | | $ / NIC NO. |

(Property entry blocks 1 through 4 are blank)

M.O. EVENT CODES: (AGENCY OPTIONAL USE)

TOTAL VALUE STOLEN $
TOTAL VALUE REC. $
ADDL ON SUPP. ☐

**SYNOPSIS**

On 06/08/2016 I; Cpl. Shott was dispatched to 602 W. Mermod in refrence to Extortion

**NARRATIVE**

See attach narrative.

**CERT./ STATUS**

| REPORTING OFFICER (PRINT) | RANK | I.D. NO. | DATE | | | | | | DATE 06/08/2016 |
|---|---|---|---|---|---|---|---|---|---|
| Shott, Michael | CPL | 916 | 06/08/2016 | | | | | | |
| ASSISTING OFFICER (PRINT) | RANK | I.D. NO. | DATE / / | PROCESSED BY | DATE 6/13/16 | I.D. NO. | DATE 6/13/16 | | DATE / / |
| APPROVING OFFICER (PRINT) | RANK | I.D. NO. | DATE | | | | | | DATE / / |
| Balevich, JN | LT | 97 | 06/10/16 | | | | | | |

STATUS: ACT ☒  INA ☐  CLOSE ☐  UNF ☐
CASE CLEAR: YES ☐  NO ☐
HOW CLEAR: ARREST ☒  EXC. ☐
EXCEPT CODE

CASES CLEARED BY THIS ARREST

AGENCY OPTIONAL USE (DISTRIBUTION, OTHER OFFICERS, ETC.)

REV. 7/99

ORIGINAL

# STATE OF NEW MEXICO SUPPLEMENTAL REPORT

| | |
|---|---|
| SUPP. DATE | 06/08/2016 |
| INCIDENT NO. | S1602144 |
| PAGE | 3 |
| OF | 4 |

**ORIGINAL OFFENSE REPORTED:** Extortion

**ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE):** Moffatt, Jeffery

**DATE OF BIRTH:** 08/28/1964

## OFFENSE

| ADDITIONAL OFFENSE/INCIDENT | STATUTE OR ORDINANCE | FEL. MISD | ATTEMPTED | COMPLETED | UCR OFFENSE CODE | CRIMINAL ACTIVITY CODE | LOCATION CODE | WEAPON CODE UP TO 3 PER OFFENSE | OFFENDER(S) SUSPECTED OF USING | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | ALCOH | DRUG | COMP | UNK |
| 4 | | | ☐ | ☐ | | | | | ☐ | ☐ | ☐ | ☐ |
| 5 | | | ☐ | ☐ | | | | | ☐ | ☒ | ☐ | ☐ |
| 6 | | | ☐ | ☐ | | | | | ☐ | ☐ | ☐ | ☐ |
| 7 | | | ☐ | ☐ | | | | | ☐ | ☐ | ☐ | ☐ |
| 8 | | | ☐ | ☐ | | | | | ☐ | ☐ | ☐ | ☐ |

**ADDL ON SUPP:** ☐

**PERSON CODES:** C-CITED, G-PARENT/GUARDIAN, W-WITNESS, A-ARRESTED, R-REPORTING PERSON, D-DECEASED, I-INTERVIEWED, V-VICTIM, S-SUSPECT, M-MISSING PERSON/RUNAWAY

**TYPE CODES:** I-INDIVIDUAL, B-BUSINESS, F-FINANCIAL INSTITUTION, P-POLICE, O-OTHER, G-GOVERNMENT, R-RELIGIOUS, S-SOCIETY/PUB., U-UNKNOWN

**INJURY CODES:** B-APPARENT BROKEN BONE, I-POSSIBLE INTERNAL INJURY, L-SEVERE LACERATION, M-APPARENT MINOR INJURY, O-OTHER MAJOR INJURY, T-LOSS OF TEETH, U-UNCONSCIOUSNESS, N-NONE

## ADDITIONAL SUBJECTS

**PERSON CODE:** S   **TYPE CODE:** I   **INJURY CODE:** N
**4-NAME (LAST, FIRST, MIDDLE):** Childers, Lisa
**SOCIAL SECURITY NO.:** 585 - 08 - 8680
**DOB:** 05/16/1963
**AGE (RANGE):** 53
**SEX:** F
**RACE:** WHT ☒

**STREET ADDRESS:** 1504 Country Club Circle
**RES. PHONE:** (575) 302 - 8455
**HEIGHT:** 505
**WEIGHT:** 100
**HAIR:** Bro
**EYES:** Blu
**ETHNIC:** NON ☒

**CITY:** Carlsbad   **STATE:** NM   **ZIP:** 88220
**BUS. PHONE:** (575) 885 - 4150

**OCCUPATION:** Med Secretary
**EMPLOYER/SCHOOL:** Lakeview
**EMPLOYER/SCHOOL ADDRESS:** 1905 W. Pierce St.
**GANG AFFILIATION:** None

**ARMED WITH (SEE CODES):** 99
**TYPE OF ARREST:** CITED ☒

**DRIVER'S LICENSE NO.:** 016851965   **D.L. STATE:** NM
**RES. STATUS:** RES ☒

**PERSON CODE / TYPE CODE / INJURY CODE:** 5-NAME (LAST, FIRST, MIDDLE):

**PERSON CODE / TYPE CODE / INJURY CODE:** 6-NAME (LAST, FIRST, MIDDLE):

## STATUS

**REPORTING OFFICER:** Shott, Michael   **I.D. NO.:** 916   **DATE:** 06/08/2016

**DETECTIVE/FOLLOW-UP OFFICER/ REFERRED TO:**   **I.D. NO.:**   **DATE:** / /

**ASSISTING OFFICER:**   **I.D. NO.:**   **DATE:** / /

**PROCESSED BY:** [signature]   **DATE:** 6/13/16
**DATA ENTRY PERSON:** [signature]   **DATE:** 6 13 16

**APPROVING OFFICER:** Balencia, JN   **I.D. NO.:** 97   **DATE:** 06/14/16

**STATUS:** ACT ☒   INA ☐   CLOSE ☐
**CASE CLEAR:** UNF ☐   YES ☐   NO ☒
**HOW CLEAR:** ARREST ☐   EXC. ☐
**EXCEPT. CODE:** N

A-DEATH OF OFFENDER, B-PROSECUTION DECLINED, C-EXTRADITION DENIED, D-VICTIM REF. TO COOPERATE, E-JUVENILE, NO CUSTODY, N-NOT APPLICABLE

**AGENCY OPTIONAL USE (DISTRIBUTION, OTHER OFFICERS, ETC.):**

**WARRANT ISSUED:** YES ☐   NO ☐
**WARRANT DATE:** / /

ORIGINAL

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIGINAL OFFENCE DATE 04/06/2016 | SUPP. DATE 06/08/2016 | CASE NO. | | INC. NO. S1602144 | | PAGE 4 | OF 4 |
|---|---|---|---|---|---|---|---|---|
| ORIGINAL OFFENSE REPORTED Extortion | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) Moffatt, Jeffery | | | | | | | |
| LOCATION OF OCCURANCE Lancaster CA, 93534 | | | | | | DATE OF BIRTH 08/20/1963 | | |

On 06/08/2016 at 19:35 hours I, Cpl. Shott was dispatched to 602 W. Mermod St. at the Police Department for a phone call report in reference to Extortion.

Upon arrival to the police department I called the reporting party via phone who was identified as Star and Jeffery Moffatt. Jeffery explained that he was on his Facebook and met a lady who was identified as Lisa Childers. Jeffery stated he asked Lisa to send him a nude picture of yourself in which she did not. Jeffery stated that once Lisa knew that he was running for Congress in California and that Star was running for Senate in California she demanded money him. Jeffery explained that Lisa advised him that if she didn't get the money from him she would go to the Media and ruin Star's campaign and have him disbarred as a attorney. Jeffery stated that Lisa demanded $20,000.00 at first and dropped it to $10,000.00 and eventually dropped to down to $2500.00. Jeffery and Star advised me they did not pay Lisa any money.

Star explained that in April or May of 2016 the Media in California released accusations against her and Jeffery which was from Lisa. Star stated she could not exactly remember what was on the press release she would have to look it up. I closed my contact with Jeffery and Star.

Jeffery and Star stated they wanted to prosecute.

Case ACTIVE pending further investigation. Nothing further by this officer. End of report.

REV. CC 01/15

| STATUS | REPORTING OFFICER Shott, Michael | RANK Cpl. | I.D. NO. 916 | DATE 06/08/2016 | DETECTIVE/ FOLLOW-UP OFFICER/ REFERRED TO | | | | I.D. NO. | DATE / / | ADDL. ON SUPP. ☐ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | ASSISTING OFFICER | RANK | I.D. NO. | DATE / / | PROCESSED BY AM | DATE 6/13/16 | | DATA ENTRY PERSON SL. | DATE 6/13/16 | |
| | APPROVING OFFICER Ballencajn | RANK LT | I.D. NO. 97 | DATE 061616 | INCIDENT STATUS | | | EXCEPT. CODE | N=DEATH OF OFFENDER D=VIC. REF. TO COOPERATE B=PROSECUTION DECLINED E=JUV, NO CUSTODY C=EXTRADITION DENIED N=NOT APPLICABLE | DATE / / | |
| | | | | | UNFOUNDED ☐ | CLRD BY ARREST ☒ | CLEARED EXCEPT ☐ | | | | |
| | AGENCY OPTIONAL USE (DISTRIBUTION, OTHER OFFICERS, ETC.) | | | | CASES CLEARED BY THIS ARREST | CASE NO. | | CASE NO. | CASE NO. | / / |

ORIGINAL

Login

# JEFFREY MOFFATT FOR CONGRESS

HOME   BLOG   MEDIA   EVENTS   PL

"As an attorney, I fight for my clients and I will fight for you in Congress."

God, Family, & Count,

http://jeffreymoffatt4congress.com/

6/8/2016



Moffatt's husband, who is also running for office, is also under scrutiny for past activity relating to explicit photos. He was disbarred in Arizona after allegedly soliciting a nude photo from a New Mexico woman in exchange for legal services.

"Rather than worrying about a nude photo," said Jeffrey Moffatt, who is running for the 25th Congressional District seat in the June primary, "we should be worrying about our nation's crisis happening with illegal undocumented immigrants killing American citizens and sanctuary cities, including the City of Los Angeles, protecting these dangerous people who should be turned over to ICE, and sent back to their own countries."

ORIGINAL

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIGINAL OFFENSE DATE 10/10/2013 | SUPPLEMENTAL DATE 06/28/2016 | CASE NO. S1602144 | INCIDENT. NO. PD216060600 | PAGE 1 | OF 1 |
|---|---|---|---|---|---|---|
| ORIGINAL OFFENSE REPORTED 30-16-9 Extortion | | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) Moffatt, Jeffrey D. | | | DATE OF BIRTH 08/28/1964 | |

LOCATION OF OCCURRENCE

**Electronic communication sent from Carlsbad, New Mexico to Lancaster, California**

On June 27th, @016 Star Moffatt sent a copy of an electronic communication to my e-mail. The body of the e-mail was authored by Jeffrey Moffatt and read as follows:

Date: Tue, 19 Nov 2013 02:00:21 -0800
Subject: Re: Moffatt issue
From: jeffreymbajd@hotmail.com

Dear Sirs,

The case, as interesting and Caligula like as it may seem actually has four acts of extortion committed against Jeff Moffatt.

Pat Spurlin, the guy that made the referral wanted a fee on her behalf not to convey the situation to Jeff's wife, to his opponents in a recent election, to the bar and the opponents of Jeff's Wife Star whom ran for State Senate and is going to run again. The fee requested was $2500. Copies of those posts are available if requested.

• The individual has taken a barter option, essentially a picture, when that same individual said they had no funds or assets and tried to extort $2500.00.

• A barter was offered as last, off the cuff, option. A contract requires an offer and acceptance, since it was never accepted, no contract was created.

• The request for a picture as a barter is neither illegal nor criminal with an adult over 18, as claimant apparently is.

• No services were provided, yet a long stream of extortion attempts were made by claimant and her agent.

• What caused the claim to be filed was the failure to pay the extortion in the time frame desired by claimant's agent.

| REPORTING OFFICER (PRINT) Detective Brian Burke | RANK Senior Detective | I.D. NO. 952 | DATE 06/29/2016 | DETECTIVE/FOLLOW-UP OFFICER/REFERRED TO Detective Brian Burke | | I.D. NO. 952 | DATE 06/29/2016 |
|---|---|---|---|---|---|---|---|
| ASSISTING OFFICER (PRINT) | RANK | I.D. NO. | DATE | PROCESSED BY | DATE 6/30/16 | DATA ENTRY PERSON | DATE 6/30/16 |
| APPROVING OFFICER (PRINT) | RANK | I.D. NO. 950 | DATE 6-29-16 | INCIDENT STATUS | EXCEPT CODE | A=DEATH OF OFFENDER  B=PROSECUTION DECLINED C=EXTRADITION DECLINDED D=VICTIM REFUSED TO COOPERATE E=JUVENILE, NO CUSTODY  N=NOT APPLICABLE | |
| AGENCY OPTIONAL USE (DISTRIBUTION, OTHER OFFICERS, ETC) | | | | ACTIVE INACT. CLOSED U.F CLA CLE  X | | | |

CASES CLEARED BY THIS ARREST CASE NO. CASE NO.
CASE NO

ORIGINAL

ORIGINAL

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIGINAL OFFENSE DATE 10/10/2013 | SUPPLEMENTAL DATE 06/29/2016 | CASE NO. S1602144 | INCIDENT. NO. PD216060600 | PAGE 1 | OF 1 |
|---|---|---|---|---|---|---|

| ORIGINAL OFFENSE REPORTED 30-16-9 Extortion | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) Moffatt, Jeffrey D. | DATE OF BIRTH 08/28/1964 |
|---|---|---|

**LOCATION OF OCCURRENCE**
Electronic communication sent from Carlsbad, New Mexico to Lancaster, California

On Monday, June 27, 2016, I received an e-mail from Star Moffatt. This e-mail contained a transcript of text conversation between Jeffrey Moffatt and Pat Spurlin. The text indicates that this contact was initiated on or about October 10thand ended on October 24th. The year is not listed but the Hotmail messages were dated July 10th, 2015 and November 19th, 2013. I have concluded that this contact must have occurred in October of 2013.

The text clearly indicates Pat Spurlin was acting on behalf of and with Lisa Childers knowledge and consent. Pat Spurlin made it clear he had knowledge of Jeffrey Moffat and Star Moffatt both running for individual public offices in the California. Pat Spurlin repeatedly requests "cash or assets" to make Lisa go away and for her not to go public with Jeffrey Moffatts original offer. Pat Spurlin repeatedly threatens to file official complaints with the New Mexico and California Bar if a cash offer is not sent to Lisa.

Pat Spurlin communicated threats to Jeffrey Moffatt requesting cash or assets in violation of New Mexico revised statute 30-16-9; Extortion. Pat Spurlin violated sub section "C" of New Mexico Statute 30-16-9 by threatening to expose an act of deformity or disgrace completed by Jeffrey Moffatt on or about October 10th, 2013. The act of Disgrace was completed by Jeffrey Moffatt requesting Nude photographs and/or physical bartering in replacement of cash payment for a referral of perspective client Lisa Childers. Pat Spurlin indicated several times he is in contact with Lisa Childers throughout this negotiation and that she is directing his actions and requests. Jeffrey Moffatt was in a current bid for the U. S. Congress, California's 25th congressional district in the republican primary. Star Moffatt was currently campaigning for a 2016 California State Senate seat. Jeffrey Moffatt was further disbarred by the Arizona State Bar as a result of these allegations which affect the Moffatt family business of the Moffatt Law Firm. Pat Spurlin indicated Lisa Childers was offering to refrain from going public with her allegations for a cash payment of $2,500.00 subsequently reduced to $2,000.00. Jeffrey and Star Moffatt refuse to make the payment and sustained financial and career injury by Lisa Childers allegations being made public and having a substantial and detrimental effect on Jeffrey and Star Moffatt's careers. Jeffrey Moffatt lost in the Republican primary race. Star Moffatt lost in her bid for a California State Senate seat; a campaign costing approximately 5 million dollars.

A copy of the text communication between Pat Spurlin and Jeffrey Moffatt is attached to this supplemental report.

| REPORTING OFFICER (PRINT) Detective Brian Burke | RANK Senior Detective | I.D. NO. 952 | DATE 06/29/2016 | DETECTIVE/FOLLOW-UP OFFICER/REFERRED TO Detective Brian Burke | | I.D. NO. 952 | DATE 06/29/2016 |
|---|---|---|---|---|---|---|---|
| ASSISTING OFFICER (PRINT) | RANK | I.D. NO. | DATE | PROCESSED BY | DATE 6/30/16 | DATA ENTRY PERSON | DATE 6/30/16 |
| APPROVING OFFICER (PRINT) | RANK | I.D. NO. 952 | DATE 6-29-16 | INCIDENT STATUS ACTIVE / INACT. / CLOSED / U.F / CLA / CLE  X | | EXCEPT CODE | A=DEATH OF OFFENDER  B=PROSECUTION DECLINED C=EXTRADITION DECLINDED D=VICTIM REFUSED TO COOPERATE E=JUVENILE, NO CUSTODY  N=NOT APPLICABLE |
| AGENCY OPTIONAL USE (DISTRIBUTION, OTHER OFFICERS, ETC) | | | | CASES CLEARED BY THIS ARREST CASE NO. CASE NO.  CASE NO | | | |

ORIGINAL

ORIGINAL

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIGINAL OFFENSE DATE 10/10/2013 | SUPPLEMENTAL DATE 06/30/2016 | CASE NO. S1602144 | INCIDENT. NO. PD216060600 | PAGE 1 | OF 2 |
|---|---|---|---|---|---|---|

ORIGINAL OFFENSE REPORTED
30-16-9 Extortion

ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE)
Moffatt, Jeffrey D.

DATE OF BIRTH
08/28/1964

LOCATION OF OCCURRENCE
Electronic communication sent from Carlsbad, New Mexico to Lancaster, California

On Thursday, June 30th, 2016, I received an e-mail authored by Star Moffatt. In this e-mail Ms. Moffatt described financial injury she has incurred as a result of the allegations made by Lisa Childers and Pat Spurlin. Below is an exact duplication of the e-mail.

Dear Detective Mr. Burke:

Another Childers/Spurlin "pour over affect" now affecting our real estate holdings.
Today, we received a Cancellation Notice from one of our residents who resides at one of our low incoming housing facilities.

The individual claimed their reasoning for cancelling their contract with Jeffrey (us), exact quote "Reason: Disbarrdment from Arizona Bar Association."...

Jeffrey and I, ask ourselves what would a Disbarment issue have to do with receiving housing services, is beyond us.

Anyways, the wrongful Disbarment caused by Childers/Spurlin, due to their Extortion/Conspiracy, is now having an affect on our real estate holdings and we do not have any idea, how many others will follow! With the above said, would you be kind enough to forward the above to your DA, to include within his analysis and consideration regarding Childers/Spurlin - extortion case. Keeping in mind this loss of income also has valuation.

Thanks again for taking the time to read the above!

Sincerely,
Star Moffatt

P.S. If you would like me to forward a copy of the individual's letter sent to Jeffrey, with my response, please just let me know and I will send it ASAP, for you and your DA's review.

| REPORTING OFFICER (PRINT) Detective Brian Burke | RANK Senior Detective | I.D. NO. 952 | DATE 06/30/2016 | DETECTIVE/FOLLOW-UP OFFICER/REFERRED TO Detective Brian Burke | I.D. NO. 952 | DATE 06/30/2016 |
|---|---|---|---|---|---|---|
| ASSISTING OFFICER (PRINT) | RANK | I.D. NO. | DATE | PROCESSED BY | DATE 083116 | DATA ENTRY PERSON | DATE |
| APPROVING OFFICER (PRINT) | RANK | I.D. NO. 750 | DATE 8-29-16 | INCIDENT STATUS | | |

ORIGINAL

ORIGINAL

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIGINAL OFFENSE DATE 10/10/2013 | SUPPLEMENTAL DATE 06/30/2016 | CASE NO. S1602144 | INCIDENT. NO. PD216060600 | PAGE 2 | OF 2 |
|---|---|---|---|---|---|---|
| ORIGINAL OFFENSE REPORTED 30-16-9 Extortion | | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) Moffatt, Jeffrey D. | | | DATE OF BIRTH 08/28/1964 | |

**LOCATION OF OCCURRENCE**
Electronic communication sent from Carlsbad, New Mexico to Lancaster, California

On Thursday, June 30th, 2016, I drove to 1504 South Country Club Circle and met with Lisa Childers. Ms. Childers allowed me to record our conversation and explained her financial situation. Ms. Childers contacted Pat Spurlin for advice who knew Jeffrey Moffatt's cousin, Susanne Carlson. Pat Spurlin subsequently contacted Jeffrey Moffatt and made arraignments for Lisa to contact him for legal assistance. Ms. Childers confirmed the authenticity of the Facebook messenger conversation supplied in the original report by Corporal Shott. Ms. Childers explained that she was naive and did not comprehend Mr. Moffatt was asking for explicit photographs until he directly asked for them. Ms. Childers advised that she contacted Pat Spurlin while messaging Jeffrey Moffatt for advice and caused Mr. Moffatt to inquire if she was still on the messaging application. Ms. Childers stated she contacted the New Mexico Bar and the California Bar, without any knowledge Pat Spurlin asked Mr. Moffatt for cash or assets. Ms. Childers became a victim of a domestic battery and this caused her marriage to dissolve.

This interview was audibly recorded.

On Thursday, June 30th, 2016, at approximately 1115 hours, I contacted Pat Spurlin and completed a telephonic interview with him. Mr. Spurlin confirmed the authenticity of the electronic conversation he had with Jeffrey Moffatt. Mr. Spurlin advised me it was his idea to request $2,500.00 from Mr. Moffatt in order to cover legal fees. Mr. Spurlin advised he was not attempting to break any law or commit any unethical acts. Mr. Spurlin was attempting to have Mr. Moffatt complete legal documentation and cover the legal fees from their agreement. I will meet with the 5th Judicial District Attorney's Office regarding this information and complete a supplemental report with their arecommendation.

| REPORTING OFFICER (PRINT) Detective Brian Burke | RANK Senior Detective | I.D. NO. 952 | DATE 06/30/2016 | DETECTIVE/FOLLOW-UP OFFICER/REFERRED TO Detective Brian Burke | | I.D. NO. 952 | DATE 06/30/2016 |
|---|---|---|---|---|---|---|---|
| ASSISTING OFFICER (PRINT) | RANK | I.D. NO. | DATE | PROCESSED BY BC | DATE 08 31 16 | DATA ENTRY PERSON | DATE 8/31/16 |
| APPROVING OFFICER (PRINT) | RANK Sr | I.D. NO. 950 | DATE 8-20-16 | INCIDENT STATUS ACTIVE | INACT. | CLOSED | U.F | CLA | CLE   X | EXCEPT CODE | A=DEATH OF OFFENDER  B=PROSECUTION DECLINED C=EXTRADITION DECLINDED D=VICTIM REFUSED TO COOPERATE E=JUVENILE, NO CUSTODY  N=NOT APPLICABLE | |
| AGENCY OPTIONAL USE (DISTRIBUTION, OTHER OFFICERS, ETC) | | | | CASES CLEARED BY THIS ARREST CASE NO. CASE NO. CASE NO | | | |

ORIGINAL

Blackmail Spurlin

Conversation started October 10
Pat Spurlin
10/10, 12:46pm
Pat Spurlin

Hello Mr Moffatt,

I was referred to you by Suzanne Moffatt regarding an issue a friend of mine has in Carlsbad N.M.. My friends ex-husband has left her with some State tax issues that have been attached to a home that she inherited from her parents and has not had any luck dealing directly with the State and her ex-husband has basically abandoned her and left to another state years ago. She does not have a lot of funds and could use some direction. Would you consider having a consultation with her to give her some advice and direction on what to do to resolve her problem. She has had no luck finding anyone locally in Carlsbad that will sit and just give her a consultation.

Thank you very much for your time and would greatly appreciate any help you could give.

Pat Spurlin
Jeffrey D. Moffatt
10/10, 12:49pm
Jeffrey D. Moffatt

A consult would normally run $150. I would charge $75.
Pat Spurlin
10/10, 12:51pm
Pat Spurlin

Is this something that you would have some insight on?
Jeffrey D. Moffatt
10/10, 12:55pm
Jeffrey D. Moffatt

Likely it would give an understanding that I know what I am talking about. It would also be useful to start setting up a game plan.
Pat Spurlin
10/10, 12:58pm
Pat Spurlin

Great thanks Mr. Moffatt. My friends name is Lisa Childers and see if this will work if so I will get the two of you together.
Jeffrey D. Moffatt
10/10, 12:59pm
Jeffrey D. Moffatt

She can go to my web to make the payment and call me for the consult www.taxauditattorney.com
Tax Attorney, Social Security Attorney
www.taxauditattorney.com
The Law Office of Jeff Moffatt, provides services in the are of Tax and Social Security benefits. We have an amazing track record with multiple leading cases in both the Tax realm and Social Security areas. test33
October 16
Jeffrey D. Moffatt
10/16, 9:23pm
Jeffrey D. Moffatt

What ever happened to her. She never paid the fee. I heard she was worth an attempt at being flexible but she hasn't come through. $75 was the start. Is this still an issue for her or not.
October 17
Pat Spurlin

Page 1

S1602144

Blackmail Spurlin

10/17, 6:08am
Pat Spurlin

I know that it is still an issue but what was your flexible alternative payment
methods you offered her.
Jeffrey D. Moffatt
10/17, 6:12am
Jeffrey D. Moffatt

She is a friend of my cousin. I offered to look at her issue, I.e. send me the
docs.

I heard she paid 8k already and no results. I need to see doc first to see what
needs to be done.
Pat Spurlin
10/17, 6:14am
Pat Spurlin

I heard you offered some very shady alternatives for payment. Not very ethical
in my opinion.
Jeffrey D. Moffatt
10/17, 6:15am
Jeffrey D. Moffatt

Cash and assets are best. I was advised those were not available.
Pat Spurlin
10/17, 6:17am
Pat Spurlin

Yea neither was the nude pictures or sex you wanted either

You really think she wants someone representing her that is soliciting sex for
payment........
Jeffrey D. Moffatt
10/17, 6:19am
Jeffrey D. Moffatt

I ask for cash.
Pat Spurlin
10/17, 6:20am
Pat Spurlin

you asked for cash or assets or nude pic or sex....I have the transcript from
the conversation
Jeffrey D. Moffatt
10/17, 6:20am
Jeffrey D. Moffatt

Never used the word.
Pat Spurlin
10/17, 6:21am
Pat Spurlin

ok you said physical and you that you would collect while visiting Carlsbad

it all means the same damn thing and it is very unethical for anyone in your
profession or any ohter

Pic buys time. Physical attention will be bartered. I could collect the physical
when I am in town later in year. which way are we going, pic, cash, physical?
your words right here....
Jeffrey D. Moffatt

Page 2

S160214

Blackmail Spurlin

10/17, 6:26am
Jeffrey D. Moffatt

don't disagree. Never used the word you stated. Again.
Pat Spurlin
10/17, 6:26am
Pat Spurlin

means the same thing Mr. Moffatt

I think that the law board would agree both in California and New Mexico
Jeffrey D. Moffatt
10/17, 6:27am
Jeffrey D. Moffatt

Now, take the fact I have a cousin that says this girl needs help. I do this for a living. No cash, no assets. I am not a charity. She does not live down the street to clean, or work at one of my businesses.
Pat Spurlin
10/17, 6:28am
Pat Spurlin

no but she is a potential client that you are trying to solicit nude pictures and physical contact from for payment

And I am the one that contacted you not your cousin.
Jeffrey D. Moffatt
10/17, 6:29am
Jeffrey D. Moffatt

You tell me, what sort of barter would you have done. I am soliciting nothing. I haven't even seen that I can help the girl. yet. My cousin says help her. I am mistaken then.
Pat Spurlin
10/17, 6:31am
Pat Spurlin

you are very mistaken and I have consulted with a number of attorneys that are appalled by your actions and have given direction on how to follow up with this........remember we have the entire transcript of the conversation
Jeffrey D. Moffatt
10/17, 6:33am
Jeffrey D. Moffatt

How do I move forward on this.
Pat Spurlin
10/17, 6:38am
Pat Spurlin

The damage is done and it is unfortunate that you chose to take the path that you did. I am sure that you will be contacted in the near future by the correct authorities that handle these cases.

This transcript will also be added to the documentation
Jeffrey D. Moffatt
10/17, 6:43am
Jeffrey D. Moffatt

That is fine. Look at what was asked for. Legal pics. Porn is not illegal.

Not that I wish to make that argument but it is accurate.
Pat Spurlin
10/17, 6:48am

Page 3



Blackmail Spurlin

Pat Spurlin

You asked for a nude picture........you may want to go back and read what you
wrote.......good luck to you
Jeffrey D. Moffatt
10/17, 6:51am
Jeffrey D. Moffatt

I did as an alternate. No appology for it. Love cash best.
Pat Spurlin
10/17, 6:52am
Pat Spurlin

Hi just want to share with you a transcript of a conversation that your husband
recently had with a friend of mine in Carlsbad N.M. as you will read she was wanting
a consultation and in the end he was soliciting nude pictures or physical contact in
exchange for services....Not a very ethical way to conduct business and I am sure
that you will be very proud of him....This has been turned over to the New Mexico
and California Law Board.........

Hi I'm the person pat spurlin talked to you about and I am also a personal
friend of Suzanne Carlsen. I just wanted to let you know I'm trying to get the 75.00
round up and hopefully will be in touch with you next week. Thank you so much. You
don't know how much this means to me. Have Suzanne tell me you are good for it and
we can move forward. I take all sorts of things as trade fyi. C.A.P. Cash, Assets,
I've pretty much sold everything I have of value paying my last lawyer who took
8000.00 from me and my house and truck have liens. So. .... I can get it it will
just take weekend. I will talk to Suzanne though. Thank you.
jeffrey@lawofficesofjeffreymoffatt.com> is the email address. why don't you just
send me the basics to the email. I will take the position that it is on the way.
fyi- i have a bad boy streak in me, just like my father. This allows me to be
flexible. How about a pic. and then send me the money later. A picture of???? Lets
just call it what I want. Yes I want a nude. And what would that get me Give me a
surrogate for you, or cash works. A surrogate? Another woman. How would I do that
How many friends do you have. Say Can I borrow$. No, if not, I need a pic for **.
How much in services will that cover

Pic buys time. Physical attention will be bartered. I could collect the physical
when I am in town later in year. which way are we going, pic, cash, physical?
Jeffrey D. Moffatt
10/17, 6:53am
Jeffrey D. Moffatt

I can go to a club and see this view, buy magazines etc.
Pat Spurlin
10/17, 7:52am
Pat Spurlin

But yet you solicited my friend for it........
October 18
Pat Spurlin
10/18, 8:35am
Pat Spurlin

Both N.M and California Bar Associations have asked Lisa for reports on the
incident and have sent paperwork or they said she could retain a lawyer and bring it
directly to the courts. I understand that you are running for a school board
position so I don't know if you want this in the public. So if you have an
alternative of how you want to settle this let me know or she will move forward with
the bar associations paperwork.
Jeffrey D. Moffatt
10/18, 8:40am
Jeffrey D. Moffatt

Page 4

*S1602144*

Blackmail Spurlin

What is your suggestion. My wife is less than happy.
Pat Spurlin
10/18, 8:49am
Pat Spurlin

Don't blame her If I had done this my wife would of divorced me.....Make an
offer and it goes away. Lisa has been through a lot in her life and this rekindled a
lot of old issues in her life by you soliciting her. If you two can come to an
agreement on the offer then everything will be deleted when offer is received.
Jeffrey D. Moffatt
10/18, 10:31am
Jeffrey D. Moffatt

Have something written up. Legal I'm not worried about, since it wasn't illegal.
Election- not the biggest deal, everything comes out in them. Putting it to bed
permanently for my wife's sake is more the issue. It would need to have no
disclosure clauses, structure.
Pat Spurlin
10/18, 10:38am
Pat Spurlin

Send to my email. .pspurlin25@yahoo.com

I will look at offer and send to lisa for her approval
Pat Spurlin
10/18, 12:36pm
Pat Spurlin

And just so we understand you are going to write something up in the form of an
offer. Include the language that when accepted there will be no disclosure of any
documentation in regards to conversations between you and lisa and myself.
Jeffrey D. Moffatt
10/18, 1:01pm
Jeffrey D. Moffatt

No. I am waiting for your suggestions. You can send them to
Jeffreymbajd@hotmail.com
Pat Spurlin
10/18, 1:03pm
Pat Spurlin

I am no lawyer and the not sure I would have everything written properly. You
need to make an offer and then I will incorporate it into a letter
Jeffrey D. Moffatt
10/18, 1:05pm
Jeffrey D. Moffatt

I don't know what you want. As such, send it to me first. My wife is my biggest
concern. My marriage is on the rocks because of this. As such, I want it done, but
done correctly.
Pat Spurlin
10/18, 1:06pm
Pat Spurlin

Cash or assets as you say.......make an offer and I will write a letter we can
agree on and have this done as quickly as possible
Pat Spurlin
10/18, 3:08pm
Pat Spurlin

I will take no response as you would prefer for Lisa to continue with filing
reports with the New Mexico and California Bar.

Page 5

S1602144

Blackmail Spurlin

Jeffrey D. Moffatt
10/18, 3:26pm
Jeffrey D. Moffatt

Your option. I need to know what is requested. I have said so multiple times.
Pat Spurlin
10/18, 3:33pm
Pat Spurlin

A cash offer from you to Lisa.. I have said that many times also. Or we can drag this out with the Bar or with a lawyer....That is my suggestion to her in the first place. But we are trying to make sure you don't do this again and not drag everyone through a long process including your wife
Pat Spurlin
10/18, 3:35pm
Pat Spurlin

Now either make a cash offer for the indecent proposal you made and the trauma or we will proceed the other direction........your choice
Jeffrey D. Moffatt
10/18, 3:38pm
Jeffrey D. Moffatt

All I ask is make your request. This is the weekend. I need to know what you want. TT wife and move forward. This will be over between me and my wife for life so hurrying it makes no sense.

Again tell me first.
Pat Spurlin
10/18, 3:41pm
Pat Spurlin

You want Lisa to give you a figure she wants

Lisa is just a friend of mine, I am just talking for her

The number that has been discussed is 2500.00
Jeffrey D. Moffatt
10/18, 4:48pm
Jeffrey D. Moffatt

Heavy number. My marriage is already I'm jeopardy. See if she is more flexible.
Pat Spurlin
10/18, 4:49pm
Pat Spurlin

make a counter offer
Jeffrey D. Moffatt
10/18, 4:54pm
Jeffrey D. Moffatt

Will TT wife. Tough to do so.
Pat Spurlin
10/18, 5:05pm
Pat Spurlin

Ok
October 19
Pat Spurlin
10/19, 6:23pm
Pat Spurlin

Need to know something by end of weekend

Page 6

S160214

Blackmail Spurlin

Jeffrey D. Moffatt
10/19, 7:26pm
Jeffrey D. Moffatt

She has agreed to an arraignment. Details will need to be discussed.
Pat Spurlin
10/19, 7:27pm
Pat Spurlin

Send me details
October 20
Pat Spurlin
10/20, 12:57pm
Pat Spurlin

Please send me the details so we can put this to rest or move forward
Jeffrey D. Moffatt
10/20, 1:17pm
Jeffrey D. Moffatt

Big picture. Star is running for Senate in 2016. Having a husband that wants a nude of another woman is embarrassing to her. She would have to talk about her med condition that makes intimacy painful. Etc. Value for her is not hearing anything from anyone, especially until 2016. Agreement written by an out of Country attorney, mexico or Europe. If those details are workable then let us know.
Pat Spurlin
10/20, 1:19pm
Pat Spurlin

I have no problem with that at all and neither does Lisa. What is the dollar amount you are countering with from the 2500.00 she proposed
Pat Spurlin
10/20, 1:42pm
Pat Spurlin

I tell you what just make it 2k and get the agreement written up and it will go away
October 20
Pat Spurlin
10/20, 4:58pm
Pat Spurlin

Have been thinking and if we need to involve a lawyer to write this up but it needs to be one in the United States and there has to be certain verbiage in it pertaining to the incident itself and that not only Lisa will not make mention but that you will not make the same offer again to anyone else. Also doing this it doesn't look like she is trying to extort money from you when it is for pain and suffering that you are agreeing to instead of going to court. Also you keep saying that all you did was ask for a nude picture but you also asked for physical relations and that has to be addressed. If we can't agree to use a lawyer in the U.S of your desecration and have these items put in the agreement then I will suggest that Lisa continue with going to the State Bar of California and New Mexico with this.
Pat Spurlin
10/20, 6:18pm
Pat Spurlin

In fact the only way this will continue is if you come up with a number and it be put into legal documentation from a U.S attorney including the context of the solicitation including the physical solicitation and that you are very sorry that it happened. Also that with that said no one will ever bring this up again. I want this as legal as it can possible be so it is not be construed as anything else but a legal way of restitution for an unethical act and nothing more.
Page 7

Blackmail Spurlin

Jeffrey D. Moffatt
10/20, 6:23pm
Jeffrey D. Moffatt

As you know I disagree with your statement. That being said I want this to be finished. It also has no value if disclosed, much less disclosed prior to 2016. How to work that into the document. The downside of such a disclosure agreement, has the flip side of what happens if disclosure happens.

Pat Spurlin
10/20, 6:24pm
Pat Spurlin

Pic buys time. Physical attention will be bartered. I could collect the physical when I am in town later in year. which way are we going, pic, cash, physical?

How can you disagree with that statement right there

If there is disclosure you can sue for slander and your pain and suffering

but there won't be a need to since she wants it done as much as you and your wife

I am still trying to talk her into doing this through the legal system but she does not want to

she has been through enough with your solicitation and what has happened to her in the past......her words not mine

Pat Spurlin
10/20, 7:28pm
Pat Spurlin

Let's decide what way this is going quickly as I am growing weary of this back and forth and just as soon take this public and expose someone that does things like this to vulnerable women.

Jeffrey D. Moffatt
10/20, 7:45pm
Jeffrey D. Moffatt

Sounds like we are similar in thought. I grow weary as well. I have a life that needs to move on. You provide a suggestion on details.and we will work through them.

Pat Spurlin
10/20, 7:57pm
Pat Spurlin

I have provided details now get put in a Legal Document and tell her if you agree to the 2,000. You can send an answer on the amount tonight and a rough draft of letter tomorrow and then it can be put on letter head and sent certified to Lisa. The one this I ask to be in Legal document is that the agreement is not enforceable until payment is received. If not received within 3 business days of return receipt then further action is to be taken.

Pat Spurlin
10/20, 8:02pm
Pat Spurlin

As I said this is being set up as legal way of settling a unethical situation nothing more and nothing less agreed on by both parties. This is not an attempt to extort monies from Jeffrey D. Moffatt but a means of making right not only unethical but unwanted solicitation on his behalf for legal services.

October 21
Pat Spurlin
10/21, 8:04am
Pat Spurlin

Page 8

S1602144

Blackmail Spurlin

I need to know where we are and if you are going to draw the agreement up. If this isn't going to happen then I will have Lisa proceed the other direction.

And also need to know what compensation amount you are offering Lisa for her torment in this situation.
Jeffrey D. Moffatt
10/21, 8:08am
Jeffrey D. Moffatt

Stars position is that she will make arrangements after the first of the year. She wants me out of it. If she hears nothing about it until the first then she will move forward. She is not against handling as you suggested. Her 2016 career is the big deal.
Pat Spurlin
10/21, 8:09am
Pat Spurlin

This needs to be taken care of now not after the first of the year. We will proceed with the State Bar associations in both states and retain a lawyer for Lisa. Thanks and have a good day.
October 21
Pat Spurlin
10/21, 1:21pm
Pat Spurlin

Since you are out of it please have your wife Star contact me
October 22
Pat Spurlin
10/22, 6:44am
Pat Spurlin

Just to reiterate that Lisa is just waiting for the paperwork to fill out and then she will be filing both with New Mexico and California. I have felt this is the way to go all along so you won't be able to do this to anyone else again.
Jeffrey D. Moffatt
10/22, 8:17am
Jeffrey D. Moffatt

A non disclosure was on the table.
Pat Spurlin
10/22, 8:17am
Pat Spurlin

It needs to be done now and a dollar amount in it...

if it needs to be contingent until first of year then that needs to be in it also

Either way it needs to be in place
October 22
Pat Spurlin
10/22, 1:48pm
Pat Spurlin

I need you to take the time and address this today with either a rough draft of a non disclosure with and offer amount or Lisa has the paperwork filled out and ready to send out....none of us have the time to drag this out anymore.
Jeffrey D. Moffatt
10/22, 4:18pm
Jeffrey D. Moffatt

Have her make one and send it to Star.
Pat Spurlin

Page 9

S1602144

Blackmail Spurlin

10/22, 4:19pm
Pat Spurlin

You are the lawyer you can make it up so it is legal

And also you need to come up with a settlement amount

Offer
Pat Spurlin
10/22, 4:29pm
Pat Spurlin

This back and forth is about to come to an end. I have asked you several times to make up the agreement and come up with an offer and you keep putting it off on her. There was a dollar amount put out there and you didn't like it so you need to counter it.....also you can make up a legal document with the proper language in it better than her. This is it either come up with this document and an offer by tonight or she has the paperwork filled out that she received and we will let the State Bar associations handle it.
Pat Spurlin
10/22, 4:31pm
Pat Spurlin

And if Star has some input she needs to contact one of us today
Pat Spurlin
10/22, 6:04pm
Pat Spurlin

I am doing this as a favor for Lisa and I am not going to deal with it past tonight. If there is not a counter offer to her by the time I go to sleep which will be in about 3 hours and a rough draft of the agreement or an agreement then she has no choice but to mail back the complaint forms she has.
Pat Spurlin
10/22, 8:46pm
Pat Spurlin

Mr. Moffatt, this is where we go in a different direction. I am a happy that it is going to be taken care of through the legal system so you will be public knowledge of you unethical practices with women. I personally find it a disgrace and I am sure the State Bar will also. Please let your wife know this is not about her it's all about you and your actions. Lisa had given you plenty of time to take care of this so it didn't get brought into the public eye but you have chosen not to participate in that process.
Jeffrey D. Moffatt
10/22, 10:53pm
Jeffrey D. Moffatt

Star advised would handle after the 1st.
Jeffrey D. Moffatt
10/22, 11:03pm
Jeffrey D. Moffatt

I asked Cindy who you were. She advised your wife was at her wedding. Moving on. Extortion is what I see here. The demand for immediacy when I am out of the process. That immediacy without the proper documentation. Tends to indicate the agreement might not be solid on your part. I might just be misreading it. Star agreed to your terms but her timing.
Wednesday
Pat Spurlin
10/23, 9:32am
Pat Spurlin

You know as well as I that this isn't even close to extortion as I have stated

Page 10

Blackmail Spurlin

before. It is a settlement just like you would get in a court case without going to court and you know that as well as I do. As far it not being a solid going forward you also know that we have everything documented that you said and requested from Lisa so it is very cut and dry that this happened. If you want her to move forward and wait until the first of the year for a settlement instead of going forward with the State Bar Association you need to do a couple of things up front.

1. Written apology to Lisa for your actions 2. Admit fully what your intentions where a. wanting nude pictures b.) wanting physical contact ie. sex from her when visiting Carlsbad. Both of which for exchange of payment.

You know as well as I do that the physical part was an attempt to get her to have sex with you for payment and you need to admit to that. If you can do those things then we will move forward with Stars suggestion on waiting until first of year. If not Lisa has all the paperwork filled out and ready to go to the State Bar of both States. Let me know today how you want to move forward.
Wednesday
Pat Spurlin
10/23, 8:20pm
Pat Spurlin

I need you to respond please...
Thursday
Jeffrey D. Moffatt
10/24, 6:17am
Jeffrey D. Moffatt

TT star. Just in her time frame.
Pat Spurlin
10/24, 6:19am
Pat Spurlin

I need to inform you that I am no longer a part of this equation. Based on your responses Lisa has chosen to move forward with the Bar association paperwork and going public to expose your actions.

Choose an emoticon

Page 11

S1602144

STATE OF NEW MEXICO
EDDY COUNTY MAGISTRATE COURT IN CARLSBAD

RECEIVED
5-23-2017

STATE OF NEW MEXICO

CPD incident number: ___S1602144___

v. Hershel Pat Spurlin
_____, Defendant    No. _____

Address:
SSN: 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    DOB: 08/25/1963

## CRIMINAL COMPLAINT

CRIME:  Count 1: Extortion 30-16-9 (C)(D)(B) a third degree felony

(... e or offenses)

... ins and says that on or about the ___10th___ day ... of Eddy, State of New Mexico, the above-named ... PAGE(S)***

... xico Statue, Municipal code, or ordinance, and date of

... THAT THE FACTS SET FORTH ABOVE ARE ... EF. I UNDERSTAND THAT IT IS A CRIMINAL ... MENT TO MAKE A FALSE STATEMENT IN A

... mplainant

... bad Police Department / Senior Detective Brian Burke #952

... le (if any)

... proved by

declined further Invetig.

... ember 31, 2013) Criminal Form 9-201 Court Information: Eddy County ... e: www.nmcourts.com

STATE OF NEW MEXICO
IN THE MAGISTRATE COURT

PAGE __2__

CRIMINAL COMPLAINT

STATE OF NEW MEXICO
V.

# Hershel Pat Spurlin . Defendant(s)

Date Filed: _____

On June 8th, 2016, at approximately 1935 hours, Corporal Michael Shott of the Carlsbad Police Department was assigned to to a telephonic report complaining of extortion. The complainants, Jeffrey Moffatt and Staretta Moffatt, were out of state in Lancaster, California. Mr. Moffatt explained that he was referred to potential client from Carlsbad, New Mexico; by his cousin; Suzanne Carlsen of Carlsbad, New Mexico. Mr. Moffatt is a tax attorney and agree to a consultation with Lisa Childers of Carlsbad, New Mexico. Mr. Moffatt further agree to drastically reduce his consultation fee to seventy-five dollars. Mr. Moffatt was contacted by Lisa Childers over Facebook Messenger where Mr. Moffatt admits to requesting nude photographs from Lisa Childers which she did not send. At the time of the consultation, Mr. Jeffreey Moffatt was running for the a United States Congressional Seat in the California Republican primary. Staretta Moffatt was, also, running for a California State Senate Seat. Mr. Moffatt alleged that Lisa Childers requested $20,000.00 dollars from him in order for her not to make his nude photograph request public in the California media. Mr. Moffatt refused to pay the money and advised the amount was subsequently reduced to $10,000.00 and then ultimately to $2,500.00.

In May of 2016, Staretta Moffatt advised accusations were released to the California media against Jeffrey and herself. This media release was thought to have been made by Lisa Childers. Lisa Childers filed complainant with the California State Bar and the New Mexico State bar. The California State Bar rejected the complaint and referred it to the Arizona State Bar. The new Mexico State Bar dismissed the complaint, but the Arizona State Bar disbarred Mr. Moffatt

On June 27th, 2016 Star Moffatt sent a copy of an electronic communication to my e-mail. The body of the e-mail was authored by Jeffrey Moffatt and read as follows:

Date: Tue, 19 Nov 2013 02:00:21 -0800
Subject: Re: Moffatt issue
From: jeffreymbajd@hotmail.com

Dear Sirs,
The case, as interesting and Caligula like as it may seem actually has four acts of extortion committed against Jeff Moffatt.

Pat Spurlin, the guy that made the referral wanted a fee on her behalf not to convey the situation to Jeff's wife, to his opponents in a recent election, to the bar and the opponents of Jeff's Wife Star whom ran for State Senate and is going to run again. The fee requested was $2500. Copies of those posts are available if requested.

• The individual has taken a barter option, essentially a picture, when that same individual said they had no funds or assets and tried to extort $2500.00.
• A barter was offered as last, off the cuff, option. A contract requires an offer and acceptance, since it was never accepted, no contract was created.
• The request for a picture as a barter is neither illegal nor criminal with an adult over 18, as claimant apparently is.
• No services were provided, yet a long stream of extortion attempts were made by claimant and her agent.
• What caused the claim to be filed was the failure to pay the extortion in the time frame desired by claimant's agent.

STATE OF NEW MEXICO
IN THE MAGISTRATE COURT

PAGE __3__

CRIMINAL COMPLAINT

STATE OF NEW MEXICO
V.

# Hershel Pat Spurlin . Defendant(s)

Date Filed: _____

On Monday, June 27, 2016, I received an e-mail from Star Moffatt. This e-mail contained a transcript of text conversation between Jeffrey Moffatt and Pat Spurlin. The text indicates that this contact was initiated on or about October 10th and ended on October 24th. The year is not listed but the Hotmail messages were dated July 10th, 2015 and November 19th, 2013. I have concluded that this contact must have occurred in October of 2013.

The text clearly indicates Pat Spurlin was acting on behalf of and with Lisa Childers knowledge and consent. Pat Spurlin made it clear he had knowledge of Jeffrey Moffat and Star Moffatt both running for individual public offices in the California. Pat Spurlin repeatedly requests "cash or assets" to make Lisa go away and for her not to go public with Jeffrey Moffatts original offer. Pat Spurlin repeatedly threatens to file official complaints with the New Mexico and California Bar if a cash offer is not sent to Lisa.

Pat Spurlin communicated threats to Jeffrey Moffatt requesting cash or assets in violation of New Mexico revised statute 30-16-9; Extortion. Pat Spurlin violated sub section "C" of New Mexico Statute 30-16-9 by threatening to expose an act of deformity or disgrace completed by Jeffrey Moffatt on or about October 10th, 2013. The act of Disgrace was completed by Jeffrey Moffatt requesting Nude photographs and/or physical bartering in replacement of cash payment for a referral of perspective client Lisa Childers. Pat Spurlin indicated several times he is in contact with Lisa Childers throughout this negotiation and that she is directing his actions and requests. Jeffrey Moffatt was in a current bid for the U. S. Congress, California's 25th congressional district in the republican primary. Star Moffatt was currently campaigning for a 2016 California State Senate seat. Jeffrey Moffatt was further disbarred by the Arizona State Bar as a result of these allegations which affect the Moffatt family business of the Moffatt Law Firm. Pat Spurlin indicated Lisa Childers was offering to refrain from going public with her allegations for a cash payment of $2,500.00 subsequently reduced to $2,000.00. Jeffrey and Star Moffatt refuse to make the payment and sustained financial and career injury by Lisa Childers allegations being made public and having a substantial and detrimental effect on Jeffrey and Star Moffatt's careers. Jeffrey Moffatt lost in the Republican primary race. Star Moffatt lost in her bid for a California State Senate seat; a campaign costing approximately 5 million dollars. (See Attachment "A"of this complaint).

STATE OF NEW MEXICO
IN THE MAGISTRATE COURT

PAGE __4__

CRIMINAL COMPLAINT

STATE OF NEW MEXICO
V.

**Hershel Pat Spurlin** _____ . Defendant(s)       Date Filed: _____

On Thursday, June 30th, 2016, I received an e-mail authored by Star Moffatt. In this e-mail Ms. Moffatt described financial injury she has incurred as a result of the allegations made by Lisa Childers and Pat Spurlin. Below is an exact duplication of the e-mail.

Dear Detective Mr. Burke:

Another Childers/Spurlin "pour over affect" now affecting our real estate holdings.
Today, we received a Cancellation Notice from one of our residents who resides at one of our low incoming housing facilities.

The individual claimed their reasoning for cancelling their contract with Jeffrey (us), exact quote "Reason: Disbarment from Arizona Bar Association."...

Jeffrey and I, ask ourselves what would a Disbarment issue have to do with receiving housing services, is beyond us.

Any ways, the wrongful Disbarment caused by Childers/Spurlin, due to their Extortion/Conspiracy, is now having an affect on our real estate holdings and we do not have any idea, how many others will follow!
With the above said, would you be kind enough to forward the above to your DA, to include within his analysis and consideration regarding Childers/Spurlin - extortion case. Keeping in mind this loss of income also has valuation.

Thanks again for taking the time to read the above!

On Thursday, June 30th, 2016, I drove to 1504 South Country Club Circle and met with Lisa Childers. Ms. Childers allowed me to record our conversation and explained her financial situation. Ms. Childers contacted Pat Spurlin for advice who knew Jeffrey Moffatt's cousin, Susanne Carlson. Pat Spurlin subsequently contacted Jeffrey Moffatt and made arraignments for Lisa to contact him for legal assistance. Ms. Childers confirmed the authenticity of the Facebook messenger conversation supplied in the original report by Corporal Shott. Ms. Childers explained that she was naive and did not comprehend Mr. Moffatt was asking for explicit photographs until he directly asked for them. Ms. Childers advised that she contacted Pat Spurlin while messaging Jeffrey Moffatt for advice and caused Mr. Moffatt to inquire if she was still on the messaging application. Ms. Childers stated she contacted the New Mexico Bar and the California Bar, without any knowledge Pat Spurlin asked Mr. Moffatt for cash or assets. Ms. Childers became a victim of a domestic battery and this caused her marriage to dissolve. (This interview was audibly recorded)

On Thursday, June 30th, 2016, at approximately 1115 hours, I contacted Pat Spurlin and completed a telephonic interview with him. Mr. Spurlin confirmed the authenticity of the electronic conversation he had with Jeffrey Moffatt. Mr. Spurlin advised me it was his idea to request $2,500.00 from Mr. Moffatt in order to cover legal fees. Mr. Spurlin advised he was not attempting to break any law or commit any unethical acts. Mr. Spurlin was attempting to have Mr. Moffatt complete legal documentation and cover the legal fees from their agreement.

STATE OF NEW MEXICO
IN THE MAGISTRATE COURT

PAGE ___5___

CRIMINAL COMPLAINT

STATE OF NEW MEXICO
V.

<u>Hershel Pat Spurlin</u> . Defendant(s)        Date Filed: _____

On Thursday morning, July 7th, 2016, at approximately 1015 hours, I contacted Suzanne Carlsen by telephone. I asked Ms. Carlsen to explain her involvement with Lisa Childers and Jeffrey Moffatt. Ms. Carlsen described Jeffrey Moffatt to be a relative of a relative and stated she is "a little bit "familiar with this incident. Ms. Carlsen explained that someone made a random post asking for help locating a tax attorney. Ms. Carlsen recommended Jeffrey Moffatt to the person who she later named to be Pat Spurlin. Ms. Carlsen stated she thought Jeffrey Moffatt was kidding around because he became "racy". Latter Ms. Carlsbad described Jeffrey's racy to be that he advised he has three options for payment and his third option was "pussy". Ms. Carlsen stated she washed her hands of this and has not had any contact with Jeffrey Moffatt since October of 2013. Ms. Carlsen did not have any knowledge of anyone asking Jeffrey Moffatt for money. Ms. Carlsen did receive a text message from Pat Spurlin. Pat Spurlin explained that Jeffrey Moffatt filed extortion charges because of his requesting $2,500.00.

This interview was audibly recorded. end of criminal complaint.

01/12/2017  23:56     66194530190000000000          LAWOFFICEMOFFATTIS                    PAGE  01/08

FACSIMILE TRANSMITTAL SHEET
LAW OFFICES OF JEFFREY D. MOFFATT
43625 N. SIERRA HWY, STE A
LANCASTER, CA 93534                    *dated* 1-17-17
                                                   @ 09:13
AREAS OF PRACTICE: TAX LAW; SOCIAL SECURITY LAW/ ARIZONA LAW /
MILITARY& VETERANS LAW; AND DISPUTE MEDIATION

FACSIMILE TRANSMITTAL SHEET

• *Bar Admission:* U.S. Supreme Court / U.S. Tax Court / U.S Supreme Court State of Arizona.

TO: Attn. Records

FROM: Heather Foncannon, Legal Clerk

COMPANY: Carlsbad Police Dept.

DATE:   January 13, 2017                          S1602144

Fax number: 575-885-2122

TOTAL NO. OF PAGES INCLUDING
COVER      8

PHONE NUMBER
   661-945-6121

SENDER'S REFERENCE NUMBER:

RE: S1602144

ADDITIONAL COMMENTS:

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☑ PLEASE REPLY    ☐ PLEASE RECYCLE

This was mailed Priority Mail to 602 W Mermod St. Carlsbad, NM. 88220-4910 on
January 4, 2017 & received on January 9, 2017 12:37pm by the Front Desk Receptionist.

Please fax a copy of the Spurlin Confession to 661-945-3019. Thank you.

Confidentiality Note: The information contained in this telefax message is legally privileged
and confidential information intended only for the use of the addresses named above.  If the
reader of this message is not the intended recipient or an agent responsible for delivering it to
the intended recipient, you are hereby notified that any review, dissemination, distribution, or
copy of the telecopy is strictly prohibited.  If you have received this telecopy in error, please
immediately notify me by telephone and return the original message to me at the address
above via: Jeffrey D. Moffatt, Attorney, fax telephone number (661) 945-3019 / *telephone
number (661) 945-6121 or (480) 626-4844).*

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIGINAL OFFENCE DATE 06/08/2016 | SUPP. DATE 06/08/2017 | CASE NO. | | INC. NO. S1602144 | PAGE 1 | OF 1 |
|---|---|---|---|---|---|---|---|

ORIGINAL OFFENSE REPORTED
Extortion

ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE)
Moffat, Jeffery

LOCATION OF OCCURANCE
Lancaster, California

DATE OF BIRTH
06/20/1963

On June 8th, I, Detective Bryant of the Carlsbad Police Department received the letter of declination regarding this case. I had met with the Assistant District Attorney several times regarding receiving this letter and just received it today.

This case is CLOSED. There is nothing further from this officer at this time. End of report.

REV. CC 01/15

| STATUS | REPORTING OFFICER Bryant, P.N. | RANK DET | I.D. NO. 952 | DATE 06/08/2017 | DETECTIVE/ FOLLOW-UP OFFICER/ REFERRED TO | | I.D. NO. | DATE / / |
|---|---|---|---|---|---|---|---|---|
| | ASSISTING OFFICER | RANK | I.D. NO. | DATE / / | PROCESSED BY | DATE 6 18 17 | DATA ENTRY PERSON | DATE 6 18 17 |
| | APPROVING OFFICER | RANK | I.D. NO. 950 | DATE 6 18 17 | INCIDENT STATUS UNFOUNDED ☐ CLRD BY ARREST ☐ CLEARED EXCEPT ☐ | EXCEPT. CODE | A=DEATH OF OFFENDER D=VIC. REF. TO COOPERATE DATE / / B=PROSECUTION DECLINED E=JUV. NO CUSTODY | |
| | AGENCY OPTIONAL USE (DISTRIBUTION, OTHER OFFICERS, ETC.) | | | | CASES CLEARED BY THIS ARREST CASE NO. | C=EXTRADITION DENIED N=NOT APPLICABLE CASE NO. | CASE NO. | / / |

June 8, 2017

Det. Patrick Bryant
Carlsbad Police Department
Carlsbad, New Mexico 88220

RE: Hershel Pat Spurlin; DOB:
08/25/1963

Det. Bryant,

After a review of the case, I have
determined that criminal charges
should not be brought the above-
mentioned matter. There is insufficient
evidence to charge and/or obtain a
conviction.

Please do not hesitate to contact me
with any questions or concerns.

Sincerely,

Ariane R. Navarrette
Deputy District Attorney

## Dianna Luce
**District Attorney**
**Fifth Judicial District**
Lea, Eddy & Chaves Counties

**LEA COUNTY**
100 N. Main Avenue, #7C
Lovington, NM 88260-4060
Phone: 575-396-7616

301 N. Dalmont Street
Hobbs, NM 88240-8335
Phone: 575-397-2471
Fax: 575-397-6484

**EDDY COUNTY**
102 N. Canal Street, Suite 200
Carlsbad, NM 88220-5750
Phone: 575-885-8822

Fax: 575-887-3516

CHAVES COUNTY
400 N. Virginia Avenue, Suite G-2
Roswell, NM 88201-6222
Phone: 575-622-4121
Fax: 575-622-4126

Exhibit W

State Bar of New Mexico by Chief Disciplinary Counsel William D. Slease complete dismissal, explicitly finding no actionable attorney misconduct. Found Childers was not a client.



# The Disciplinary Board

AN AGENCY OF THE SUPREME COURT OF THE
STATE OF NEW MEXICO

Mailing Address:
P.O. Box 1809
Albuquerque, NM 87103-1809

20 First Plaza, Ste. 710
Albuquerque, NM  87102

Phone (505) 842-5781 • Facsimile (505) 766-6833

## CONFIDENTIAL
January 13, 2014

**Letter of Caution**
Jeffrey D. Moffatt, Esq.
43625 N. Sierra Hwy, Suite A
Lancaster, CA  93534

Re:    Complaint by Lisa Childers

Dear Mr. Moffatt:

By copy of a separate letter you now know that the complaint against you by Ms. Childers has been dismissed by this office.  That is not to say that we do not have serious concerns with your conduct or that we agree with your position that this office has no jurisdiction over you.  Consequently, in closing this matter, I am issuing you this letter of caution.

You do not dispute that there was an email exchange between you and Ms. Childers in which she sought legal services from you.  This is not, as you offer in your December 30, 2013 letter, "the mere brush by of a New Mexico resident" with an out-of-state lawyer who happened to be asked to consider providing legal services to a New Mexico resident. You engaged in a fairly lengthy email exchange with Ms. Childers and asked in your email exchange for "docs" so that you could get started on Ms. Childers' legal matter.  *See* your email to Ms. Childers of October 11, 2013 at 11:57 a.m.  You also asked for a "thumbnail of the problem so that [you] can start working on it." *Id.* at 3:46 p.m.  Additionally you sought a retainer from Ms. Childers and when she said she had no funds you offered to accept a nude photo of Ms. Childers suggesting that "pics buys time. Physical attention will be bartered." *Id.* at 1:50 p.m.  *See also* your email to Ms. Childers of October 11, 2013 at 12:03 p.m. ("[l]ets (sic) just call it what I want. Yes I want a nude"); and at 1:15 p.m. ("which way are we going, pic, cash, physical?").  Indeed, you offered to "collect the physical when [you were] in town later this year." *Id.* at 1:05 p.m.

The sum of your communication makes it clear that, at a minimum, you discussed with Ms. Childers the possibility of forming an attorney-client relationship making Ms. Childers, at a minimum, a prospective client under Rule 16-118 NMRA.  Again, because you did much more than receive an unsolicited request for the provision of legal services

Jeffrey D. Moffatt, Esq.
January 13, 2014
Page 2 of 2

but, in fact, engaged in a discussion about providing such services in New Mexico to a New Mexico resident you are subject to the jurisdiction of the New Mexico Supreme Court and the New Mexico Disciplinary Board. *See* Rule 17-201 NMRA

It does not appear, however, that an attorney-client relationship was subsequently formed. Nevertheless, I remain concerned that you do not appreciate the problem with your conduct. In fact, your correspondence to this office evidences a shocking lack of remorse or embarrassment for your admitted solicitation of a nude photograph and some type of physical contact or relationship with a woman in exchange for legal services. If you had formed an attorney-client relationship with Ms. Childers your conduct would have likely violated Rule 16-107 NMRA (representing a client when the personal interest of the lawyer results in an impermissible concurrent conflict of interest), Rule 16-300 NMRA ("in the course of any judicial or quasi-judicial proceeding before a tribunal, a lawyer shall refrain from intentionally manifesting, by words or conduct, bias or prejudice based on . . . gender. . ."), Rule 16-404(A) NMRA ('[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay or burden a third person . . .") and Rule 16-804(D) (engaging in conduct that is prejudicial to the administration of justice by manifesting bias or prejudice based upon sex in the course of representing a client). It is only because you did not appear to form an actual attorney-client relationship that this office has decided not to pursue disciplinary charges against you at this time. I am hopeful, however, that you will actually reflect upon your conduct, realize how inappropriate it was and refrain from such conduct in the future.

This is an official Letter of Caution issued pursuant to Rule 17-105(B)(3)(b) of the New Mexico Supreme Court Rules Governing Discipline. It is not a matter of public record, and does not involve a finding of misconduct under the New Mexico Rules of Professional Conduct. Be advised, however, that we may consider re-opening this matter in the event additional complaints are received alleging similar misconduct or additional information is brought to our attention which would warrant further investigation. Otherwise, should inquiry be made regarding the disposition of any complaints filed against you and accompanied by your written waiver or confidentiality, the person making such inquiry will be told only that this complaint was dismissed. Again, it is hoped, however, that the criticism and suggestions contained herein will be viewed by you as constructive and utilized to avoid further problems.

Sincerely,

William D. Slease
Chief Disciplinary Counsel



## The Disciplinary Board

AN AGENCY OF THE SUPREME COURT OF THE
STATE OF NEW MEXICO

Mailing Address:
P.O. Box 1809
Albuquerque, NM 87103-1809

20 First Plaza, Ste. 710
Albuquerque, NM 87102

Phone (505) 842-5781 • Facsimile (505) 766-6833

CONFIDENTIAL
January 13, 2014

Lisa Childers
1504 S. Country Club Circle
Carlsbad, NM 88220

     Re:    Your complaint against Jeffrey D. Moffatt, Esq.

Dear Ms. Childers:

The office of disciplinary counsel has looked into your complaint against Jeffrey D. Moffatt, Esq. Although we do have serious concerns with Mr. Moffat's actions that we are addressing with him by way of a separate letter, under the circumstances we are not pursuing formal disciplinary action against him and are dismissing your complaint.

You consulted with Mr. Moffatt, who is not a New Mexico licensed attorney, concerning his possible representation of you in some tax matters. In the course of discussing the possibility of him undertaking your representation, Mr. Moffat solicited from you a nude photograph and suggested some type of physical relationship or contact. We agree that this is highly offense and inappropriate. However, Mr. Moffatt never formed an attorney-client relationship with you and, therefore, the duties he owed to you are quite limited: primarily he is prohibited from revealing your confidences. The other Rules of Professional Conduct that might arguably address your circumstances, and provide us with a basis upon which to charge Mr. Moffatt, are not implicated in this matter because it does not appear that there was an attorney-client relationship formed.

Accordingly, the Disciplinary Board will be taking no further action. If you do not understand the reasons for this dismissal and wish to have the decision to dismiss this complaint reviewed by a member of the Disciplinary Board, you may submit a written request for review to this office. If the Disciplinary Board member feels that additional investigation is warranted, he or she will order the file reopened for that purpose. The Board member's authority does not, however, extend to ordering that disciplinary action be taken.

Thank you.

Sincerely,

William D. Slease
Chief Disciplinary Counsel

cc:    Disciplinary Board Chair
       Jeffrey D. Moffatt. Esq.

# EXHIBIT X, LIST OF PAYMENTS NOT MADE TO MOFFATT LISTED AS NA

## SSA Payments to Defendant After Disbarment (4/6/2016)

| Claimant Name | Payment | Payment Date | Date of False Representation Regarding Disbarment After 4/6/2016 |
|---|---|---|---|
| 1.  Perez, Enriquez | | | 4/19/2016 |
| 2.  Mann, Scott | | | 7/5/2016 |
| 3.  Singleton, Rodney | N/A | 3/18/2019 | 7/18/2016 |
| 4.  Briseno, Josefina | $3,968.00 | 10/19/2018 | 9/9/2016 |
| 5.  Kane, Marcellus | $5,282.90 | 12/11/2018 | 9/12/2016 |
| 6.  Golden, Cindy | | | 10/4/2016 |
| 7.  Anguino, Roberto | | | 10/20/2016 |
| 8.  Lopez, Alvaro | | | 12/7/2016 |
| 9.  Brown, Anthony | | | 1/5/2017 |
| 10. Matthews, Izaiah | $2,602.39 | 11/4/2019 | 1/24/2017 |
| 11. Rubio, Darin | | | 1/27/2017 |
| 12. Walters, Alyssa | $5,903.00 | 1/6/2020 | 2/9/2017 |
| 13. Walters, Cassandra | | | 2/9/2017 |
| 14. Walters, David | | | 2/9/2017 |
| 15. Leard, Micheal | $5,905.00 | 4/25/2019 | 3/9/2017 |
| 16. Card, Steven | $5,907.00 | 9/19/2018 | 3/15/2017 |
| 17. Loya, John | $5,905.00 | 3/12/2019 | 4/3/2017 |
| 18. Griego, Venus | | | 4/4/2017 |
| 19. Kennedy, Demond | | | 4/4/2017 |
| 20. Sterret, Oscar | | | 4/6/2017 |
| 21. Acosta, Joseph | | | 4/20/2017 |
| 22. Dickinson, Harvey | $5,905.00 | 3/8/2019 | 4/27/2017 |
| 23. Weeks, Alan | N/A | 9/13/2023 | 5/1/2017 |
| 24. Grace, Larry | | | 5/2/2017 |
| 25. Leahy, Michael | | | 5/9/2017 |
| 26. Slaughter, Sharelle | $5,903.00 | 2/3/2020 | 5/11/2017 |
| 27. Bennett, Kaiaja | | | 5/15/2017 |
| 28. Garcia, Josefina | $5,907.00 | 3/8/2018 | 5/24/2017 |
| 29. Chacon, Ana | | | 6/30/2017 |
| 30. Taggart, Steven | | | 7/3/2017 |
| 31. Moore, Gloriastine | $5,905.00 | 3/7/2019 | 7/13/2017 |
| 32. EL Ayass, Ghanem | $5,909.00 | 8/16/2017 | 7/18/2017 |
| 33. Belmley, Ephraine | $5,907.00 | 2/7/2018 | 8/1/2017 |
| 34. Rodriguez, Leonardo | | | 8/3/2017 |
| 35. Gearhart, Joy | $5,905.00 | 5/19/2021 | 8/15/2017 |
| 36. Robinson, Madyson | | | 8/22/2017 |

Redact Names. = ID761814.29

158 ~ limited Purpose per Judge.

Exhibit 158
Page 1 of 2

| Claimant Name | Payment | Payment Date | Date of False Representation Regarding Disbarment After 4/6/2016 |
|---|---|---|---|
| 37. Slavinski, Dale | $1,850.00 | 2/16/2018 | 10/5/2017 |
| 38. Hernandez, Nehrujr | | | 12/27/2017 |
| 39. Hernandez, Jessica | | | 12/28/2017 |
| 40. Zapata, Joshua | | | 1/10/2018 |
| 41. Lang, Mia | | | 1/17/2018 |
| 42. Lockhart, Arthur | | | 1/24/2018 |
| 43. Martinez, Emilia | $2,743.50 | 3/19/2018 | 2/6/2018 |
| 44. Rafala, Sebastian | $5,903.00 | 3/25/2020 | 2/6/2018 |
| 45. Martinez, Julian | $5,242.02 | 12/11/2018 | 2/14/2018 |
| 46. Rakisits, Craig | | | 3/6/2018 |
| 47. McNair, Jeren | | | 3/12/2018 |
| 48. Owens, John | | | 3/12/2018 |
| 49. Bell, Dawn | | | 3/26/2018 |
| 50. Lewis, Tyaun | $5,907.00 | 10/16/2018 | 5/14/2018 |
| 51. Robedeaux , Cole | | | 6/7/2018 |
| 52. Smith, Antoine | $5,907.00 | 11/7/2018 | 6/13/2018 |
| 53. Brandon, Kymora | | | 8/20/2018 |
| 54. Sampson, Breanna | $5,903.00 | 1/6/2020 | 8/22/2018 |
| 55. Custer, Patricia | $1,211.45 | 11/13/2018 | 8/23/2018 |
| 56. Thomas, Kristy | | | 9/13/2018 |
| 57. James, Rashid | | | 9/17/2018 |
| 58. Baker, Afton | | | 11/16/2018 |
| 59. Skinner, Tamara | N/A | 10/5/2020 | 11/26/2018 |
| 60. Kopanski, Wayne | $5,905.00 | 9/14/2020 | 11/28/2018 |
| 61. Dewey, Martha | $1,476.25 | 9/22/2020 | 1/22/2019 |
| 62. Carlton, Lisa | | | 1/31/2019 |
| 63. Barber, Herbert | $1,563.50 | 9/1/2021 | 3/14/2019 |
| 64. Castillo, Lisa | | | 3/25/2019 |
| 65. Stewart, Donna E | $5,905.00 | 2/3/2020 | 4/03/2019 |
| Total | $126,331.01 | | |

Exhibit 158
Page 2 of 2

Exhibit AA


Offer from the government after trial offering no
incarceration

This browser version is no longer supported. Please upgrade to a supported browser.                                                                          Learn More



Date: Tue, Nov 4, 2025, 10:16 AM
Subject: RE: [EXTERNAL] OFFER IN COMPROMISE – REDUCTION TO MISDEMEANOR
To: Jeffrey Moffatt <jeffreydeanjustin@gmail.com>, Lachman, David (USACAC) <David.Lachman@usdoj.gov>

Mr. Moffatt,

We have considered your request.  The government will not disturb the jury verdict and reduce your conviction from a felony to a misdemeanor.  However, we are prepared to seek approval to extend a post-conviction sentencing agreement you that would offer significant benefits.

In the contemplated agreement, the government would agree not to retry you on the wire fraud counts (Counts 1-5) for which a mistrial was declared, and would also agree to seek a 4-level variance at sentencing.  The 4-level variance at sentencing would reduce your Guidelines range to 0-6 months, and would make you eligible for a sentence of probation without any incarceration.  The government would further agree to recommend a sentence of probation to the Court.  In exchange, you would agree to waive all post-conviction motions, appeals, and collateral attacks.

As I noted, we do not yet have approval to extend this agreement, but will seek approval if you would accept these terms. Please let us know by **noon** on **November 6, 2025**.

Thank you,
Nisha

Reply      Forward

Exhibit CC

Email documentation from Attorney Diaz that a thumbdrive was provided to him by 10 3 2025. Moffatt received the thumbdrive on the first day of trial 10 6 2025.

 **Gmail**

Jeffrey Moffatt <jeffreydeanjustin@gmail.com>

## Moffatt matter
2 messages

**Jeffrey Moffatt** <jeffreydeanjustin@gmail.com>                                      Sun, Oct 5, 2025 at 7:19 PM
To: Humberto Diaz <JHDiazLaw@gmail.com>, Star Moffatt <starmoffatt@gmail.com>

10 5 2025 Please file this for me
Ex parte application to request suppression hearing and set aside trial date

--
*Dr. Jeffrey Moffatt "Retired" Federal Attorney*

Telephone No.: (661) 435-2417  CONFIDENTIALITY NOTICE:  This e-mail and any attached documents contain
information, which is PRIVILEGED, PROPRIETARY and CONFIDENTIAL, are protected by the Electronic
Communications Privacy Act, 18 U.S.C. Sections 2510-2521

 **Exparte applitation to request supp;ression hearing and set aside trial date .pdf**
104K

**Humberto Diaz** <jhdiazlaw@gmail.com>                                         Sun, Oct 5, 2025 at 8:18 PM
To: Jeffrey Moffatt <jeffreydeanjustin@gmail.com>

Mr. Moffatt, I filed your application already.  I also received a thumbdrive from the prosecutors.  I will
have that in my office tomorrow, if you want to send somebody to get it from me.

I will email you the trial exhibits, and will do so 10 at a time, to avoid overloading your email

**LAW OFFICES OF HUMBERTO DIAZ**
714 West Olympic Blvd., Suite 610
Los Angeles, CA  90015
tel:  213/745-7477
cell:  818/484-1799
fax:  213/745-7447
JHDiazLaw@gmail.com

[Quoted text hidden]